Monitoring requirements are specified at the end of Chapter 2 (p. 2-27 to 2-31) of the Final EIS. These monitoring items are adopted as part of this decision and will be implemented. Each monitoring item describes what the item is, where it is to occur, when it is to occur, how it will occur, and the intended use of the monitoring information. Monitoring activities may reveal results that deviate from planned effects, in which case corrective actions are prescribed.

The Petersburg District Ranger is responsible for ensuring that project implementation, mitigation, monitoring, and enforcement are accomplished as specified in the Final EIS.

# Findings Required By Law

**National Forest Management Act**

The National Forest Management Act (NFMA) requires specific determinations in this Record of Decision: consistency with existing Forest Plans and Regional Guides, a determination of clearcutting as the optimal method of harvesting, and specific authorization of clearcuts over 100 acres in size.

**Tongass Land Management Plan and Alaska Regional Guide -** This decision is consistent with the Alaska Regional Guide and the Tongass Land Management Plan (1979 as amended). I have reviewed the management direction, standards and guidelines, and the schedule of activities for the VCUs included in the Selected Alternative, and find the Selected Alternative to be consistent with these elements. The areas of undisturbed old-growth wildlife habitat maintained in this Alternative exceed the standards for retention established in the TLMP.

**Clearcutting as the Optimal Method of Harvesting -**Of the 51 harvest units planned in the Selected Alternative, 43 units have a stand management objective of timber production accomplished by a single regeneration harvest. These units will include green tree retention and result in conversion to a predominantly even-aged stand. The remaining eight units have a stand objective of uneven-aged management.

For the eight harvest units with stand objectives of uneven-aged management, the silvicultural prescriptions are as follows: six units (104,108,118,122,124 and 147) will employ group selection, one unit (150) is planned as a sanitation harvest and unit 111 is a partial cut. A more detailed discussion of each of these units can be found in Appendix A of the Final EIS.

The remaining 43 harvest units will have an even-aged management (clear cutting with reserves) silvicultural prescription. These units will have either reserve tree clump(s) approximately 0.5 to 1 acre in size or individual green trees remaining after harvest. The clumps or individual trees will be designated at the time of harvest. These clumps/trees will be selected for windfirmness, the relative absence of disease and dwarf mistletoe, wildlife attributes, noncommercial value, and freedom from insects. See Appendix A (Unit Descriptions) of the Final EIS for a detailed description of each unit.

I have determined that the use of clearcutting with reserves to achieve the unit objectives is the optimal silvicultural method for this project for the following reasons:

1) The use of clearcutting with reserves will meet the objective of maintaining fast-growing, dwarf mistletoe-free stands of mixed species and is the optimum method of harvesting considering the following factors referenced in the Alaska Regional Guide:

   - The thin bark and shallow roots of hemlock and spruce make them particularly susceptible to logging injury which leads to decay and mortality. Losses from decay fungi are high, especially in the old-growth forests of Alaska. Conversion from old-growth to young growth by clearcutting has the greatest potential for reducing decay.

   - Hemlock dwarf mistletoe, *Arceuthobium tsugense*, a common disease of western hemlock, can be best controlled by clearcutting. Elimination of residual overstory trees infected with dwarf mistletoe minimizes infection of western hemlock regeneration in the new stand.

   - Exposure to the sun raises soil temperature, which speeds decomposition and nutrient cycling, thereby improving the productivity of the sites.

   - Clearcutting favors regeneration of Sitka spruce by destroying much of the advanced hemlock regeneration and by creating more favorable conditions for spruce regeneration.

   - The risk of blowdown within residual stands is eliminated. The chance of blowdown along cutting boundaries is increased but can be reduced through proper design of cutting units.

   - Natural regeneration of spruce and hemlock is increased after clearcutting.

   - Logging costs are lower than with other silvicultural systems.

