AGREEMENT MADE AND ENTERED INTO THE 21ST DAY OF FEBRUARY, 1997,
BY AND BETWEEN THE UNITED STATES; UNITED STATES DEPARTMENT OF
AGRICULTURE, FOREST SERVICE; KETCHIKAN PULP COMPANY AND
LOUISIANA-PACIFIC CORPORATION

## AGREEMENT

THIS AGREEMENT ("Agreement"), made and entered into this 21st day of February, 1997, by and between the United States; United States Department of Agriculture, Forest Service ("Forest Service"); Ketchikan Pulp Company ("KPC") and, solely for the purposes set forth in paragraph 21(b), Louisiana-Pacific Corporation ("LP"), WITNESSETH:

Whereas the parties desire to resolve outstanding takings, contractual and environmental issues in a way which will permit a smooth transition to future management of the Tongass National Forest and provide for continued operations of the sawmills that KPC operates at Ketchikan and Metlakatla, Alaska ("Sawmills") during the next three years, protecting both jobs and the environment in Southeast Alaska, the parties agree as follows:

DEFINITIONS

a.  "Contract" means the long-term timber sale contract (#A10fs-1042) between KPC and the United States, as that contract earlier was modified by agreement of KPC and the United States prior to the Tongass Timber Reform Act of 1990 (TTRA), and as that contract was further modified by Congress in the TTRA and its text revised by the Secretary of Agriculture pursuant to the TTRA, and as the parties through parts I, II, III, IV, and VI of this

Agreement (including offering packages for each Specified Offering) now further modify it.

b. "United States" means the United States of America, including its agencies, departments, and instrumentalities.

I. TIMBER HARVEST

1. Modification of Long-Term Contract: The Contract, including those offerings listed in paragraph 2 herein, is modified to terminate on December 31, 1999, and shall not be subject to renewal or extension, but may be subject to Offering Term Adjustment as set forth below. Offerings other than those listed in paragraph 2 are hereby closed except for KPC's timely completion of required clean-up work, and except for settling of the Timber Sale Account pursuant to B9.6. During the term of operations under this Agreement, the contracting officer shall adjust the Contract and offering termination date to the extent required by B8.21 of the Contract for a period not to exceed one Normal Operating Season as defined in the Contract (i.e., to October 31, 2000).

2. Specified Offerings: The United States shall make available for harvest under the Contract the following offerings ("Specified Offerings"). The remaining obligation of the United

2

States to make timber available under the Contract is limited to the Specified Offerings:

    a.   Offering No. 17 (South Margaret)

    b.   Offering No. 22 (Trumpeter 6)

    c.   Offering No. 23 (Chin Point/Bushy Point)

    d.   Offering No. 16 (Slide/Lava Creek)

    e.   Offering No. 25 (East Polk)

    f.   Offering No. 26 (Thorne Bay II)

    g.   Offering No. 31 (Klu/Hassler/Shrimp)

    h.   Offering No. 32 (North Thorne/Little Ratz)

    i.   Offering No. 33 (Big Dewey)

    j.   Offering No. 35 (West Polk)

    k.   Offering No. 24 (Little Coal Bay)

    l.   Offering No. 34 (Naukati/Sarkar)

    m.   Offering No. 36 (East Twelve Mile)

The Forest Service has deleted the timber included within Timber Harvest Unit 588-327 of the Big Dewey offering, Offering No. 33, to assure compliance with the proportionality requirements of section 301(c)(2) of the TTRA. The Forest Service has deleted the timber included within Timber Harvest Units 738-8030, 739-9002, 739-9003, and 739-9068 of the Chin Point/Bushy Point offering, Offering No.

3

23, and will locate the boundary of Timber Harvest Unit 738-8063 at least 1000 feet from shoreline to provide resource protection.

The Forest Service has reviewed all of the Specified Offerings in consultation with the United States Fish and Wildlife Service, and no additional deletions for resource protection are contemplated or foreseen, other than minor modifications made in the ordinary course of administration of timber contracts pursuant to B2.37 and B8.3 of the Contract.

3.    Relinquishment of Rights to Other Timber:    Other than the Specified Offerings, KPC and LP relinquish any rights they may possess under the Contract to receive any timber under the Contract including but not limited to the following offerings:

   a. Offering No. 28 (Neka I)

   b. Offering No. 20 (Crab Bay I)

   c. Offering No. 21 (In between)

Any rights of KPC and LP to receive any timber under the Contract other than the Specified Offerings are hereby cancelled.

