FILED

MAR 2 3 2004

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA
By _____ Deputy

Thomas S. Waldo
Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801-1145
Phone: (907) 586-2751
Fax: (907) 463-5891

Nathaniel S. W. Lawrence
NATURAL RESOURCES DEFENSE COUNCIL
3723 Holiday Drive, SE
Olympia, WA 98501
Phone: (360) 570-9309
Fax: (360) 570-9310

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, SOUTHEAST ALASKA CONSERVATION COUNCIL, SIERRA CLUB, THE WILDERNESS SOCIETY, and CENTER FOR BIOLOGICAL DIVERSITY, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES FOREST SERVICE; UNITED STATES DEPARTMENT OF AGRICULTURE; MARK REY, in his official capacity as Under Secretary of Agriculture; DENNIS E. BSCHOR, in his official capacity as Alaska Regional Forester; and FORREST COLE, in his official capacity as Forest Supervisor for the Tongass National Forest. <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) Case No. **J 04 - 0 1 0   CV** ) ) ) ) ) ) ) ) ) ) ) |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
**(5 U.S.C. § 702; 16 U.S.C. § 1604; 16 U.S.C. § 539d; 42 U.S.C. § 4332)**

**INTRODUCTION**

1.   This action challenges the 1997 Tongass Land Management Plan Revision ("Tongass Plan"), including its Record of Decision and the Environmental Impact Statement (EIS) accompanying it.  This action also challenges a 2003 Record of Decision to proceed with the currently roadless portions of the Woodpecker timber sale, which implements the Tongass Plan.

2.   The Tongass Plan allocates about 3.6 million acres of the Tongass to land use designations that allow logging and roadbuilding, of which about 2.5 million acres are currently undeveloped and roadless.  The Woodpecker timber sale authorizes clearcut logging and roadbuilding in a roadless area of the Tongass.  Like other Tongass timber sales, the Woodpecker sale also approves logging of trees that are, on average, more valuable economically and for wildlife than the average timber available for logging in the Tongass Plan. This practice is unsustainable.

3.   Tongass roadless areas and the high-value stands of old growth forest authorized for logging in the Woodpecker project are important for wildlife, biological diversity, recreation and other natural resource uses.  The Tongass Plan and the Woodpecker timber sale do not adequately protect these resources, and the defendants have failed adequately to consider and disclose the adverse impacts of the plan and the timber sale.

4.   The plaintiffs are organizations whose members use the roadless areas of the Tongass, including the Woodpecker timber sale area, for recreation, subsistence and sport hunting and fishing, camping, photography, wildlife viewing, and other activities that depend on the natural old-growth forest values.  These organizations seek declaratory and injunctive relief preventing the Forest Service from proceeding with actions that cause harm to the environment, and thereby to their members, pending compliance with the law.

**Exhibit 21, page 2 of 27**

## JURISDICTION, RIGHT OF ACTION, AND VENUE

5.  This court has jurisdiction pursuant to 28 U.S.C. § 1331 and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-02.  Judicial review is available under the Administrative Procedure Act.  5 U.S.C. §§ 701-06.

6.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) and the Department of the Interior and Related Agencies Appropriations Act, 2004, Pub. L. No. 108-108, § 338 (2003).

## PLAINTIFFS

7.  The Natural Resources Defense Council (NRDC) is a non-profit organization dedicated to protection of the earth's environment.  NRDC has over 1,500 members in the State of Alaska and more than 550,000 members in all.  NRDC's involvement in conservation of the Tongass National Forest dates back almost to the organization's inception.

8.  Southeast Alaska Conservation Council (SEACC) is a nonprofit organization of 18 volunteer conservation groups in fourteen communities across the Southeast Alaska panhandle, from Yakutat to Ketchikan, and over 2000 individual members, the majority of whom live in Alaska.  SEACC advocates the conservation and wise long-term management of the scenic, wilderness, fish, wildlife, recreation, subsistence and other natural resources and values of southeast Alaska and the Tongass National Forest in particular.

9.  The Sierra Club is a national grassroots conservation organization.  The Sierra Club's members are 700,000 Americans, including about 1,850 Alaska residents, who are inspired by nature.  They explore, enjoy, and protect the wild places of the earth including the Tongass National Forest.  They practice and promote the responsible use of the earth's ecosystems and

**Exhibit 21, page 3 of 27**

resources.  For over a hundred years they have sought to educate and enlist humanity to protect and restore the quality of the natural and human environment.  In Southeast Alaska the Sierra Club is represented by the Juneau Group of the Sierra Club.  Sierra Club members reside in nearly every community of Southeast Alaska, from Yakutat to Ketchikan, and derive benefits and enjoyment from the natural environment and unlogged areas of the Tongass National Forest.

10.    The Wilderness Society, founded in 1935, is a national non-profit membership organization devoted to preserving wilderness and wildlife, protecting America's prime forests, parks, rivers, deserts, and shorelines, and fostering an American land ethic.  It has approximately 225,000 members nationwide, approximately 700 of whom live in Alaska.

11.    The Center for Biological Diversity (the Center) is a non-profit organization based in Tucson, Arizona with a regional office in Sitka, Alaska.  The Center works to protect wild places and their inhabitants.  The Center believes that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked.  It has been actively involved in protecting Alaska's wildlife since the early 1990's.  With regard to the Tongass National Forest, the Center has filed petitions to protect the Queen Charlotte goshawk and the Alexander Archipelago wolf under the Endangered Species Act.  The Center is still involved in active litigation over the fate of the goshawk, and carefully follows the fate of many other species that depend upon Tongass wildlands.  The Center has 7,500 members including some members who live in Southeast Alaska.

12.    The plaintiffs participate actively in the administrative processes established for management of the Tongass.  Various of the plaintiff groups have submitted comments on proposed actions and draft EISs for the Tongass Plan and for the Woodpecker timber sale.  Various of these groups have also filed appeals (including interventions and interested party

**Exhibit 21, page 4 of 27**

comments) of the Tongass Plan and of the 2003 Record of Decision for the Woodpecker timber sale.  The plaintiffs have exhausted administrative remedies for each of the decisions challenged in this complaint.