2) Clearcutting with individual green tree retention should minimize the potential for logging injury to the residual stand with its subsequent increased mortality and decay. It will provide for natural regeneration and growth of desired trees including a greater component of spruce and cedar which are less shade tolerant than hemlock. This may increase the vegetative diversity of the stand.

**Harvest Openings Over 100 Acres in Size** - There are no harvest openings over 100 acres proposed for this project. Unit 147 in the Selected Alternative is identified as a stand 112 acres in size, however only 17 acres out of the 112 will be harvested, due to the group selection prescription.

**Tongass Timber Reform Act**

Harvest units were designed and located to maintain a minimum 100-foot buffer zone for all Class I streams and Class II streams which flow directly into Class I streams as required in Section 103 of the TTRA. As discussed in Appendix A of the Final EIS, the actual widths of these buffer strips will often be greater than the 100-foot minimum. The design and implementation direction for the Selected Alternative incorporate Best Management Practices (BMPs) for protection of all stream classes.

**Endangered Species Act**

Actions authorized in the Selected Alternative are not anticipated to have a direct, indirect, or cumulative effect on any threatened, or endangered species in the South Lindenberg Project Area. The U.S. Fish and Wildlife Service and the National Marine Fisheries Service have concurred with the conclusion of the Petersburg Ranger District wildlife biologist that the actions described within the proposed project are not likely to adversely affect threatened and endangered species. A complete biological assessment is included in the planning record for this project. I have determined that this action will not have any adverse impacts on any threatened or endangered species.

**Bald Eagle Protection Act**

Management activities within 330 feet of an eagle nest site are restricted by a Memorandum of Understanding (MOU) between the Forest Service and the U.S. Fish and Wildlife Service to facilitate compliance with the Bald Eagle Protection Act. The Selected Alternative is not anticipated to have a significant direct, indirect, or cumulative effect on any bald eagle habitat.

**Clean Water Act**

The design of harvest units and roads for the Selected Alternative were guided by standards, guidelines, and direction contained in the current Tongass Land Management Plan, Alaska Regional Guide, and applicable Forest Service manuals and handbooks. The Unit Description Cards (see Appendix A) and Road Description Cards (see Appendix B) contain specific details on practices prescribed to prevent or reduce non-point sediment sources. Reasonable implementation with site specific application and monitoring of approved BMPs is expected to comply with applicable State Water Quality Standards Regulations.

These regulations provide for variances from anti-degradation requirements and water quality criteria. The harvest and road building operators will be responsible for compliance, including obtaining any variance required by the State, and will be monitored for compliance by the Forest Service. The Forest Service expects the South Lindenberg Timber Sale(s) Project Area activities to fully qualify for any variance required by the State, according to the criteria in 18 AAC 70.015.

All roads, landings, and rock pits for this project will be designed to a minimum standard to accommodate timber harvesting and silvicultural activities and will be constructed and/or reconstructed in accordance with Federal Best Management Practices listed at 33 CFR 323.4(a). Therefore, no permits under Section 404 of the Clean Water Act are required.

### National Historic Preservation Act

Cultural resource surveys of various intensities have been conducted in the Project Area. The State Historic Preservation Officer has been consulted, and I have complied with the provisions of 36 CFR part 800. I have determined that there will be no significant effects on cultural resources.

### Federal Cave Resource Protection Act of 1988

The actions in the Selected Alternative will not have a direct, indirect, or cumulative effect on any significant cave in the South Lindenberg Project Area. No cave resources have been documented in the Project Area and no caves were discovered during field work done for this analysis.

### ANILCA Section 810, Subsistence Evaluation and Findings

A subsistence evaluation was conducted for the five alternatives considered in detail for the proposed action in accordance with ANILCA Section 810. An ANILCA Section 810 hearing was held in Petersburg on August 28, 1996. During the hearings, subsistence concerns were expressed by people giving testimony.