4.    Forest Service Provision of Timber, Acceptance by KPC, Modifications by Forest Service:

   a.    The Forest Service shall provide the Specified Offerings to KPC under the terms and conditions in the offering packages for

4

such offerings, including environmental protection, and in accordance with the provisions of this Agreement regarding timber harvest and pricing as set forth in Attachments A-1 through A-13. This Agreement, including Attachments A-1 through A-13 and Attachment B (Attachment B is KPC's general plan of operations), constitutes both the logging/construction approval notice pursuant to CT 6.312 and the general plan of operation approval pursuant to B6.3. However, Forest Service approval of this general plan of operations is limited to those portions of the plan which do not conflict with requirements under the Contract such as timing windows and other environmental restrictions. KPC shall be deemed to have accepted the Specified Offerings and modifications agreed to herein as of the date of this Agreement and shall make full stumpage payment by the due date established in the bill for collection.

b.    The Forest Service may unilaterally modify or cancel a Specified Offering only to the extent necessary in order (1) to comply with a federal court order or a court-approved settlement agreement, or (2) to comply with a federal statute or regulation. In addition, the Forest Service may cancel or modify one or more Specified Offerings if a permanent injunction issues enjoining

5

operations under an offering or parts thereof unless and until the Forest Service prepares an environmental impact statement (EIS) or supplemental environmental impact statement (SEIS) and:

(i).  The volume of unharvested timber for which the EIS or SEIS would be prepared is less than 10 million board feet (MMBF), or

(ii).  The permanent injunction issues on or after June 30, 1998, or

(iii).  An injunction or injunctions issue requiring three or more EISs or SEISs to be prepared on the remaining specified timber.

In the event that the Forest Service modifies or cancels one or more Specified Offering(s) under this paragraph 4b, the Forest Service shall pay KPC for the modified or cancelled Specified Offering(s) only out-of-pocket expenses and the payments specified in paragraph 13b(ii) of this Agreement.  Out-of-pocket expenses are only the following and no others:  stumpage paid for timber not in fact removed, mobilization and demobilization of equipment, mobilization and demobilization of camps (if temporary/mobile), felling and bucking, lopping, skidding, decking, temporary roads without purchaser credit, landing construction and

6

other temporary facilities without purchaser credit, costs of holding contracts, and advance cash deposits. Out-of-pocket expenses will be determined from Forest Service appraisal cost estimates for the affected Specified Offering(s), the value of which has not been amortized or otherwise recovered by harvest of timber. Payment of out-of-pocket expenses shall be made promptly upon closure of the affected Specified Offering(s) which have been cancelled. Out-of-pocket expenses under paragraph 4b for Specified Offering(s) which have been modified but not cancelled shall be paid promptly after modification has been made.

5.    Harvest, Removal and Processing of Timber:

KPC shall harvest, remove and process the timber included in the Specified Offerings ("Included Timber") in accordance with the terms of the Contract, including this Agreement, the offering packages, and the approved general plan of operation (Attachments A-1 through A-13 and B). KPC shall perform offering closure requirements in accordance with the terms of the offering packages for the Specified Offerings.

KPC shall no later than 20 days after the effective date of this Agreement purchase and deliver to the Contracting Officer a performance bond in the amount of five million dollars ($5,000,000)

7

to secure its performance under the Contract.   The performance bond
will remain in effect until the Contracting Officer determines in
writing that KPC has fully complied with the terms of the Contract.
Upon request by KPC, the Contracting Officer may at any time in the
United States' unreviewable discretion reduce the amount of the
performance bond required.