13.    Members of plaintiff organizations reside near, visit, or otherwise use and enjoy the Tongass National Forest, including the Woodpecker project area.  In particular, members of plaintiff organizations use these areas for recreation, subsistence and sport hunting and fishing, wildlife viewing, photography and education, and aesthetic and spiritual enjoyment.  The plaintiffs and their members derive scientific, recreational, aesthetic, and conservation benefits and enjoyment from these areas.  The logging authorized in the Woodpecker timber sale will directly and irreparably injure these interests.

14.    The plaintiff organizations monitor the use of forest ecosystems and compliance with the laws respecting these ecosystems, educate their members and the public concerning management of these ecosystems, and advocate policies and practices that conserve the natural value of these ecosystems.  It is impossible to achieve these organizational purposes fully without adequate information and public participation in the processes required by law.  The interests and organizational purposes of the plaintiffs are directly and irreparably injured by defendants' violations of the laws as described in this complaint.

## DEFENDANTS

15.    The full name of Defendant United States Forest Service is United States Department of Agriculture, Forest Service.  It is an agency of the Department of Agriculture entrusted with the administration of the national forests, including the Tongass.

16.     Defendant United States Department of Agriculture is the department of the executive branch responsible for overseeing the activities of the Forest Service.

17.     Mark Rey is sued in his official capacity as the Under Secretary, Natural Resources and Environment, United States Department of Agriculture

18.     Defendant Dennis E. Bschor is sued in his official capacity as US Forest Service Region 10 Regional Forester.

19.     Defendant Forrest Cole is sued in his official capacity as the Forest Supervisor for the Tongass National Forest.

## FACTS

Planning Process

20.     The Tongass National Forest in Southeast Alaska is this country's largest National Forest.  The Tongass contains the largest remaining expanse of unaltered coastal temperate rainforest ecosystem in the world.

21.     The National Forest Management Act (NFMA) requires the Forest Service to prepare and revise land and resource management plans for national forests.  16 U.S.C. § 1604. After a lengthy planning process, the Alaska Regional Forester signed a Record of Decision (ROD) for the Tongass Land Management Plan Revision in May 1997.  At that time, the Forest Service published the revised Land and Resource Management Plan for the Tongass National Forest, its associated Final Environmental Impact Statement (FEIS), and a Record of Decision selecting the management alternative to be implemented.

22.    The 1997 Tongass Plan established a maximum allowable sale quantity (ASQ) of 2.67 billion board-feet per decade, which is equivalent to an annual average of 267 million board-feet (mmbf) per year.

23.    Numerous groups and individuals filed administrative appeals of the Regional Forester's May 1997 decision.

24.    In April 1999, Under Secretary James Lyons resolved all administrative appeals and issued a final Record of Decision for implementation of the Tongass Land Management Plan. The final Record of Decision modified the May 1997 Record of Decision by reducing the ASQ to 1.87 billion board-feet per decade, which is equivalent to an annual average of 187 million board-feet per year. The final Record of Decision also identified 18 areas of special interest, mostly in roadless areas. The 1997 Tongass Plan had assigned these areas to land use designations that allowed logging. The final Record of Decision changed them to new designations that generally prohibit timber sales. The final Record of Decision also adopted new standards and guidelines to provide additional protection for wildlife.

25.    On March 31, 2001, the court vacated the 1999 Record of Decision in *Alaska Forest Association, et al., v. United States Department of Agriculture, et al.*, No. J99-0013 CV (JKS) (D. Alaska). The court also enjoined the Forest Service from implementing the 1999 Record of Decision and ordered the Forest Service to prepare a supplemental EIS addressing the changes from the 1997 Tongass Plan. However, the Forest Service never prepared a supplemental EIS to address those proposed changes. Instead, the agency has chosen to implement the 1997 Tongass Plan without the changes adopted by Under Secretary Lyons.

26.    The Forest Service has implemented the Tongass Plan with numerous decisions to authorize new timber sales. These decisions include (date of signing of Record of Decision

**Exhibit 21, page 7 of 27**

follows):  Woodpecker (September 12, 2003); Madan (July 31, 2003); Finger Mountain (June 20,

2003); Cholmondeley (April 23, 2003); Sea Level (May 3, 1999); Canal Hoya (April 1, 1999);

Crane and Rowan Mountain (June 30, 1998); and Chasina (April 27, 1998).  The Forest Service

prepared a site-specific EIS for each of these decisions.

     27.     The timber sale offerings approved under these EISs have caused and are

projected to cause adverse impacts to wildlife and other resources including visual quality,

roadless recreation, and subsistence and sport hunting.

Planning for Viable Populations of Wildlife

     28.     As part of formulating wildlife protections for possible use in the Tongass Plan,

the Forest Service, responding to congressional direction, assembled a group of prominent

scientists to provide peer review for protective strategies it was considering.  The primary

wildlife conservation strategy considered by the Forest Service at the time, like that eventually

adopted as a part of the Tongass Plan, was a system of reserves protecting a limited amount of

old growth habitat throughout the Forest.  This peer review group identified important

considerations for wildlife not proposed by the Forest Service, including the protection of large

unroaded, unlogged blocks of habitat, and the conservation of "high volume" forest stands.  The

peer review group ultimately concluded that the Forest Service's conservation strategy was not

adequate to protect old growth dependent wildlife.

     29.     High volume stands, characterized in part by the presence of large trees and

having special significance as wildlife habitat, are a relatively scarce resource in Southeast

Alaska.  They have been disproportionately targeted for logging by the Forest Service and on

**Exhibit 21, page 8 of 27**

lands adjacent to the Tongass by others, in an unsustainable and harmful practice known as "highgrading."

30.     Concerns over highgrading led Congress in 1990 to adopt protections for high volume stands.

31.     Scientific panels convened by the Forest Service evaluated the alternatives presented in the 1996 Revised Supplemental Draft EIS (RSDEIS) for the Tongass Plan for their effects on individual wildlife species and groups of related species.  Several of these panels rated alternatives similar to the one ultimately adopted as having a relatively low likelihood of maintaining viable populations of the species well-distributed throughout the Tongass.

32.     A majority of members of the scientific peer review group described in paragraph 29 above submitted a joint statement on the RSDEIS emphasizing the importance of preserving the Tongass' remaining large blocks of old growth, including undeveloped watersheds, from logging and of avoiding logging of high volume stands.  These scientists specifically identified the RSDEIS strategies as inadequate to ensure the continued viability of wildlife well-distributed in the Tongass.