The evaluation of comments from the public, subsistence hearing testimony, and additional analysis, indicates that the potential foreseeable effects from the action alternatives in the South Lindenberg Project Area do not indicate a significant possibility of a significant restriction of subsistence uses for black bear, furbearers, marine mammals, waterfowl, salmon, other finfish, shellfish, and other foods such as berries and roots.

However, there may be a significant possibility of a significant restriction of subsistence use of Sitka black-tailed deer based on projected past, present and reasonably foreseeable activities in the project area. Implementation of the Selected Alternative by itself does not present a significant possibility of a significant restriction to subsistence use of deer. The project's effects on restricting subsistence use of deer are minimal. The Selected Alternative projects a reduction in deer habitat capability in the future of approximately 5 percent. Subsistence hunters will have increased access to deer in the interior of the island. The Selected Alternative will not change competition between subsistence and non-subsistence hunters. Subsistence needs in the communities are currently being met. This restriction exists regardless of which alternative is implemented, including the No Action Alternative, because of the anticipated human population growth with its associated increase in subsistence hunter demand for deer which will exceed the habitat capability to produce the desired number of deer. This possibility of restriction of subsistence use would most likely affect the rural communities of Petersburg, Wrangell, and Kupreanof, which have documented use of various subsistence resources within the analysis area.

**Subsistence Determinations** - Section 810 (a)(3) of ANILCA requires that when a use, occupancy, or disposition of public lands would significantly restrict subsistence uses, determinations must be made that (1) the significant restriction of subsistence uses is necessary, consistent with sound management of public lands, (2) the proposed activity involves the minimum amount of public lands necessary, and (3) reasonable steps will be taken to minimize adverse impacts on subsistence uses and subsistence resources resulting from the action.

**Necessary, Consistent with Sound Management of Public Land** - The Selected Alternative has been examined to determine whether the associated potential restriction to subsistence use is necessary, consistent with the sound management of public lands. Standards used for the review include (1) the National Forest Management Act of 1976 and its implementing regulations; (2) the Alaska National Interest Lands Conservation Act (ANILCA) 1980; (3) the Alaska Regional Guide (1983); (4) the Tongass Land Management Plan and Draft Revision; (5) the Tongass Timber Reform Act (TTRA) 1990; (6) the Alaska State Forest Practices Act; (7) the Alaska Coastal Management Program; (8) Multiple Use Sustained Yield Act (1960); and (9) Subsistence Management and Use Handbook (FSH 2609.25).

ANILCA places an emphasis on the maintenance of subsistence resources and lifestyles. However, the Act also provides for adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people and recognized public lands necessary and appropriate for more intensive uses. The Act also requires the Forest Service to make available for harvest 4.5 billion board feet of timber per decade from the Tongass National Forest. TTRA removes the 4.5 billion board foot requirement from ANILCA, but directs the Forest Service to seek to meet market demand for timber to the extent consistent while providing for the multiple use and sustained yield of all renewable forest resources, and subject to applicable law.

The Selected Alternative is necessary as a component of the timber management program designed to implement the Forest Plan and to meet TTRA direction. There is currently a market demand for timber, a limited timber supply from other sources, and an underutilized mill capacity in the region. Current timber demand appears to exceed supply. The volume from the Selected Alternative is a component of the 10-year timber sale schedule which attempts to provide timber to industry in a even-flow over the planning cycle. The timber volume is also a substantial component of the timber sale program to be offered in 1997 on the Stikine Area to meet annual market demand. Timber volume from other areas of the National Forest is not readily available to replace this volume within a reasonable timeframe.

Of the action alternatives, the Selected Alternative best meets the objectives of Forest Plan and TTRA direction while also providing protection measures for forest resources. It is consistent with the Forest Plan and laws, regulations, policies, public needs, and the capabilities of the land.

Based on a review of the subsistence hearing testimony and the analysis conducted in the Final EIS, it is apparent that all of the action alternatives involve some potential impact to subsistence deer use in the future. Based on the analysis of the information presented in this document on the proposed alternatives, and on the guidance provided by the documents listed above, these actions are considered necessary, consistent with sound management of public lands.