6.   Employment:

     a.   To process the Included Timber, for the three years
starting on July 1, 1997, KPC will maintain a combined average
employment at its Sawmills of at least 195,000 person-hours per
year so as to achieve cumulative total employment of at least
585,000 person-hours over the three years.   This number of
employment hours may be distributed between the Sawmills at KPC's
discretion.   In addition, the parties expect that timber harvest,
road building and related activities (including contractor
employment) will provide approximately 325 additional jobs annually
during the next three Normal Operating Seasons.   Nothing in this
Agreement prevents the creation of additional employment, including
if KPC acquires additional timber through the independent timber
sale program or elsewhere.   KPC shall provide documentation

8

annually to the Forest Supervisor of the Ketchikan Area regarding the number of actual employment hours paid at the Sawmills and KPC's best estimate of additional employment created in timber harvest, road building and related activities.

b.   It is the intent that the employment requirements of paragraph 6a will produce jobs at the Sawmills.  If KPC does not provide 585,000 person hours of employment required by paragraph 6a (subject to the provisions in paragraphs 7d, 7e and 7f relating to proportional reduction in the person/hour employment requirements), KPC shall relinquish to the United States its right to the five million dollar ($5,000,000) payment provided in paragraph 13c.


7.   Force Majeure:

a.   Force majeure events may prevent or delay performance of one or more contractual obligations.  Except as provided in subparagraphs 7b, 7c, 7d, 7e, or 7f of this Agreement, KPC's relief shall be limited to the relief in B8.21 of the Contract, provided that the total Offering Term Adjustment shall not exceed one Normal Operating Season (i.e., such adjustments may not extend beyond October 31, 2000).  Force majeure events shall not include market fluctuations or increases in operating costs.

9

b.  If KPC is entitled to an Offering Term Adjustment pursuant to B8.21 of the Contract, any portion of the harvest and removal of Included Timber which cannot be completed by virtue of the limitation against Offering Term Adjustments beyond October 31, 2000 shall be cancelled as of November 1, 2000.  In the case of such cancellation, the Forest Service shall promptly pay KPC for the cancelled Specified Offering(s) or portions thereof only out-of-pocket expenses as defined in paragraph 4b of this Agreement and the payments specified in paragraph 13b(ii) of this Agreement.

c.  If (for reasons other than breach or non-compliance by KPC) an order of a court of competent jurisdiction, court-approved settlement agreement, Forest Service notice to suspend, or other agency administrative order prohibits activities such that, for a period of 120 or more consecutive days during the Normal Operating Season, harvest operations cannot be conducted at the rate of at least 10 MMBF per month during the Normal Operating Season, then KPC shall have the right to cancel all of the remaining offerings in total.  The determination of the availability of 10 MMBF per month will be made by the Contracting Officer utilizing Forest Service volume estimates shown on the A5c tables of the relevant offering packages and based on a revised general plan of operations

10

(B6.3) as agreed by the Forest Service and KPC after the operations are suspended.  KPC's right of election to cancel shall not continue beyond thirty days after the date of cessation of the order(s) giving rise to that right of election.

In the event that KPC elects to cancel all the Specified Offerings under this subparagraph, the Forest Service shall promptly pay KPC for the cancelled Specified Offerings only out-of-pocket expenses, as defined in paragraph 4b of this Agreement, and the payments specified in paragraph 13b(ii) of this Agreement.

d.  The employment requirements set forth in paragraph 6 of this Agreement shall be reduced proportionately for unavoidable delays and reductions in volume harvested beyond KPC's control resulting from the inability of KPC to harvest Included Timber by reason of:

(i)  an order by a court of competent jurisdiction or a court-approved settlement agreement other than for breach or non-compliance;

(ii)  suspensions of operations or stays or other orders of the Forest Service or other agencies, other than for breach or non-compliance; and

11

Exhibit 6, page 12 of 35

(iii)    cancellations under paragraphs 4b, 7b and 7c of this Agreement.

To the extent that KPC receives an Offering Term Adjustment for delay in harvest or processing of Included Timber, KPC will receive an equivalent adjustment in the time available for satisfaction of the employment requirements set forth in paragraph 6a.

e.    CT3.32 and B8.33 of the Contract shall control rate redeterminations and modifications due to catastrophic damage to the Included Timber. KPC will be entitled to a proportionate reduction in the paragraph 6a employment requirements to the extent that catastrophic damage to Included Timber results in a reduced volume of sawlog timber.

f.    If a catastrophic event destroys one or both of the Sawmills, or if there is a termination of the Annette Hemlock Mill lease pursuant to the rental adjustment provisions thereof (provided that KPC does not provide notice of termination prior to March 10, 1999), KPC must meet the processing and employment obligations specified in this Agreement at facilities in Southeast Alaska. If there is insufficient capacity at a competitive domestic price, as determined by the Contracting Officer, to

12

process the Included Timber in Southeast Alaska, the Forest Service shall consider permitting export of the timber for which there is no such capacity in Southeast Alaska, permitting additional time to meet the employment obligations at an alternate facility in Southeast Alaska, or both.