33.     Public comments on the RSDEIS also requested that the Forest Service develop one or more alternatives that actively provided timber for industrial use but scheduled logging only outside of the remaining blocks of undeveloped old growth watersheds.

34.     The Forest Service convened scientific panels to evaluate the alternatives in the Tongass Plan's FEIS for their impacts on wildlife viability.  Once again, several of these panels rated the preferred and similar alternatives as having a relatively low likelihood of maintaining viable populations of the species well-distributed throughout the Tongass.

35.     The Forest Service made some adjustments to the FEIS's preferred alternative prior to adopting it as the Tongass Plan in the 1997 Record of Decision.  These adjustments did not, however, remedy the central defects identified by scientists and the public in the preferred alternative.

36.     The former scientific peer review members described in paragraph 29 above analyzed the Tongass Plan as adopted in 1997 and prepared a joint statement concluding that the plan would not ensure the continued viability of Tongass wildlife species, that continued logging and roading of existing large blocks of old growth, including undeveloped watersheds, was inconsistent with maintaining wildlife viability, and that high volume stands had to be maintained for wildlife.  This statement was submitted to the Forest Service during the administrative appeal process for the Tongass Plan.

37.     The Tongass Plan FEIS did not include information then available to the Forest Service about the significance and scarcity of high volume class forest stands in Southeast Alaska, the reduction in their numbers throughout the region by logging, and the likely impact of the FEIS alternatives on such stands and their associated values.

38.     The Tongass Plan FEIS analyzed the impacts of the various alternatives on forest "volume strata."  In so doing, the FEIS did not include information then available to the Forest Service about the original proportion of high strata stands in the region and their disproportionate loss to logging over time.

39.     The Tongass Plan FEIS analyzed the impacts of alternatives on volume strata on the assumption that each stratum would be logged in proportion to its occurrence on the Tongass.

40.     The Tongass Plan does not prohibit highgrading, or disproportionate logging, of volume strata or volume classes.  For the first decade of the Tongass Plan, the Forest Service

**Exhibit 21, page 10 of 27**

planned to log a disproportionate amount of high volume timber. For example, the Canal Hoya draft and final EISs state that "there is a disproportionate amount of harvesting planned within high-volume low-elevation stands – areas that also provide critical wildlife habitat and are the most valuable to several species of concern…."

41.    After the Tongass Plan was made final, the Forest Service through a separate process decided to protect all large, undeveloped portions of the Tongass, known as Inventoried Roadless Areas, from further logging, excepting projects already in the planning process or previously approved.

42.    Notwithstanding the decision described in paragraph 42 above, the Forest Service is planning to implement the Tongass Plan by logging in many of the Tongass' Inventoried Roadless Areas.

43.    Since the Tongass Plan was adopted, the Forest Service has continued to highgrade Tongass timber.

44.    The EISs for timber projects implementing the Tongass Plan do not contain information or analyses that adequately reveal the past history, significance, and impacts of highgrading.

45.    Recently the Forest Service has begun to offer timber sales that highgrade the Tongass' high value cedar stands.

46.    The EISs for timber projects that highgrade cedar do not reveal significant information available to the Forest Service about the possible consequences of this practice.

**Exhibit 21, page 11 of 27**

Tongass Plan Market Demand Analysis

47.    In making his decision adopting the 1997 Tongass Plan, the Alaska Regional Forester used a draft report projecting market demand prepared by Pacific Northwest Station economists Brooks and Haynes ("Timber Products Output and Timber Harvests in Alaska: Projections for 1997-2010" (Brooks and Haynes,  May 15, 1997)).  This draft report projected a market demand ranging from a low scenario in which harvest levels were between 65-72 mmbf/year to a high scenario in which harvest levels were between 136-206 mmbf/year over the thirteen-year period.

48.    The 1997 Record of Decision states that the demand projections contained in that draft are "for sawlogs suitable for producing lumber in Southeast Alaska mills."

49.    This statement is incorrect.  In fact, the projections encompass both sawlogs and utility logs.

50.    This error led to an assumption in the Tongass Plan decision that an annual logging level of between 130 mmbf and 296 mmbf would be needed to satisfy the projections in the May 15 Brooks and Haynes draft.

51.    In adopting a plan, the Regional Forester was, among other things, seeking to provide sufficient timber to meet market demand for the planning cycle, under 16 U.S.C. § 539d.

52.    The erroneous interpretation of the May 15 Brooks and Haynes draft caused the Regional Forester to seek to provide a supply of timber that was significantly higher than the actual Brooks and Haynes projections.

53.    In so doing, the Forest Service allocated significantly more land for timber production than was necessary to meet the Brooks and Haynes projected market demand.

**Exhibit 21, page 12 of 27**

Logging and road construction on these lands causes harm to wildlife, recreation and other multiple use objectives.

Actual Market Demand

54.    Beginning in the 1950s, the United States annually sold large volumes of timber to the Ketchikan Pulp Company (KPC) and Alaska Pulp Company (APC), and their predecessors, pursuant to 50-year contracts intended to facilitate construction and operation of two large pulp mills.

55.    APC ceased operation of its Sitka pulp mill in 1993, and the Forest Service terminated its long-term contract in 1994.  APC removed 94 mmbf of Tongass timber in FY 1994 and 15 mmbf in FY 1995.  It has logged no timber from the Tongass since.

56.    KPC ceased operation of its Ketchikan pulp mill in 1997.  To resolve legal claims, the United States, KPC, and Louisiana-Pacific Corporation entered a Settlement Agreement in 1997.  The agreement canceled the contract.  The United States agreed to pay KPC approximately $135 million and to make 300 mmbf of Tongass timber available to KPC for cutting in 1997, 1998, and 1999.  KPC dropped its claims and agreed to cut this timber and keep its sawmills operating.  In 1999, the agreement was extended to grant one more year to cut the remaining timber, to provide start-up timber for a proposed new veneer mill.

57.    In attempting to meet market demand for Tongass timber, the Forest Service forecasts demand using estimates contained in the final 1997 Brooks and Haynes report, published shortly after the 1997 Tongass Plan.  The report is entitled "Timber Products Output and Timber Harvest in Alaska: Projections for FY97-10" (Brooks and Haynes; PNW-GTR-409, September, 1997).