Therefore, based on the analysis of the information presented in the Final EIS, it is my determination that the Selected Alternative is necessary, consistent with sound management of public lands and strikes the best balance between meeting the needs of the public and protecting the forest resources.

**Amount of Land Necessary to Accomplish the Purpose of the Proposed Action** - The amount of public land involved to implement the Selected Alternative (considering sound multiple-use management of public lands) is the minimum necessary.

The Selected Alternative provides a sound harvest unit and road design. It is located as the next logical extension of the existing road system. The minimum amount of land and roading was used to resolve resource concerns while meeting the purpose and need for this project in a practical and efficient manner. The Selected Alternative harvests only 2.9 percent of the land area and 5.6 percent of the commercial forest land in the study area. Resources were protected to the maximum extent practicable.

Choosing an alternative other than the Selected Alternative (including the No Action Alternative) or locating harvest in another location on Kupreanof Island would not avoid or substantially lessen the risk to subsistence use in the future. The total deer habitat capability projected into the future is only expected to be reduced by approximately 5.0 percent by harvest from the Selected Alternative when compared to the No Action Alternative. The risk to subsistence use in the future is primarily related to the anticipated human population growth with its increased subsistence hunting demand. This population growth is independent of the South Lindenberg project.

The deer habitat quality in the South Lindenberg Area is relatively poor. If timber harvest was shifted to other areas of the Tongass it would likely occur on higher value deer habitat which could result in more of a negative effect on future deer habitat capability on a forest-wide basis.

The entire Tongass National Forest is used by one or more rural communities for subsistence deer hunting purposes. The areas of most subsistence use forest-wide are the areas adjacent to existing road systems, beaches, and the areas in close proximity to communities. Management activities cannot completely avoid these subsistence areas due to their location and broad extent across the forest. Areas other than subsistence use areas that could be harvested may be limited by other resource concerns such as soil and water protection, high-value wildlife habitat, economics, visuals, or unit and road design. The impact of viable timber harvest projects always includes alteration of old-growth habitat which reduces habitat capability for old-growth dependent species. It is not possible to lessen harvest in one area and concentrate it in another without impacting one or more rural communities' important subsistence use areas. In addition, harvestable populations of game species could not be maintained in a natural distribution across the forest if harvest were concentrated in specific areas. A well-distributed population of species is also required by the Forest Service regulations implementing the National Forest Management Act (NFMA).

It is my determination that the Selected Alternative involves the minimum amount of public lands necessary and strikes the best balance between meeting the needs of the public and protecting the forest resources.

**Reasonable Steps to Minimize Adverse Impacts Upon Subsistence Uses and Resources -**
Considerable steps were taken to minimize adverse impacts to subsistence uses and resources. The Selected Alternative reflects special efforts to minimize the effects on subsistence resources used by those rural communities that would be most likely to receive the highest priority for game in the event of an ANILCA Section 804 "Tier II" restriction.

Much effort was taken during the South Lindenberg analysis to protect the highest value subsistence areas. Impacts to subsistence have been minimized through the development of individual harvest units and roads and through the formulation of the alternatives.

The deer habitat is relatively poor in the South Lindenberg Area compared to other areas on the Tongass. Less than 1 percent of the habitat is considered "good," none of which will be harvested in the Selected Alternative.

One of the most significant subsistence resources in the analysis area is salmon. Fish habitat is protected in the Selected Alternative through the application of the BMPs and stream buffers. In addition to protecting fish habitat, these buffers also protect estuarine and riparian habitat important to other species such as deer, black bear, and furbearers.

Chapter 2 describes the standards, guidelines and mitigation measures that will be implemented as part of the Selected Alternative. Most of the standards, guidelines and mitigation measures are designed to maintain fish and wildlife habitat productivity at as high a level as possible, while still maintaining a supply of timber.