## II.   TIMBER PRICING

8.   Rates to be Charged:  The comparable price adjustment (CPA) as required in Section 301(c)(8) of the TTRA has been calculated based upon the average annual CPA charged for volume removed during the three years prior to the effective date of this Agreement.  The average CPA is $10.36 per thousand board feet.  KPC and the Forest Service hereby adopt this amount as the CPA for all Specified Offerings under this Agreement.  This CPA is added to the current contract rates in effect on the effective date of this Agreement to establish the stumpage obligation to be reflected in the bill for collection provided for in paragraph 4a.  No further CPA or emergency rate redetermination or any other adjustments to rates shall be made for the duration of the Contract except for rate redeterminations pursuant to paragraph 7e of this Agreement.  If the Forest Service approves changes to harvest systems to improve

13

safety, efficiency or both, no rate redetermination will be made as a result of such change(s). The Forest Service retains unreviewable discretion whether to approve such changes and nothing in this Agreement in any way obligates the Forest Service to do so.

III. TIMBER EXPORT

9. Export of Chips and Manufacturing By-Products: KPC may export chips and manufacturing by-products from the State of Alaska, and no additional permits from the Forest Service will be required for such exports.

10. Export of Logs

a. KPC shall increase the amount of western redcedar sawlogs processed or sold for processing in Alaska annually to at least 20% of the harvested volume of included western redcedar sawlogs meeting A2 specifications. The Forest Service determines that the in-state processing of 20% will satisfy statutory and regulatory criteria for approval for export of National Forest System timber from Alaska. The Forest Service authorizes the export of 80% of the western redcedar volume harvested annually. As part of its annual report on timber exports, KPC shall provide documentation of

14

domestic processing of 20% of the merchantable western redcedar harvested.

   b.   KPC may export Alaska yellow cedar logs which already have been appraised to export markets and utility-grade logs of other species, upon obtaining the written consent of the Regional Forester or designated representative.  The Regional Forester or designated representative shall make decisions on export pursuant to B0.15 of the Contract.

IV.  TAKINGS AND CONTRACT CLAIMS

11.  Releases by KPC and LP:  KPC and LP release, waive and abandon the following:

   a.   all claims, demands, counterclaims and offsets which KPC, LP or both may now possess against the United States relating to the rights and obligations under the Contract;

   b.   all claims, demands, counterclaims and offsets which KPC, LP or both may possess, or may acquire, against the United States relating to any modifications to the Contract declared by Congress in the TTRA, or revisions to the text of the Contract made by the Secretary pursuant to the TTRA, or made through this Agreement; and

   c.   all claims, demands, counterclaims and offsets which KPC, LP or both have asserted, or could have asserted, against the

15

United States in Case No. 95-463C, Nos. 94-96C & 95-775C (Consoli-
dated), and No. 95-816C in the United States Court of Federal
Claims, including demands for costs or attorneys' fees.

d.    Nothing in this paragraph releases any claim by KPC or LP
for breach of this Agreement.

12. Releases by the United States: Except as provided in Section
V herein, the United States releases, waives and abandons the
following:

a.    all claims, demands, counterclaims, and offsets which the
United States may now possess against KPC, LP or both, relating to
the rights and obligations under the Contract;

b.    all contract claims, demands, counterclaims and offsets
and other actions, whether legal or administrative, relating to or
arising in any way out of the earlier announcement that the KPC
Pulp Mill will be closed in March, 1997, which the United States
may possess, or may acquire, against KPC, LP or both, against their
or either of their officers, directors and shareholders, including
but not limited to actions for suspension and debarment;

c.    all claims, demands, counterclaims and offsets which the
United States has asserted, or could have asserted, against KPC

16

and/or LP in Case No. 95-463C, Nos. 94-96C & 95-775C (Consolidated) and No. 95-816C in the United States Court of Federal Claims.

d.   Nothing in this paragraph releases any civil action, claim or demand, if any, arising from or relating to fraud or violation of the False Claims Act, whether or not the action, demand or claim was raised or could have been raised in the cases referenced in paragraph 12c.

e.   Nothing in this paragraph releases any claim by the United States for breach of this Agreement.