**Exhibit 21, page 13 of 27**

58.    The 1997 demand projections are an integral component of the formula developed in the 2000 report entitled "Responding to the Demand for Tongass Timber:  Using Adaptive Management to Implement Sec. 101 of the 1990 Tongass Timber Reform Act."  This formula is used annually by the Forest Service in determining the volume of timber to offer each year.

59.    The Forest Service relies explicitly on the 1997 Brooks and Haynes projections in describing the demand for Tongass timber in the Final EIS for the Woodpecker timber sale.  In the FEIS, the Forest Service also used the 1997 demand projections to set its goals for the volumes of timber under analysis (Pool 1), available for sale (Pool 2), and under contract (Pool 3).  The "anticipated harvest" discussed in Appendix A of the Final EIS is the harvest projected by the 1997 Brooks and Haynes report.

60.    The historical data on which the 1997 demand predictions are based include volume cut pursuant to the two long-term pulp mill contracts.

61.    From the start of the long-term contracts until and including FY 2000, the long-term contracts, including the KPC settlement and extension, accounted for the large majority of the timber cut in the Tongass.

62.    The timber logged from the Tongass between 1997 and 2000 included significant volume provided by the KPC Settlement Agreement and the one-year extension thereof.  In FY 1997, KPC removed approximately 69 mmbf.  In FY 1998, KPC removed approximately 80 mmbf.  In FY 1999, approximately 87 mmbf was removed under the Settlement Agreement.  In FY 2000, approximately 80 mmbf was removed under the Settlement Agreement as extended.  No Tongass timber has been cut pursuant to KPC's 50-year contract, the Settlement Agreement, or extension since FY 2000.

63.     Annual timber volume cut on the Tongass since the end of the long-term contracts and KPC settlement, as extended, has been significantly lower than the 1997 demand predictions. From FY 1996 to FY 2000, as KPC was finishing out its contract, the logging volume on the Tongass averaged approximately 130 mmbf per fiscal year.  In FY 2001 and FY 2002 the volume logged on the Tongass was approximately 48 mmbf and 34 mmbf respectively.  The volume logged in FY 2003 was approximately 51 mmbf.  The FY 2003 total included approximately 16 mmbf cleared for the Southeast electrical intertie on behalf of Ketchikan Public Utilities.

64.     The 1997 demand predictions are predicated in part on the assumption that a market would develop for low-grade saw logs, utility logs, and manufacturing residue to fill the niche left by the closure of the pulp mills.  Such a market has not arisen.

65.     The Forest Service has recognized that there were already significant differences between the assumptions underlying Brooks and Haynes' 1997 projections and actual conditions in 2000.

66.     Brooks and Haynes estimated that North America's share of Japanese softwood lumber imports would range from 70 to 76 percent, depending on their scenario.  North America accounted for just 61 percent of Japanese softwood lumber imports in 1999.

67.     The dollar value of Tongass timber exports to Japan has declined by more than half over the last five years.

68.     There is no current market for chipped Tongass logs.

69.     The loss of the market for wood chips has important implications for the economic viability of timber sales on the Tongass.  The lack of a market for chips also has

resulted in an increase in applications to export low grade round Sitka spruce and hemlock logs cut from the Tongass.

70.     The veneer plant constructed by Gateway Forest Products in Ketchikan operated for approximately 9-10 months before ceasing production in December 2001, notwithstanding significant public assistance in financing the mill and providing startup timber for it.

71.     The changes in demand and prices have had significant effects on the Southeast Alaska timber industry and the profitability of the remaining facilities.

72.     Since the end of the KPC settlement agreement, as extended, two major Southeast Alaska wood products companies – Gateway Forest Products, Inc. and Silver Bay Logging, Inc. – have filed for bankruptcy protection.

73.     Gateway Forest Products has ceased operation and the majority of its assets have been liquidated.

74.     Prices for all species of trees logged on the Tongass have declined considerably over the last five years.

75.     From FY 1998 to FY 2002, the Forest Service made about 263 timber sale offerings on the Tongass.

76.     Of the sale offerings in this time period, about 75 received no bids.  About 139 received only one bid.  About 49 received multiple bids.

77.      From September 19, 2002 to September 19, 2003 the Forest Service made about 48 timber sale offerings on the Tongass.

78.     Of the sale offerings in this time period, about 28 received one bid.  About 15 received no bids.  About five received multiple bids.  Three of the sales were offered twice during this time period.

**Exhibit 21, page 16 of 27**

79.     In FY03, the Forest Service made about 44 timber sale offerings on the Tongass.

80.     Of the sale offerings in FY03, about 25 received one bid.  About 14 received no bids.  About five received multiple bids.  Three of the sales were offered twice during this time period.

81.     In 2003, Gateway Forest Products and the Forest Service entered into an agreement canceling the nine timber sales it had under contract with a total volume of approximately 108 mmbf.

82.     The Brooks and Haynes demand projections have not been updated since 1997.

83.     In January 2004, the Forest Service announced that 20 timber sales under contract at the time would be available for cancellation by mutual agreement with the purchasers.  All of these sales were originally awarded between October 1, 1995 and January 1, 2002.  They contained about 138 mmbf of remaining volume.  The Forest Service stated that all 20 sales were "uneconomical" under current timber markets.  The Forest Service further stated that it was highly unlikely that markets would improve enough for these sales to become economical during the life of the timber sale contract.


Timber Sale Losses

84.     Each year, the Forest Service spends tens of millions of dollars administering the Tongass timber sale program.

85.     The Forest Service keeps detailed records of the money it shows as spent each year on the timber sale program.  Some of that information is made available to the public as part of the annual monitoring reports.

**Exhibit 21, page 17 of 27**

86.    The Forest Service reported that in FY 1999 it spent $19,842,546 on "timber management," $7,685,131 on "timber road construction," more than $5 million on "general administration," and more than $3 million on "ecosystem planning, inventorying, and monitoring."

87.    The Forest Service reported that in FY 2000 it spent $14,524,473 on "timber management," more than $3 million each on "road construction" and "road maintenance, nearly $4 million on "general administration," and more than $1 million on "ecosystem planning, inventorying, and monitoring."

88.    The Forest Service reported that in FY 2001 it spent $21,192,221 on "timber management," more than $13 million on "roads" and more than $2 million on "ecosystem planning, inventorying, and monitoring."

89.    The Forest Service reported that in FY 2002 it spent $17,9234,470 on "timber management," more than $15 million on "roads" and more than $3 million on "ecosystem planning, inventorying, and monitoring."