It is my determination that reasonable measures to minimize impacts on subsistence have been adopted to the maximum extent practicable while still meeting the purpose and need for this project.

## Coastal Zone Management Act

The Coastal Zone Management Act of 1972 (CZMA), while specifically excluding Federal lands from the coastal zone, requires that a Federal agency's activities be consistent with the enforceable standards of a state's coastal management program to the maximum extent practicable when the agency's activities affect the coastal zone.

The enforceable standards for timber harvest activities are found in the State Forest Practices Act. The standards and guidelines for timber management activities in the South Lindenberg Project Area meet or exceed the standards in the State Forest Practices Act.

The Alaska Division of Governmental Coordination did a consistency review of our determination for Alternative 5 in the Draft EIS. The recommendations contained in this review have been addressed in Appendix E of the Final EIS. I have determined that the proposed activities are consistent with the Alaska Coastal Management Program to the maximum extent practicable.

# Executive Orders

**EO 11988** - Executive Order 11988 directs Federal agencies to take action to avoid, to the extent possible, the long and short-term adverse impacts associated with the occupancy and modification of floodplains. The numerous streams in the South Lindenberg Project Area make it impossible to avoid all floodplains during timber harvest and road construction. The design of the proposed developments and the application of Best Management Practices combine to minimize adverse impacts on floodplains.

**EO 11990** - Executive Order 11990 requires Federal agencies to avoid, to the extent possible, the long and short-term adverse impacts associated with the destruction or modification of wetlands. Soil moisture regimes and vegetation on some wetlands may be altered in some cases; however, these altered acres would still be classified as wetlands and function as wetlands in the ecosystem.

Less than one percent of the forested wetlands within the project area will be affected by proposed harvest units in the Selected Alternative.

**EO 12962** - Executive Order 12962 of June 7, 1995, directs Federal agencies to conserve, restore, and enhance aquatic systems to provide for increased recreational fishing opportunities nationwide. Section 1 of the Executive Order is most pertinent to the proposed activity. Section 1 directs Federal agencies to evaluate effects on aquatic ecosystems and recreational fisheries, develop and encourage partnerships, promote restoration, provide access, and promote awareness of opportunities for recreational fishery resources.

The effects of this project have been evaluated throughout the Final EIS, including effects to aquatic and recreational fisheries.

Partnerships are continuing to be used to leverage Federal project funds to address water quality concerns in areas of the Tongass National Forest, although none have been proposed for recreational fisheries in conjunction with this project.

Under the Selected Alternative, road access would provide recreational fishing opportunities at a number of small streams and lakes. Most recreational fishing is expected to remain at saltwater, however, so the impact of improved access on recreational fishing opportunities is expected to be minor.

**EO 12898** - Executive Order 12898 directs Federal agencies to identify and address the issue of environmental justice, i.e. adverse human health and environmental effects of agency programs that disproportionately impact minority and low income populations. Implementation of the Selected Alternative will not cause adverse health or environmental effects that disproportionately impact minority or low income populations.

## Federal and State Permits

Federal and State permits necessary to implement the authorized activities are listed at the end of Chapter 1 of the Final EIS.

## Implementation Process

Implementation of this decision may occur no sooner than 30 days after the date of publication of the Notice of Availability of the Final EIS in the Federal Register, or 52 days following publication of the legal notice of the decision in the *Petersburg Pilot,* published in Petersburg, Alaska, whichever is later. The first timber sale from this project is planned to be offered in the fall of 1997.

This project will be implemented in accordance with Forest Service Manual and Handbook direction for Timber Sale Project Implementation in FSM 2431.3 and FSH 2409.24. This direction provides a bridge between project planning and implementation and will ensure execution of the actions, environmental standards, and mitigation approved by this decision, and compliance with TTRA and other laws. All Best Management Practices (BMP's) will be applied to the Selected Alternative.