13.  <u>Payment by United States to KPC</u>:

a.   In consideration of this settlement, the United States shall pay to KPC the sum of one hundred thirty-five million dollars ($135,000,000). *The United States will make payment pursuant to a Stipulation for Entry of Final Judgment in <u>Ketchikan Pulp Company v. United States</u>, Nos. 95-463C, 94-96C & 95-775C (Consolidated), and 95-816C (Fed.Cl.).*

b.   (i)  KPC shall be entitled to refund of above-base-rate cash payments previously paid for harvested timber (and to be paid pursuant to this Agreement) equal to Purchaser Credit earned by the construction of *Specified Roads and Specified transportation facilities for Specified Offerings* to the same extent KPC would

17

have been entitled to such refund but for the provisions of this
Agreement limiting the remaining volume requirements under the
Contract.

(ii)    In the event that one or more of the Specified
Offerings is cancelled or modified pursuant to paragraph 4 or
paragraph 7 of this Agreement prior to completion of the Specified
Roads and Specified transportation facilities in the affected
Specified Offering(s), the United States shall pay to KPC promptly
after closure of the cancelled or modified offering(s), 50% of the
Purchaser Credit that would have been earned but for the cancel-
lation or modification, for the uncompleted portions of the
Specified Roads and Specified transportation facilities, had those
uncompleted portions been completed, not to exceed twelve million
five hundred thousand dollars ($12,500,000).

c.    Subject only to the relinquishment provision of Paragraph
6b, the United States shall pay promptly to KPC an additional five
million dollars ($5,000,000) after KPC has met its obligations to
provide employment under Paragraph 6a, or as those obligations are
reduced or discharged by cancellation pursuant to Paragraph 7, but
in no event shall such payment be made prior to January 1, 2000.

18

14.  Stipulation for Entry of Judgment in Pending Cases in United
States Court of Federal Claims:  Within ten days of the effective
date of this Agreement, counsel for KPC and the United States shall
file the Stipulations for Entry of Final Judgment attached hereto
as Attachment C in Case No. 95-463C, Nos. 94-96C & 95-775C
(Consolidated), and No. 95-816C in the United States Court of
Federal Claims.

V.   ENVIRONMENTAL OBLIGATIONS

15.  Environmental Obligations and Liabilities of KPC:  KPC has and
will accrue obligations and/or liabilities under environmental laws
including but not limited to the Clean Water Act, 33 U.S.C. §§ 1251
et seq.; the Clean Air Act, as amended, 42 U.S.C. §§ 7401 et seq.;
the Comprehensive Environmental Response, Compensation, and
Liability Act of 1980, as amended, 42 U.S.C. §§ 9601 et seq.; the
Resource Conservation and Recovery Act of 1976, as amended, 42
U.S.C. §§ 6901 et seq.; and the Toxic Substances Control Act, 15
U.S.C. §§ 2601 et seq.; and under the applicable terms of the Con-
tract (Environmental Obligations).  Environmental Obligations that
need to be addressed include, but are not limited to, those that
may pertain at the following locations:

19

a.   the Thorne Bay Landfills facility;

b.   the Pulp Mill facility at Ward Cove, including KPC's
     continuing obligations under the civil consent decree in
     United States v. Ketchikan Pulp Co., Civil No. A92-587
     (D. Alaska);

c.   the Sawmill facilities at Ward Cove and at Metlakatla;
     and

d.   the logging camps and log transfer facilities utilized by
     KPC pursuant to the Contract (listed in Attachment D).

16.   Reporting Requirements:   KPC and the United States will
work together to identify and address Environmental Obligations as
they arise through development of administrative orders on consent,
administrative agreements, consent decrees, or through other means.
KPC will report on March 31, June 30, September 30, and December 31
each year to the Environment and Natural Resources Division of the
United States Department of Justice on the status of its compliance
with Environmental Obligations, including those that arise after
the effective date of this Agreement, as follows:

(a) as required to be reported to any agency under state or federal
environmental law, (b) with respect to any cleanup activities that
are not otherwise reported under 16a, and (c) those Environmental

20

Obligations about which the United States has requested reporting from KPC. If KPC ceases to exist or otherwise fails to provide the reports, LP shall file such reports on behalf of KPC.