90.    In FY 1999, income to the Forest Service for timber sold from the Tongass totaled approximately $5,456,000.  In FY 2000, income from timber sold from the Tongass totaled approximately $5,582,000.  That number declined to approximately $1,855,000 in FY 2001 and approximately $1,242,000 in FY 2002.  In FY 2003, income to the Forest Service for timber sold from the Tongass totaled approximately $1,464,000.

91.    These costs, and the associated losses, were not discussed during the NEPA process for the Woodpecker timber sale.

92.    Instead, the discussion of "public investment" in the Woodpecker FEIS simply cites outdated and incomplete "budget allocation costs and management expenses" as estimates

of the costs incurred by the Forest Service.  The budget estimates do not reflect accurately the costs borne by the Forest Service in administering the Woodpecker timber sale.

93.    The Forest Service itself has recognized in its annual monitoring reports that these numbers are inaccurate and should be revised.

94.    Moreover, the Woodpecker FEIS does not present the costs borne by the Forest Service in a way that allows the public or the decisionmaker to understand the total expense that would be borne by the Forest Service for each alternative.  Nor does it show those costs in conjunction with the predicted revenues.  That failure prevents the public and the decisionmaker from determining that the alternatives will result in significant losses for the Forest Service and taxpayers.

95.    Accordingly, the evaluation of the "public investment" necessary to administer the Woodpecker sale is incomplete and misleading, and does not accurately reflect the actual costs incurred by the Forest Service.


COUNT I

Failure to Ensure Wildlife Viability

(National Forest Management Act)

96.    The plaintiffs repeat and incorporate by reference the allegations of paragraphs 1-95.

97.    The National Forest Management Act (NFMA) requires the Forest Service to adopt regulations for national forest planning.  16 U.S.C. § 1604.

98.    In formulating and adopting the Tongass Plan, the Forest Service was required by its NFMA regulations in effect at the time, 36 C.F.R. § 219.19 (2000), to manage fish and

**Exhibit 21, page 19 of 27**

wildlife habitat "to maintain viable populations of existing native and desired non-native vertebrate species" found on the Tongass.

99.     In formulating, adopting, and implementing the Tongass Plan, the Forest Service was required by its NFMA regulations in effect at the time, 36 C.F.R. § 219.27 (2000), to "[p]rovide for adequate fish and wildlife habitat to maintain viable populations of existing native vertebrate species."

100.     For planning purposes, the Forest Service defined a "viable population" in 36 C.F.R. § 219.19 (2000) as "one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area."

101.     In adopting the Tongass Plan and deciding to implement it through the Woodpecker decision, the Forest Service failed to ensure the population viability of vertebrate species in violation of 36 C.F.R. §§ 219.19 & 219.27 (2000).


COUNT II

Miscalculation of Market Demand in the Tongass Plan

(National Forest Management Act, Tongass Timber Reform Act,

National Environmental Policy Act, Administrative Procedure Act)

102.     The plaintiffs repeat and incorporate by reference the allegations of paragraphs 1-95.

103.     The National Forest Management Act requires the Forest Service to prepare a land management plan for each national forest.  16 U.S.C. § 1604.

104.     The NFMA specifies that each management plan shall:

(1) provide for multiple use and sustained yield of the products and services obtained therefrom in accordance with the Multiple-Use Sustained-Yield Act of 1960 (16 U.S.C. 528-531), and, in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness; and

(2) determine forest management systems, harvesting levels, and procedures in the light of all of the uses set forth in subsection (c)(1) of this section ....

16 U.S.C. § 1604(e).

105.    The Tongass Timber Reform Act exhorts the Forest Service to "seek" to provide enough timber to meet market demand, subject to all applicable laws and "to the extent consistent with providing for the multiple use and sustained yield of all renewable forest resources." 16 U.S.C. § 539d.

106.    The Record of Decision for the Tongass Plan is the formal decision document setting forth the Regional Forester's rationale for adopting the Plan.  40 C.F.R. § 1505.2.

107.    In explaining the basis for the Allowable Sale Quantity of timber that may be cut under the Tongass Plan, the Forest Service made an error in projecting market demand for timber.  The Record of Decision nearly doubles the actual projections.  The market demand projection influenced the amount of land to be made available for logging.  The result was a plan that allowed logging up to an average of 267 mmbf/year, while the demand projection for the highest market scenario was an average of 154 mmbf/year.  More likely medium and low market scenarios had lower demand projections.

108.    In making this error, the Forest Service allowed logging in areas that would cause unnecessary harm to other multiple use objectives, such as wildlife and recreation.

109.    The 1997 Tongass Plan FEIS makes the same error in reporting projected market demand and harvest levels.  The FEIS also uses the same error to predict employment and income levels under the various alternatives.  The result is that the FEIS presents false and

**Exhibit 21, page 21 of 27**

misleading data regarding the likely amount of logging and predicted economic benefits of the proposed action and alternatives.

110.    Under the Administrative Procedure Act, the Court "shall … hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law …."  5 U.S.C. § 706(2)(A).

111.    In adopting the Tongass Plan based on a significant error projecting market demand, and in implementing the Plan in the Woodpecker timber sale project, the Forest Service acted arbitrarily and in violation of its obligations under the National Forest Management Act and the Tongass Timber Reform Act.

112.    The 1997 Tongass Plan FEIS violates NEPA by presenting false and misleading information about projected market demand, logging levels, and economic effects.


COUNT III

Inadequate Alternatives in Tongass Plan FEIS

(National Environmental Policy Act)

113.    The plaintiffs repeat and incorporate by reference the allegations of paragraphs 1-95.

114.    In formulating and implementing the Tongass Plan, the Forest Service was required by National Environmental Policy Act (NEPA) to provide "detailed statement[s] on … alternatives to [its] proposed action[s]," 42 U.S.C. § 4332(C)(iii), and to "study, develop, and describe appropriate alternatives to [its] recommended courses of action."  42 U.S.C. § 4332(E).

115.    White House Council on Environmental Quality ("CEQ") regulations, binding on and adopted by the Forest Service, implement NEPA in part by requiring that an EIS shall

**Exhibit 21, page 22 of 27**

"[r]igorously explore and objectively evaluate all reasonable alternatives" to the agency's proposal.  40 C.F.R. § 1502.14(a).