Implementation of all activities authorized by this Record of Decision will be monitored to ensure that they are carried out as planned and described in the Final EIS.

Appendix A of the Final EIS contains Harvest Unit Design Cards and Appendix B contains Road Design Cards. These cards are an integral part of this decision because they document the specific resource concerns, management objectives, and mitigation measures to govern the layout of the harvest units and construction of roads. These cards will be used during the implementation process to assure that all aspects of the project are implemented within applicable standards and guidelines and that resource impacts will not be greater than those described in the Final EIS. Similar cards will be used to document any changes to the planned layout as the actual layout and harvest of the units occurs with project implementation.

The implementation record for this project will display each harvest unit, transportation facility, and other project components as actually implemented, any proposed changes to the design, location, standards, and guidelines, or other mitigation measures for the project, and the decisions on the proposed changes.

## Procedure for Changes During Implementation

Proposed changes to the authorized project actions will be subject to the requirements of the National Environmental Policy Act (NEPA), the National Forest Management Act of 1976 (NFMA), Section 810 of the Alaska National Interest Lands Conservation Act, the Tongass Timber Reform Act (TTRA), the Coastal Zone Management Act (CZMA), and other laws concerning such changes.

In determining whether and what kind of NEPA action is required, the Forest Supervisor will consider the criteria for whether to supplement an existing Environmental Impact Statement (EIS) in 40 CFR 1502.9(c), and FSH 1909.15, sec. 18, and in particular, whether the proposed change is a substantial change to the Selected Alternative as planned and already approved, and whether the change is relevant to environmental concerns. Connected or interrelated proposed changes regarding particular areas of specific activities will be considered together in making this determination. The cumulative impacts of these changes will also be considered.

The intent of field verification is to confirm inventory data and to determine the feasibility and general design and location of a unit or road, not to locate final boundaries or road locations. Minor changes are expected during implementation to better meet on-site resource management and protection objectives. Minor adjustments to unit boundaries are also likely during final layout for the purpose of improving logging system efficiency. This will usually entail adjusting the boundary to coincide with logical logging setting boundaries. Many of these minor changes will not present sufficient potential impacts to require any specific documentation or other action to comply with applicable laws. Some minor changes may still require appropriate analysis and documentation to comply with FSH 1909.15, sec. 18.

# Right to Appeal

This decision is subject to administrative appeal. Organizations or members of the general public may appeal this decision according to Title 36 Code of Federal Regulations (CFR) 215. The appeal must be filed within 45 days of the date that legal notification of this decision is published in the Petersburg Pilot, the official newspaper of record. The Notice of Appeal must be filed in duplicate with:

> Phil Janik, Regional Forester
> Forest Service
> U.S. Department of Agriculture
> P.O. Box 21628
> Juneau, AK 99802-1628

It is the responsibility of those who appeal a decision to provide the Regional Forester sufficient written evidence and rationale to show why the decision by the Forest Supervisor should be changed or reversed. This written Notice of Appeal must:

1. State that the document is a Notice of Appeal filed pursuant to 36 CFR Part 215;
2. List the name, address, and, if possible, the telephone number of appellant;
3. Identify the decision document by title and subject, date of the decision, and name and title of the Responsible Official;
4. Identify the specific change(s) in the decision that the appellant seeks or portion of the decision to which the appellant objects;
5. State how the Responsible Official's decision fails to consider comments previously provided, either before or during the comment period specified in 36 CFR 215.6 and, if applicable, how the appellant believes the decision violates law, regulation, or policy.

For additional information concerning this decision, contact Jim A. Thompson, Forest Service Interdisciplinary Team Leader, Petersburg Ranger District, P.O. Box 1328, Petersburg, AK 99833, or call (907) 772-3871.

_____
ABIGAIL R. KIMBELL
Forest Supervisor, Stikine Area
Tongass National Forest

Dec. 14, 1996
Date