17. LP's Performance of Environmental Obligations:

a.   LP hereby guarantees unconditionally that if KPC becomes unable to fulfill its Environmental Obligations by reason of bankruptcy, or the liquidation or dissolution of KPC as a separate corporation, LP shall perform or otherwise satisfy the remaining KPC Environmental Obligations on behalf of KPC. .

b.   If KPC fails to comply with Environmental Obligation(s) imposed by final administrative order or court order (except as provided in paragraphs 17c and 17d) (unless compliance is stayed by court or administrative order), then LP, upon notice by the United States, shall perform or otherwise satisfy such Environmental Obligation(s) on behalf of KPC. The United States' notice shall specify the particular court or administrative order that LP must perform, limited to the terms of a specified order(s). LP's performance will not affect KPC's other Environmental Obligations.

21

c. The provisions of Paragraph 17b do not apply to KPC's or LP's obligations under United States v. Ketchikan Pulp Company, No. A95-025CR (D. Alaska), which remain unchanged.

d. If any agency issues a unilateral administrative order to KPC under Section 106 of CERCLA, LP's obligation to perform under the conditions set forth in paragraph 17b does not arise until a court issues a substantive order against KPC related to compliance with the unilateral administrative order.

e. Paragraph 17 shall not increase, diminish, or otherwise affect the applicability or operation of the suspension, listing, and debarment laws and regulations of the United States or civil or criminal laws of the United States as they pertain to LP. Nothing in this Agreement alters the status of the parent/subsidiary relationship between KPC and LP. In the event LP under this provision is required to perform any of KPC's Environmental Obligations, the United States may exercise all its rights and remedies under the environmental laws against LP with respect to LP's acts and omissions from the point that LP is required by paragraph 17 to perform. LP reserves the right to assert any defenses or pursue any remedies that may be available to itself or to KPC under the environmental laws, except that LP may not

22

relitigate before courts or administrative agencies orders or issues already litigated or settled by KPC except to the extent that KPC could do so.

f. LP enters into this paragraph 17 voluntarily as part of an overall settlement of this matter, and under paragraph 17 may be required to perform Environmental Obligations for which it is not otherwise responsible under applicable law.

g. Except as set forth in paragraph 17a or 17b, or provided by applicable law, KPC (rather than LP) remains the party primarily responsible for performing or otherwise satisfying Environmental Obligations.

18. Financial Assurance:

a. As evidence of financial assurance for LP's guarantee as set forth in Paragraph 17, LP shall provide to the United States within 15 days of the effective date of this Agreement the following information derived from LP's 1995 audited financial statement: (1) LP's current commercial paper rating from Standard and Poor's, (2) LP's tangible net worth, and (3) LP's total assets in the United States.

b. As evidence of financial assurance for LP's guarantee as set forth in Paragraph 17, LP shall provide to the United States by

23

March 31, 1997 a letter signed by LP's chief financial officer
containing the following information derived from LP's 1996 audited
financial statement: (1) LP's current commercial paper rating from
Standard and Poor's, (2) LP's tangible net worth, and (3) LP's
total assets in the United States. That letter shall be provided
in a form acceptable to the United States and consistent with
paragraph 18f.

    c.  By April 30, 1997, LP's chief financial officer shall
provide to the United States:

    1.  a copy of an independent certified public accoun-
tant's report on examination of LP's financial statements for
fiscal year 1996; and

    2.  a special report from LP's independent certified
public accountant to LP's chief financial officer that: (a) the
independent certified public accountant has compared the financial
data which the letter in paragraph 18b from LP's chief financial
officer to the United States specifies as having been derived from
the independently audited, year-end financial statements for fiscal
year 1996 with the amounts in such financial statements, and (b) in
connection with that procedure, no matters came to her or his

24

attention which caused her or him to believe that the specified data should be adjusted.

d.   As ongoing evidence of financial assurance for LP's guarantee as set forth in Paragraph 17, LP shall provide to the United States by April 30 of each year after 1997 that this paragraph is in effect the following information derived from LP's audited financial statement for the preceding fiscal year: (1) LP's current commercial paper or bond rating from Standard and Poor's or Moody's, (2) LP's tangible net worth, and (3) LP's total assets in the United States.