116.    Managing the Tongass by preventing logging in the existing large blocks of old growth, including undeveloped watersheds, is, and was in 1997, an appropriate and reasonable alternative for the Tongass Plan.  This fact is shown by recommendations from scientists and the public that the Forest Service adopt that approach, and by the fact that the agency itself did eventually adopt it for a time by deciding to protect remaining roadless areas on the Tongass.

117.    All of the alternatives in the 1997 FEIS, except Alternative 1, would allow logging at levels in excess of the medium scenario projected by Brooks and Haynes in their May 15, 1997 report.

118.    Managing the Tongass to allow a timber sale program that more closely approximated the actual and likely demand for timber as projected by Brooks and Haynes is, and was in 1997, an appropriate and reasonable alternative for the Tongass Plan.

119.    The Forest Service's failure in the Tongass Plan FEIS to study, develop, describe, rigorously explore, and/or evaluate the alternative of maintaining an active logging program restricted to trees outside of the existing large blocks of old growth, including undeveloped watersheds, violated 42 U.S.C. §§ 4332(C) and (E) and 40 C.F.R. § 1502.14(a).


COUNT IV

Failure to Disclose Highgrading

(National Environmental Policy Act)

120.    The plaintiffs repeat and incorporate by reference the allegations of paragraphs 1-95.

**Exhibit 21, page 23 of 27**

121.    In formulating, adopting, and implementing the Tongass Plan, the Forest Service was required by NEPA to identify "the environmental impact of [its] proposed action."  42 U.S.C. § 4332(C)(i).

122.    White House CEQ regulations, binding on and adopted by the Forest Service, implement NEPA in part by requiring that an EIS shall discuss "the environmental effects of alternatives," including "[d]irect effects and their significance" and those that "are caused by the action and … reasonably foreseeable."  40 C.F.R. §§ 1502.16 & 1508.8.

123.    The Forest Service violated 42 U.S.C. § 4332(C) and 40 C.F.R. §§ 1502.16 and 1508.8 by failing to include in the Woodpecker FEIS and in the Tongass Plan EIS information available to it about high volume stands, about the history and significance of past highgrading, about reasonably foreseeable future highgrading, and about the possible impacts and significance of highgrading by volume class, volume strata, and/or tree species.


COUNT V

Misleading Presentation of Market Demand

(National Environmental Policy Act)

124.    The plaintiffs repeat and incorporate by reference the allegations of paragraphs 1-95.

125.    NEPA requires federal agencies to prepare environmental impact statements on any proposal for "major Federal actions significantly affecting the quality of the human environment . . .."  42 U.S.C. § 4332(C).

126.    The presentation of incomplete or misleading information in an EIS violates NEPA.

**Exhibit 21, page 24 of 27**

127.    The information about market demand for timber contained in the Woodpecker FEIS is both incomplete and misleading.  In the FEIS, the Forest Service relied on outdated market demand projections to justify the projects.  The FEIS failed to present the public and decisionmaker with relevant, accurate information known to the Forest Service about market conditions.

128.    The false, incomplete and misleading information in the Woodpecker EIS violates NEPA.

COUNT VI

Public Investment Analysis

(National Environmental Policy Act)

129.    The plaintiffs repeat and incorporate by reference the allegations of paragraphs 1-95.

130.    An EIS must disclose to the public the costs the agency – and thereby the public – will bear in undertaking the proposed action.  42 U.S.C. § 4332.

131.    The "Public Investment" analysis contained in the Woodpecker FEIS is incomplete and misleading because it does not reflect current cost information collected annually by the Forest Service.  Actual costs are significantly higher than reported in the FEIS.  The agency and the public will bear significant losses on the project not disclosed in the FEIS.

132.    The presentation of the "Public Investment" estimates are misleading because they do not reasonably allow the public or decisionmaker to determine the total loss that the Forest Service expects to incur on the timber sale.

133.    The failures to present accurate information on public investment mislead and fail to inform the public and decisionmaker and thereby violate NEPA.

**Exhibit 21, page 25 of 27**

**PRAYER FOR RELIEF**

WHEREFORE, the plaintiffs respectfully request that the court:

1.  Enter a declaratory judgment that:

    a.  the Forest Service violated the requirement in its NFMA regulations to ensure minimum viable populations of wildlife well-distributed across the Forest;

    b.  the decision adopting the 1997 Tongass Plan was arbitrary, because it was based on a significant error in projecting market demand;

    c.  the FEIS for the Tongass Plan violates NEPA by disclosing erroneous information about projected market demand and resulting economic impacts;

    d.  the FEIS for the Tongass Plan violates NEPA by failing to consider reasonable alternatives to protect more large blocks of old growth, including undeveloped watersheds, and important high value stands;

    e.  the FEISs for the Woodpecker project and for the Tongass Plan fail adequately to disclose the practice of highgrading and its adverse impacts in violation of NEPA;

    f.  the FEIS for the Woodpecker project violates NEPA by presenting false, incomplete and misleading information about market demand for timber and resulting economic effects; and

    g. the FEIS for the Woodpecker project violates NEPA by presenting false, incomplete and misleading information about the costs to the public of the timber sales;

2.  Enter appropriate injunctive relief;

3.  Award plaintiffs the costs of this action, including reasonable attorneys' fees; and

4. Grant such other relief as this Court deems just and proper.

Respectfully submitted this 23rd day of March 2004,

*Thomas S. Waldo (by Denice A. Shaw*
*Bar No. 0403007)*

Thomas S. Waldo
Eric P. Jorgensen
EARTHJUSTICE

Nathaniel S. W. Lawrence
NATURAL RESOURCES DEFENSE COUNCIL

Attorneys for Plaintiffs



**United States
Department of
Agriculture**

**Forest Service**

**Tongass National Forest**

**R10-MB-446b**

April 2004



# Threemile Timber Harvest
## Final Environmental Impact Statement



## Environment and Effects of the Significant Issues

**Discussion of Significant Issues**

A significant issue provides the focus for one or more alternatives and can be used to compare alternatives and to track environmental effects throughout the analysis. Significant issues for the Threemile Project Area were identified through public and internal scoping. Chapter 1 describes the process used to identify issues. Similar issues were combined where appropriate.

Once a significant issue is identified, measures are identified to analyze how each alternative responds to the concern. Measures are chosen that are quantitative (where possible), predictable, responsive to the issue, and linked to cause and effect relationships. These measures describe how the alternative affects the resource or resources at the heart of the issue.