e.   Also by April 30 of each year that this paragraph is in effect after 1997, LP's chief financial officer shall provide to the United States:

1.   a copy of an independent certified public accountant's report on examination of LP's financial statements for the preceding fiscal year; and

2.   a special report from LP's independent certified public accountant to LP's chief financial officer that: (a) the independent certified public accountant has compared the financial data which the letter in paragraph 18b from LP's chief financial officer to the United States specifies as having been derived from

25

the independently audited, year-end financial statements for the preceding fiscal year with the amounts in such financial statements for the preceding fiscal year, and (b) in connection with that procedure, no matters came to her or his attention which caused her or him to believe that the specified data should be adjusted.

f.   The United States shall annually assess LP's financial information against the following criteria:

1.   LP's bond rating for its most recent bond issuance: AAA, AA, A or BBB as issued by Standard Poor's or Aaa, Aa or Baa as issued by Moody's, or if LP has no bonds, then LP's commercial paper rating: A1+, A1, A2, A3 as issued by Standard and Poor's.

2.   tangible net worth:   not less than four hundred million dollars ($400,000,000); and

3.   total assets in the United States: not less than four hundred million dollars ($400,000,000).

g.   The United States may, based upon a reasonable belief that LP may no longer meet the requirements of this paragraph, require reports of financial condition at any time from LP in addition to those specified in paragraphs 18b, 18c, and 18d. If the United States finds, on the basis of such reports or other information that LP no longer meets the requirements of subpara-

26

graph 18f, LP must provide alternate financial assurance as specified in paragraph 18h within 30 days after the United States notifies LP of such a finding.

h.    If the United States or LP determines that LP is unable to meet the financial test criteria set forth in paragraph 18f, LP shall provide notice to the Environment and Natural Resources Division of the Department of Justice by April 30 of that year, by certified mail, and will, by May 31 of that year, provide an irrevocable letter of credit to the United States in the amount of twenty million dollars ($20,000,000) which shall be renewed annually, or reinstated annually if the twenty million dollars ($20,000,000) is drawn upon by the United States.  The letter of credit shall substantially conform to the requirements found in 40 C.F.R. § 264.143(d).

i.    If LP is able to demonstrate, through any subsequent showing, that it meets all the financial test criteria set forth in paragraph 18f, and the United States agrees in writing, then LP may discontinue any letter of credit established under this agreement.

j.    The United States may disallow use of paragraph 18f assurance on the basis of qualifications in the opinion expressed by the independent certified public accountant in her or his report

27

on examination of LP's financial statements. An adverse opinion or a disclaimer of opinion will be cause for disallowance; the United States will evaluate other qualifications on an individual basis. If the United States notifies LP that it is disallowing use of paragraph 18f assurance, LP must provide alternate financial assurance as specified in paragraph 18h within 30 days after such notification.

k. LP will be obligated to comply with the requirements of paragraph 18 until such time as all KPC's Environmental Obligations have been addressed or until such time as the parties may agree in writing, whichever is earlier.

19. Nothing in this Part V affects the authority of the United States or its agencies regarding the Environmental Obligations.

20. The United States shall be entitled to stipulated penalties of five thousand dollars ($5,000) per day for any failure to submit reports as required by paragraph 18, after a grace period of thirty days.

Exhibit 6, page 29 of 35

## VI. MISCELLANEOUS PROVISIONS

21.  Parties Bound:

a.  This agreement binds KPC, the United States, the Forest Service, and LP as specified in paragraph 21b, including their officers, agents, successors and assigns.

b.  LP is bound solely to the definitions paragraphs, paragraphs 3, 11, 12, 13 and Parts V and VI of the Agreement.

c.  LP hereby guarantees unconditionally that if KPC becomes unable to perform its obligation(s) under this Agreement (other than the Environmental Obligations, which are controlled by paragraph 17) by reason of bankruptcy, or the liquidation and dissolution of KPC as a separate corporation, or does not perform its obligations for any other reason not excused under this Agreement, LP shall perform the remaining obligations of KPC hereunder existing at the time KPC becomes unable to perform or does not perform. This subparagraph shall not increase, diminish, or otherwise affect the applicability or operation of the suspension, listing, and debarment laws and regulations of the United States or civil or criminal laws of the United States as they pertain to LP, except with respect to LP's contract liability to

29

perform under this paragraph. Nothing in this Agreement alters the status of the parent/subsidiary relationship between KPC and LP.