The issues that were determined to be significant and within the scope of the project decision are:

- Issue 1: Road Development and Access Management (Issue 1: Roads)
- Issue 2: Timber Sale Economics and Timber Supply (Issue 2: Timber)
- Issue 3: Inventoried Roadless Areas (Issue 3: Roadless Areas)

# 3 Environment and Effects                    Issue 1: Roads

## Issue 1: Road Development and Access Management

**Introduction**

The Kuiu Island road system is an isolated road system with no direct access to any communities or other road systems.  Access to the island is via boat, barge, or floatplane. Road system connections are at Rowan Bay, Saginaw Bay, and at Threemile Arm. Though Kake is the nearest community to the roaded portion of the island, travelers from Angoon, Juneau, Kake, Petersburg, Point Baker, Port Protection, Sitka, and Wrangell sometimes visit the island and use the forest road system.  Other individuals that use the road system, including people from out of state, usually hire an outfitter or guide.

The road system was constructed primarily for access to the interior of the island for silvicultural purposes (Figure 3-1).  Traffic on the island in the 1970s and 1980s generally consisted of Forest Service and timber purchasers' employees traveling to and from work areas.  Occasionally, and increasingly in the latter 1990s, hunters and sport fishermen have used the forest roads for recreation. However, the predominant uses of the island roads have been timber related.

For over two decades, the road system on Kuiu Island expanded to access timber stands in fulfillment of the long-term contract between the Forest Service and Alaska Pulp Corporation (APC).  In 1993, the long-term contract was terminated, which subsequently slowed down the amount of roads constructed annually on the island.  After the Forest Plan was completed (1997), changes in LUDs from development to non-development created opportunities to close some roads not needed in the near future.  Timber production from development LUDs on Kuiu as part of the regional timber program continues.  Road development and access management include decisions about where and why new roads are needed, where to upgrade existing roads, and where and why existing roads should be closed to vehicle traffic.  Who uses the roads, where, when and how, and what effects roads and road usage have on the ecosystem are all part of access management.

The Road Analysis Process (RAP) for the Threemile Project Area is a tiered, science-based system of analysis.  The first layer is the Forest-wide RAP, analysis of the whole Tongass National Forest. The second layer is the Kuiu Island RAP, an analysis of the transportation system on all of Kuiu Island, including the Threemile Project Area. The detailed road management objectives for each road segment in the Threemile Project Area are included in Appendix B.

**Affected Environment**

The forest road system on Kuiu Island was constructed for timber management.  There were no forest roads on the island until 1962 when a road about four miles long was constructed into the interior of the island from Saginaw Bay.  This was the beginning of the main road that today connects Saginaw Bay to Rowan Bay, approximately 20 miles to the south.

Issue 1: Roads                    Environment and Effects 3

No new roads were added until late in 1972 when Mud Bay Logging Company arrived in Rowan Bay with a floating camp and began construction on a shore camp, sort yard, and roads.  The logging camp at Rowan Bay has been in operation almost continuously since that time.

Between 1972 and 1993, approximately 184 miles of classified roads and associated bridges and culverts were built on Kuiu Island.  All of these roads were constructed to access timber.

Between 1994 and 2000, approximately six additional miles of classified road were built.  The following chart displays the annual and cumulative road construction on the island between 1973 and 1999.  No new roads have been built since 1999.

**Figure 3-1.** Kuiu Island Annual Road Construction



Presently, there are approximately 190 miles of classified forest roads on Kuiu Island (Table 3-1). A classified forest road is part of the transportation system and it may be used for multiple entries.  A classified road may be left open for traffic or closed to traffic.  Approximately 147 miles of the forest roads are open and drivable for either standard passenger vehicles or pickup trucks.  In addition to the classified roads, there are approximately 115 miles of closed temporary roads on the island. A temporary road is used during harvest and decommissioned after harvest

3 Environment and Effects                              Issue 1: Roads

completion.  Within the Threemile Project Area, there are 20.5 miles of classified road.  Historically, timber purchasers have performed maintenance on the forest roads, while improvements such as permanent bridge installations have at times been contracted to construction companies (Table 3-3).

All of the forest roads on the island, except for a short boat ramp access road in Threemile Arm and an access road to the salmon egg boxes in Port Camden, were constructed in order to transport logs to saltwater for rafting to mills.  The egg box access road was constructed to transport materials to the site.  People working at the site arrive on Kuiu Island at Rowan Bay and drive to the egg boxes.  The boat ramp in Threemile Arm was constructed by the Forest Service to move people and material between the north end and south end of the island.

There are two log transfer facilities on the island, at Rowan and Saginaw Bays.  The small boat ramp in Threemile Arm offers a third access point to the forest road system.  The boat ramp in Threemile Arm is the only one of the three island access points that is located within the project area.

Because of the remoteness of the island, the majority of the traffic on forest roads is logging related.  Some deer hunters bring motorcycles and all-terrain vehicles to the island and off-load them from boats to hunt from the road system.  Two outfitter/guides are currently authorized to use vehicles on the entire Kuiu road system for black bear hunting.  Outfitters/guides leading kayak trips occasionally use Road 6402 to portage from the Bay of Pillars to Port Camden.

In the past, classified roads were closed by allowing alder growth to block vehicle traffic while leaving drainage structures in place.  This has created the potential for erosion and subsequent water quality concerns downstream.  Now, roads are closed by removing drainage structures and adding waterbars to direct runoff.  In 1999-2000, approximately 44 miles of classified road on Kuiu Island were closed to vehicle traffic by removing drainage structures and putting the road into storage.  Roads located within Old-growth Habitat Reserves, those in watersheds with no expected timber harvest in the near future, and short dead-end roads with drainage structures that may act as fish migration barriers were the primary candidates for drainage structure removal.

Roads that remain open will either have relatively smooth surfaces and be suitable for passenger vehicles or have a surface more suitable for high clearance vehicles with rolling dips and drivable waterbars similar to speed bumps.  Slower vehicle speeds on high clearance roads reduce the maintenance cost.

**Temporary Roads**

Temporary roads, sometimes known as spur roads, are short term roads constructed under contract, permit, lease, or other written authorization not intended to be a part of the forest transportation system.  Normally, all drainage structures are removed and additional waterbars are constructed on temporary roads immediately after their use.  During timber sale

activities on Kuiu over the last 40 years, 115 miles of temporary roads were constructed.