22. _Agreement not Related to Any Income Tax Issue_: This Agreement is in no way related to or concerned with income or other taxes for which KPC or LP are now liable or may be liable in the future as a result of this Agreement.

23. _Purpose of Agreement_: This Agreement is entered into for the sole purpose of settling certain outstanding contract and taking issues and assuring KPC's compliance with environmental laws and resolution of environmental issues. This Agreement shall not be evidence, cited, or otherwise relied on in any other administrative appeal or legal proceeding, whether administrative or judicial in nature, in which the signing entities have or may acquire an interest, except as is necessary: to evidence the terms of this Agreement; to evidence that the signing entities entered the terms of this Agreement; and to effectuate the terms of this Agreement. This Agreement shall not be evidence of any allegations raised by any party in any case, a waiver by, or an admission against any signing entity for any purpose other than effectuating the terms of this Agreement.

30

24.  No Admission of Liability:  This Agreement does not constitute an admission of liability and will not prejudice or otherwise affect the rights of any of the signing entities with respect to any other litigation or factual situation except as expressly provided herein.

25.  No Third-Party Beneficiary Rights:  All rights created under this agreement are limited to the parties.  No third-party beneficiary rights are created by this Agreement.

26.  Regulations and Unappropriated Funds:  Nothing in this Agreement shall be construed to deprive any federal official of authority to revise, amend, or promulgate regulations.  Nothing in this Agreement shall be construed to commit any federal official to expend funds not appropriated by Congress.

27.  Disputes Clause:  All disputes relating to Parts I, II,  III and IV of this Agreement and those provisions of Part VI relevant to contract issues shall be governed by the Contract Disputes Act, 41 U.S.C. 601 et seq.  Part V of this Agreement and those provisions of Part VI relevant to environmental obligations shall be enforceable as an agreement entered into to resolve potential litigation under federal environmental laws.

31

28.  Integration Clause:  This written Agreement, including Attachments A-1 through A-13, B, C, and D, constitutes the entire agreement among the signing entities.

29.  Provisions of Contract Remain in Effect Except as Modified or Inconsistent:  Except as modified by or inconsistent with this Agreement, all provisions of the Contract as it existed immediately prior to this Agreement remain in effect.  Clauses or parts thereof in the Contract as it existed immediately prior to this Agreement which are inconsistent with this Agreement or the offering packages referenced in paragraph 4a of this Agreement shall have no force and effect.

30.  Authority to Execute Agreement:.  Each signatory to the Agreement represents that s/he has the authority to sign and to commit to the Agreement the entity on whose behalf s/he signs.

31.  Effective Date of Agreement:  The effective date of this agreement shall be February 21, 1997.  The representatives of the parties indicated in the signature blocks for the Attachments to this Agreement shall sign those documents within ten days after the effective date of this agreement.

32.  Execution in Counterparts:  This Agreement may be executed in any number of counterparts and by any combination of the signing

32

entities in separate counterparts, each of which counterparts shall

be deemed to be an original and all of which taken together shall

constitute one and the same agreement.


_____          _____
Ralph D Lewis, President                  Date
for Ketchikan Pulp Company


_____          _____
James R. Lyons, Undersecretary for        Date
Natural Resources and the Environment
U. S. Department of Agriculture
for USDA Forest Service


_____          _____
Mark A. Suwyn, Chief Executive Officer    Date
for Louisiana-Pacific Corporation
Pursuant to Paragraph 21(b)


_____          _____
Lois J. Schiffer                          Date
for the United States


_____          _____
David M. Cohen                            Date
for the United States


33

**Exhibit 6, page 34 of 35**

entities in separate counterparts, each of which counterparts shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

_____          _____
Ralph D Lewis, President                    Date
for Ketchikan Pulp Company


_____          _____
James R. Lyons, Undersecretary for          Date
Natural Resources and the Environment
U. S. Department of Agriculture
for USDA Forest Service


_____          _____
Mark A. Suwyn, Chief Executive Officer      2/21/97
for Louisiana-Pacific Corporation            Date
Pursuant to Paragraph 21(b)


_____          _____
Lois J. Schiffer                              Date
for the United States


_____          _____
David M. Cohan                                Date
for the United States

33