### Temporary, Decommissioned, and Unclassified Road Definitions

Temporary roads are authorized by contract, permit, lease, other written authorization, or emergency operation, not intended to be a part of the forest transportation system and not necessary for long-term resource management.  A common example of a temporary road found on Kuiu Island is a road leading to a landing inside of a harvested unit.  Temporary roads may be up to a mile in length, but are generally less than ½ mile long.

Decommissioned roads are unneeded roads that have been stabilized and restored to a more natural state.  Decommissioning includes reestablishing former drainage patterns, stabilizing slopes, and restoring vegetation. Culverts and bridges are removed, water bars are added, and the road entrance is generally blocked to motorized traffic.  The temporary road mentioned above would normally be decommissioned after the timber was removed from the harvest unit and the log trucks were finished hauling the timber to a log transfer facility.

Unclassified roads are roads not managed as part of the forest transportation system, such as unplanned roads, abandoned travelways, and off-road vehicle tracks that have not been designated and managed as a trail; and those roads that were once under permit or other authorization and were not decommissioned upon the termination of the authorization. An example of an unclassified road is the temporary road mentioned above that was not decommissioned after it was no longer needed.  Once the road was not decommissioned after its authorized use terminated (the timber sale), it became an unclassified road.

**Road Reconstruction Costs**

For each action alternative, some road reconstruction activities are planned. These activities include repair or replace of drainage structures and reconstruction of fill slopes in several locations. Estimates of reconstruction costs are generally proportional to the miles of existing road that will be used in each alternative. These costs are included in the economic assessment for each alternative.

**Log Transfer Facility**

Timber previously harvested from within the project area was hauled to the LTF in Rowan Bay, 25 to 30 miles away, where it was sorted and transported to mills via saltwater.  Most of the timber went to the pulp mill in Sitka or the sawmill in Wrangell.  Currently, most of the timber harvested on Kuiu Island has been transported to mills located in Wrangell, Ketchikan or on Prince of Wales Island.

# 3 Environment and Effects                   Heritage Resources

## Heritage Resources

Heritage resources include an array of historic and prehistoric period cultural sites and traditional cultural properties. Because known and previously undiscovered sites may lie within a project area, the Forest Service conducts heritage resource investigations following the Section 106 process of the National Historic Preservation Act. If heritage resources are found within a project area, measures are taken to avoid impact to the site. If impact is unavoidable, the Forest Service, in consultation with the State Historic Preservation Officer, plans and implements measures to mitigate effects.

**Past Cultural Environment**

Oral tradition and ethnographic accounts name the Tlingit Indian as the dominant Native people of Kuiu Island. The project area is in the territorial division or *kwan* of the Kakekwann Tlingit, a group whose area included Kuiu Island, the western part of Kupreanof Island, areas on the mainland shore of Frederick Sound and nearby parts of Baranof and Prince of Wales Islands (Olson, 1967). The types of archaeological sites common to the region include villages, seasonal camps, fish traps and weirs, and resource procurement/gathering areas. The earliest known archaeological site in southeast Alaska is on nearby Prince of Wales Island. Investigations at the site suggest that humans have been occupying the region for close to 10,000 years.

Trapping, hunting, fur farming, fishing, and timber harvest have historically drawn people to Kuiu Island. Although no communities currently exist on the island, Native villages and camps thrived within the past several hundred years.

**Project Investigations**

The project area heritage resource evaluation began by researching historical accounts, previous heritage resource surveys, Alaska Heritage Resource Survey listings, Petersburg District files and atlases, special use permit files, and land status atlases. Forest Service archaeologists have conducted numerous heritage resource surveys in the project area over the past several decades. Research methods include literature searches, visual reconnaissance and shovel and soil probe testing. Fieldwork for the Threemile project took place in the summers of 1994, 1998 and 1999. Approximately 463 acres were completely surveyed for heritage resources.

Comment was encouraged at public meetings held in Petersburg and Kake. The Organized Village of Kake was contacted for input and was given the opportunity to review the resource report that was submitted to the State Historic Preservation Officer. All work was initiated in compliance with Section 106 of the National Historic Preservation Act. Formal documentation about surveys and results are filed at the Petersburg Ranger District office in Petersburg, Alaska. Some information pertaining to heritage resources is restricted from public access due to its sensitive and non-renewable nature.

Heritage Resources                    Environment and Effects 3

The strategy for heritage resource surveys follows stipulations set forth in an agreement (2002) with the Forest Service, Alaska Region, the State Historic Preservation Officer, and the Advisory Council on Historic Preservation.  The stipulations were met to satisfy the Forest Service's Section 106 responsibilities of the National Historic Preservation Act. Archaeologists discovered 12 culturally modified trees and 12 new Alaska Heritage Resource Survey sites in the project area.  Sites include a cabin, wood-stake fish weirs, small shell middens, and Native villages.  Ten of these sites are considered eligible for nomination to the National Register of Historic Places.  The culturally modified trees do not meet eligibility criteria.  No known sites or culturally modified trees are in areas that will be impacted by the proposed activities.

All of the compiled heritage resource information is detailed in a report submitted to the Alaska State Historic Preservation Officer.  The report concludes that none of the heritage resources identified in the project area will be impacted by the proposed alternatives.  The Section 106 consultation process was completed and the Alaska State Historic Preservation Officer concurred with our findings and recommendations.

**Effects**

None of the Threemile Project Area alternatives will have direct or indirect effects on known sites in the project area.  All of the identified cultural sites lie outside harvest unit boundaries and proposed road locations.  Some undiscovered sites might exist in the project area. If a new site is discovered, a professional archaeologist will evaluate it. Mitigation plans will be initiated prior to any work that may adversely affect the resource.

### Cumulative Effects

Threats to significant heritage resources include development, decay, natural landscape changes such as erosion and windthrow, and increased visitation, which might lead to vandalism or looting.  Monitoring of known sites will reduce possible impacts by enabling mitigation and establishing a periodic presence.  Beach fringe, stream and estuary buffer zones will further protect heritage resources from project related activities.  The project area road system does not provide increased access to known paleontological, archaeological or historical sites.  Periodic monitoring of road construction may identify newly exposed sites and enable damage assessment.  There are no known traditional cultural properties in or near the project area that will be affected by the project.