Subsistence                                    Environment and Effects 3

The employment in Petersburg includes fishing, seafood processing, tourism, and timber. Petersburg is currently one of the top-ranking ports in the United States for quality and value of fish landed.  Petersburg residents make limited use of the project area for deer and bear hunting and for sport fishing.

**Point Baker and Port Protection**

Point Baker and Port Protection are on the northwest end of Prince of Wales Island, approximately 20 miles southeast of the project area.  The 1990 census reported a population of 39 in Point Baker and 62 in Port Protection.  In 2000, the U. S. Census reported 35 people living in Point Baker and 63 in Port Protection.  Less than 1 percent of the populations of both communities combined are Native Americans. Employment in both communities is seasonal based on commercial fishing.  Residents of both communities use the area for deer hunting and fishing.

**Wrangell**

Wrangell is on the northern tip of Wrangell Island, approximately 40 miles east of the Threemile Project Area.  In 1990, the U. S. census reported the population of Wrangell as 2,479 people and the 2000 census population was 2,308 people.  Approximately 15.5 percent of the population is Native American.  Employment in Wrangell includes commercial fishing, tourism, and timber.  Wrangell residents make limited use of the project area for deer and bear hunting, and for sport fishing.

**Other Communities**

Meyers Chuck is another community that has some reported subsistence use in the project area.

## Areas Most Often Used for Subsistence Activities

The marine waters surrounding the project area, including Threemile Arm, Port Camden, and Rocky Pass, are popular areas for subsistence fishing. Stream subsistence fishing is also likely to occur in some of the streams in the project area.  Tidal zones in and around the project area are gathering places for marine invertebrates, including bivalves, shrimp, and crab.

Deer and black bear hunting and furbearer trapping occur mostly along the beach-fringe, along the existing road system, and, to a lesser extent, in the inland forests of the project area.  Because Kuiu Island is difficult to reach during the winter months, subsistence use and marten trapping are not as heavy as in other areas of the Tongass.

## Types and Amounts of Resources Gathered

Subsistence use areas and the levels of harvest were estimated from a variety of sources.  Alaska Department of Fish and Game records the level of community harvests for select species, such as deer, moose, marten, black bear, wolf, and otter, within specific areas referred to as Wildlife Analysis Areas (WAAs).  All of the Project Area is within WAA 5018.

Alaska Department of Fish and Game harvest data and Tongass Resource Use Cooperative Survey (TRUCS) maps reveal subsistence use areas for

# 3 Environment and Effects                                    Subsistence

deer, marine invertebrates, marine mammals, salmon, and other fish within the project area. Other sources of subsistence use information came from public testimony and published accounts of community use surveys (Table 3-29). Open houses held in Kake, Petersburg, Point Baker, and Port Protection and meetings with the Organized Village of Kake provided informal opportunities to discuss subsistence practices.

In general, subsistence resources most intensively used in the Threemile Project Area by nearby community residents include deer, seaweed, finfish, anadromous fish and bottom fish.

**Table 3-29.** Estimated Subsistence Resource Use by Community

| Resources | --- Pounds of Resources Per Capita --- | | | | |
|---|---|---|---|---|---|
| | **Kake** | **Petersburg** | **Point Baker** | **Port Protection** | **Wrangell** |
| All Resources | 179.1 | 197.7 | 288.6 | 450.9 | 155.2 |
| All Fish | 85.3 | 89.8 | 171.0 | 170.2 | 73.2 |
| *Salmon* | *43.6* | *45.3* | *82.4* | *58.8* | *30.2* |
| All Land Mammals | 52.0 | 57.2 | 47.5 | 101.1 | 31.9 |
| Marine Invertebrates | 21.9 | 38.5 | 58.0 | 139.4 | 37.7 |
| Marine Mammals | 10.3 | 0.0 | 0.0 | 8.6 | 6.5 |
| Birds | 0.7 | 3.6 | 0.0 | 1.8 | 1.5 |
| Plants and Berries | 8.9 | 8.6 | 12.1 | 29.8 | 4.3 |

Source: Alaska Department of Fish and Game, Division of Subsistence, Community Profile Database, 2001. Not all numbers will sum to the total due to rounding factors.

## Wildlife Effects and Evaluation

**Abundance and Distribution of Deer**

An evaluation of the abundance and distribution of deer is based on a comparison study of supply and demand using the Forest Plan habitat capability model. The model provides an estimate of the potential number of deer that the habitat within the project area can support. This is the potential supply available for subsistence use. The Alaska Department of Fish and Game assumes that approximately ten percent of the deer population can be harvested annually on a sustained basis if the population is near carrying capacity. Carrying capacity is an estimate of the maximum deer population an area can support. Thus, the number of deer needed in an area to meet hunter demand is approximately ten times the number needed to maintain a sustainable population.

Subsistence                                        Environment and Effects 3

Historically the project area had a four to five month deer-hunting season with a four deer bag limit.  In 1972, the deer population crashed dramatically and the season was closed from 1973 to 1991.  This was due to several factors including a deep, persistent snow pack that did not retreat until late June 1973 and deer populations were above their carrying capacity as a result of artificially low wolf populations (due to the wolf eradication program).

Since 1992, all of Kuiu Island has been open with a two-buck bag limit. The reason for the long and slow recovery of deer is due high black bear populations (black bears prey on deer) and an increasing wolf population due to the rescinded wolf control program.

Data from the Alaska Department of Fish and Game Deer Hunter Surveys show that in the 2000-2001 season, 48 hunters spent a total of 185 days hunting and harvested 27 deer from Kuiu Island, an average of 6.8 hunting days per deer.  During the 1998-99 season, 41 hunters spent a total of 211 days hunting and harvested 28 deer from Kuiu Island, an average of 7.5 hunting days per deer. The number harvested on Kuiu Island only accounted for 2.6 percent of the 1,085 deer harvested from Game Management Unit 3 during the 1998-99 season.  Game Management Unit 3 includes all of Deer, Etolin, Kadin, Kasheverof, Kuiu, Kupreanof, Mitkof, Woronkofski, Wrangell, and Zarembo Islands.  No hunters from Kake or the Rowan Bay Camp reported harvesting deer from Kuiu during the 2000-2001 or 1998-99 season.  The lowest recorded deer harvest on Kuiu Island was in the 1997-98 season.  That year, 50 hunters spent 148 days to harvest 13 deer, an average of 11.4 hunting days per deer.

The Threemile Project Area encompasses about 45 percent of Wildlife Analysis Area (WAA) 5018.  The Alaska Department of Fish and Game in their 1991-1995 Strategic Plan for Management of Deer in Southeast Alaska (ADF&G, 1991) set a population objective of 1,603 deer for WAA 5018.  The population objective is the number of deer needed to sustain a huntable population. The interagency deer model estimates the deer habitat carrying capacity of 1954 at 2,411 (USDA Forest Service, 1995b). The interagency deer model uses 1954 as a base year assuming this is before large-scale timber harvest.  The interagency deer model estimates a current habitat carrying capacity of 2,194 deer.

Current hunter demand for deer is estimated at 156 per year.  To sustain a healthy deer population, harvest should not exceed ten percent of the deer population in any WAA.  Therefore, a minimum number of deer needed to meet that hunter demand would be 1,560 deer.  Table 3-30 displays estimated deer carrying capacity and hunter demand in the WAA 5018.  It is predicted by the year 2040 that the demand for deer will exceed the carrying capacity.  The predicted need is based on current demand and predicted human population increases using the Forest Plan formula.

3 Environment and Effects                                    Subsistence

According to the model predictions, the demand for deer will eventually exceed supply even if no additional timber harvest occurred.

It is important to note, however, that the estimated growth in the hunter population does not reflect actual conditions. In the last decade, the population of Kake increased by 1.4 percent, Petersburg increased by 0.5 percent, Port Protection increased by 1.5 percent, Point Baker decreased by 10.2 percent and Wrangell decreased by 6.9 percent. These actual figures were not used to calculate hunter demand. Another factor that may influence the predicted habitat capability is silvicultural prescriptions for partial harvest. Since the model assumes that all the units will be clearcut, the lesser effects of partial harvest are not included in the estimate of carrying capacity. The carrying capacity shown is the most conservative scenario.

**Table 3-30.** Estimated Changes in Deer Carrying Capacity and Demand[1] in WAA 5018

| Year | Estimated Deer Carrying Capacity[2] (# of animals) | Estimated Deer Needed for Subsistence[3] | Difference between Estimated Carrying Capcity and Estimated Subsistence Needed |
|------|---------------------------------|---------------------------|------------------------------------|
| 1954 | 2411 | 800 | +1611 |
| 2000 | 2194 | 1560 | +634 |
| 2010 | 2194 | 1840 | +354 |
| 2040 | 2129 | 2800 | -671 |
| 2050 | 2129 | 3220 | -1091 |
| 2075 | 2129 | 4510 | -2381 |
| 2100 | 2129 | 5632 | -3503 |

[1] All deer harvest is assumed to be subsistence.

[2] Deer numbers shown are the estimated deer habitat potential assuming a theoretical winter carrying capacity of 100 deer/square mile in habitats with a suitability index of 1.0.

[3] Hunter Demand is from Strategic Management Plan for Deer, ADF&G 1991. For decades 1954 to 2010 TLMP assumed 18 percent increase per decade in human population. From 2010 to 2100 TLMP assumed 15 percent increases in human population. The estimated number of deer needed for subsistence is ten times the hunter demand.

The project alternatives call for both clearcut and partial timber harvest prescriptions that are designed to mimic natural disturbance events. Alternatives were developed that selected harvest units in areas with lower deer winter range values to mitigate the impacts on the deer population. Areas designated for non-harvest like stream buffers, beach fringe, and Old-growth Habitat, will help maintain huntable deer populations.

Subsistence                                    Environment and Effects 3

### Effects on Deer

In the Threemile Project Area, there may be a significant possibility of a significant restriction on subsistence deer hunting. This is due to the cumulative effects of past management actions, the proposed actions, and the reasonably foreseeable actions. Application of riparian buffers including beach and estuary buffers, may protect deer winter habitat. Additional measures, like partial harvest prescriptions, are especially designed to protect deer habitat and vary among alternatives. Second growth thinning will help maintain deer winter habitat and prolong understory browse. Small Old-growth Habitat reserves have been designed to include some of the most important deer wintering areas and "pinch-points" on the island. These "pinch-points" are areas where the island narrows significantly and forces animal movements to be constricted.

### ANILCA 810 Hearing

A subsistence hearing was held in Kake, Alaska on July 19, 2001. Kake is the community most likely to be affected by any changes in subsistence resource availability on Kuiu Island. Nine people attended the meeting, six of whom are Kake residents. Of the Kake residents, three provided oral testimony. One non-rural resident also provided oral testimony. The concerns expressed in their testimonies centered on impacts of partial timber harvest to deer habitat, the amount of timber harvest near Native communities, timber harvest in Apricot Valley, and the amount of open roads on Kuiu being used by guides for bear harvest.

## Abundance and Distribution of Moose

Moose are in the process of migrating onto Kuiu Island from Kupreanof and Mitkof Islands and the Mainland. Their population is increasing but they are still at a low level.

## Abundance and Distribution of Furbearers

According to the Alaska Department of Fish and Game, furbearers appear to be abundant and have stable populations on Kuiu Island. Within the project area, some fur trapping occurs primarily for marten. Trapping is moderate, reflecting the current low to moderate fur prices. Harvest is well below sustained yield potentials. Most harvest occurs along the coast and is accessed by boat.

Some timber harvest does occur in marten habitat in the action alternatives, but with the mitigation measures discussed in the Marten section under Wildlife in this chapter, the population of marten found on Kuiu Island and in the Threemile Project Area will not be significantly affected.

### Effects on Furbearers

A significant possibility of significant subsistence restrictions on marten are not expected as a result of any action alternatives proposed. Boat access to the study area will not change so access to marten trapping will not change. The change in road access after timber harvest should not affect the amount of marten harvest.

# 3 Environment and Effects                                    Wildlife

## Wildlife

**Wildlife Habitat**

Habitat refers to the type of environment in which a species lives and thrives. Attributes of habitat include elevation, geographic position, and type of vegetation community. A species may occupy a single habitat, a range of different habitats, or more than one habitat depending on the season. Habitats that occur within the Threemile Project Area include old-growth forest, second-growth forest, alpine and sub-alpine, wetland, beach and estuary, and riparian. Many of these overlap. Beach fringe may include old-growth forest, second-growth forest, and wetland habitats.

**Management Indicator Species**

Management Indicator Species are species whose response to land management activities can be used to predict the likely response of a wide range of species with similar habitat requirements. Through this concept, several species can be used to determine the effects on all species within the project area.

The Forest Plan identified thirteen Management Indicator Species for the Tongass National Forest. Some of these species do not occur within the Threemile Project Area. Species not affected by the proposed activities will have their habitat needs protected by standards and guidelines, or can be represented by other Management Indicator Species. Table 3-38 displays the Management Indicator Species used for the Threemile Project Area analysis.

**Table 3-38.** Management Indicator Species for the Threemile Project

| Species | Rationale for selection |
|---|---|
| Sitka black-tailed deer | Important subsistence species |
| Marten | Needs low-elevation, high volume old-growth |
| Black Bear | There is a concern for the sustainability of the high sport hunting harvest |
| Alexander Archipelago Wolf | Predator tied to a prey base |

Wildlife                                    Environment and Effects 3

**Sitka Black-tailed Deer**

The Sitka black-tailed deer is an important game animal in Southeast Alaska. It is a prime subsistence and sport hunting resource. The Forest Service is committed to maintaining sufficient habitat to ensure a huntable deer population (Figure 3-22).

Wildlife populations go through cycles where species outgrow their habitat; populations crash, and then rebound. In Southeast Alaska, deer population crashes usually occur in conjunction with severe winter weather. Population fluctuations may also be associated with wolf control measures, which were undertaken prior to Statehood in 1959 and continued until the late 1970's. These measures allowed deer populations to become artificially high, straining their habitat and possibly precipitating the population crash that occurred in the late 1960's and early 1970's. Prior to the crash, severe cropping of prime browse species favored by deer indicated high deer population stress in the Rocky Pass area (Gerdes, 1997). There have not been severe winters with persistent snows since the 1970s on deer range in the Rocky Pass area.

Following the 1972 population crash, deer populations grew rapidly on Prince of Wales and Admiralty Islands but not on Kuiu, Kupreanof, and Mitkof Islands. Except for Admiralty Island, these islands have wolf and black bear as deer predator species. On Admiralty Island, brown bear is the prime deer predator. The slow rebound of deer populations on Kuiu, Kupreanof and Mitkof Islands may be the result of weather patterns that kept the snow pack from melting until late in the spring and heavy black bear and wolf predation (wolf populations were rebounding from the discontinued wolf control program of the late 1970's).

While Kuiu Island populations were rebounding from the crash, several holdover populations (small localized populations that survived the winter kill) were noticed. One was on the Camden Peninsula (Gerdes, 1997). The other was on the south end of Kuiu Island where snow levels are not as deep as the north end. Migration from nearby islands may have occurred, though the population's depleted status on both Kupreanof and Mitkof Islands would have limited migration. Animals do travel between these three islands and the mainland, although large deer populations do not exist on the mainland. Moose, marten, and red squirrels have migrated to Kuiu Island from the mainland and other islands.

Huntable deer populations did not return to Kuiu, Kupreanof, and Mitkof Islands for nearly 20 years after the last population crash. By 1992, deer populations had recovered enough to allow hunting on Kuiu Island.

**Exhibit 22, page 15 of 16**

# 3 Environment and Effects                                    Wildlife

**Effects on Deer**

The environmental effects on the deer population will result from habitat modification mainly from timber harvest and road construction (Table 3-40). The Threemile Project Area is the only portion of WAA 5018 that is available for timber harvest. The data in the table represents the estimated percentage change in habitat capacity from the 1954 baseline in WAA 5018. The 1954 baseline was selected to correspond with the Forest Plan analysis (Forest Plan, 3-369). The baseline is assumed to be 100% carrying capacity. These data indicate the percent of the habitat remaining on the indicated dates due to the additive effects of past management as well as the additive effects of the specified alternatives. In the short term, timber harvest will provide increased browse as harvested areas begin to regenerate. If winters are mild, fragmenting a continuous forested habitat by clearcutting has the potential to increase deer populations by creating foraging areas. This increased food supply will decrease during the stem exclusion stage, which occurs at age 15 to 25 years. Stand treatments, like thinning and pruning, can maintain deer habitat longer by increasing growing space and light for understory browse species. The habitat value starts to increase again when the stand moves into the understory reinitiation stage (Oliver and Larson, 1996). This occurs on Kuiu Island around 80 to 100 years.

As discussed in the biodiversity section, timber harvest units and harvest prescriptions in the Threemile Project Area were developed to mimic natural wind damage. By replicating natural disturbances, the chances of disrupting animal populations are reduced, although individual animals may be affected. By leaving standing trees in the units through partial harvest silvicultural prescriptions, understory plants should be retained in the units. The understory plants provide browse for deer. The retained standing trees may provide shade and habitat for other wildlife species.

In this analysis, the interagency deer model developed for the Forest Plan was used. The current interagency deer model estimates the habitat carrying capacity of deer (USDA Forest Service, 1995b). Because the model assumes that each of the proposed units is harvested as a clearcut, each of the predictions is a worst-case scenario. The model has not been adjusted for partial harvest units. Biologists are currently monitoring partial harvest stands from the Crane and Rowan Mountain, Todahl Backline, Alternatives to Clearcutting, and several other partial harvest stands to determine what factors to adjust in the deer model for partial harvest prescriptions. Any changes in the model will be the result of field observations and peer review.



**United States
Department of
Agriculture**

**Forest Service**

**Tongass National Forest**

**R10-MB-446a**

**April 2004**



# Threemile Timber Harvest
## Record of Decision



**Exhibit 23, page 1 of 27**

The following is a list of abbreviations and acronyms in this document.

| Abbreviations and Common Acronyms | |
|---|---|
| ADF&G | Alaska Department of Fish and Game |
| ANILCA | Alaska National Interest Lands Conservation Act, 1980 |
| bf | Board foot – A unit of timber measurement equaling the amount of wood contained in an unfinished board on inch thick, twelve inches long, and twelve inches wide. |
| ccf | Hundred cubic feet of timber |
| COE | U. S. Army Corps of Engineers |
| DEIS | Draft Environmental Impact Statement |
| EIS | Environmental Impact Statement |
| FEIS | Final Environmental Impact Statement |
| Forest Plan | Tongass Land and Resource Management Plan, 1997 (as amended) |
| GIS | Geographic Information System |
| IDT | Interdisciplinary Team |
| LUD | Land Use Designation |
| LTF | Log Transfer Facility |
| mbf | Thousand Board Feet |
| MIS | Management Indicator Species |
| mmbf | Million Board Feet |
| MMCF | Million Cubic Feet |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act |
| NMFS | National Marine Fisheries Service |
| OGRs | Old-growth Habitat Reserves |
| RMO | Road Management Objectives |
| TTRA | Tongass Timber Reform Act, 1990 |
| USFWS | U. S. Fish and Wildlife Service |
| VCU | Value Comparison Unit |
| VQO | Visual Quality Objective |

*Front Cover: Partial harvest unit in medium volume stand on Kuiu Island.*



| United States Department of Agriculture | Forest Service | Alaska Region Tongass National Forest | 648 Mission Street Ketchikan, AK 99901 Phone: (907) 225-3101 Fax: (907) 228-6215 |
|---|---|---|---|

File Code: 1950
Date: April 16, 2004

Dear Reader:

Here is your copy of the Record of Decision (ROD) and the Final Environmental Impact Statement (FEIS) for the Threemile Timber Harvest on the Petersburg Ranger District, Tongass National Forest. Due to the litigation surrounding the implementation of the Roadless Conservation Rule, this project was delayed pending the outcome of this litigation. At this time, due to recent court actions, this project can proceed.

Additional copies of this Final EIS are available for review at Forest Service Offices throughout the Tongass. If you would like to request additional copies to be sent to you, contact the Petersburg Ranger District at 907-772-3871.

The ROD documents my final decision on the Selected Alternative and the facts considered in reaching the decision. The effective date of implementation for the decision and the Notice of Rights of Appeal are also specified in the ROD.

I want to thank those of you who took the time to review and comment on the Draft Environmental Impact Statement. Your interest in the management of the Tongass National Forest is appreciated.

As the Forest Supervisor, I am responsible for this decision. Please direct any correspondence or requests for additional copies to Jim Brainard or Tiffany Benna, Threemile Project Coordinators, P. O. Box 1328, Petersburg, Alaska 99833, or e-mail address: jbrainard@fs.fed.us, tbenna@fs.fed.us; or call (907) 772-3841.

Sincerely,

FORREST COLE
Forest Supervisor

 

**Exhibit 23, page 3 of 27**

# Threemile Timber Harvest

## Record of Decision

### Tongass National Forest
### USDA Forest Service
### Alaska Region

Lead Agency

Tongass National Forest
648 Mission Street
Ketchikan, Alaska 99901

Responsible Official

Forrest Cole, Forest Supervisor
Tongass National Forest

For More Information:

Jim Brainard, or
Tiffany Benna
Tongass National Forest
P.O. Box 1328
Petersburg, Alaska 99833
(907) 772-3841

# Threemile Timber Harvest Record of Decision

## Introduction

This Record of Decision documents my decision to select an alternative from the Threemile Timber Harvest Final Environmental Impact Statement (FEIS).   The selection includes the specific location and design of timber harvest units, roads, and log transfer facilities (LTFs).

The project area is on Kuiu Island, within the Petersburg Ranger District, Tongass National Forest, Alaska. The Threemile Project Area encompasses approximately 21,660 acres on Kuiu Island.  It is approximately 20 miles southwest of Kake, Alaska, surrounded by Port Camden, Rocky Pass, and Threemile Arm.   Kuiu is one of many islands that comprise the Alexander Archipelago in Southeast Alaska.  The project area lies within Townships 60-61 South, and Ranges 73-75 East, Copper River Meridian (Figure R-1).

## Background

The proposed project is a component of the overall timber sale program on the Tongass National Forest.  Timber sales are allowed by the Tongass Land and Resource Management Plan (Forest Plan) in order to maintain a supply of timber from National Forest System lands for Southeast Alaska.

The National Environmental Policy Act (NEPA) process for the Threemile Timber Harvest began in March of 1999.  A proposed action for the Threemile Project Area was first published in the Federal Register as a Notice of Intent to Prepare an Environmental Impact Statement on March 8, 1999. This Notice of Intent and Proposed Action were consistent with the 1997 Forest Plan.  The original proposed action was revised in June of 1999 to reflect the April 13, 1999 Record of Decision for the Forest Plan.

After the notice in the Federal Register, public scoping, data collection and analysis, and documentation began.  A Draft Environmental Impact Statement (DEIS) was distributed in January of 2001.  Public review and comments on the DEIS were collected until June 26, 2001.  Each of the comments has been reviewed and answered, and the FEIS prepared.

When the Draft EIS was published, five alternatives were considered in detail. I identified Alternative 3 as the Preferred Alternative.

# Record of Decision

After the DEIS was published in January 2001, land management direction on parts of Kuiu Island changed.   The 1999 Forest Plan Record of Decision had removed much of the eastern portion of Kuiu Island south of the project area, except the Threemile Project Area, from development land use designations.  In April 2001, the U.S. District Court, District of Alaska, in *AFA v. Forest Service*, vacated the 1999 Forest Plan Record of Decision, returning management of the area to the 1997 Forest Plan, which allows timber harvest in this area.

As the project evolved through the steps in the NEPA process, several policy changes at the local and national levels affected its progress.  In Sierra Club v. Lyons (J00-0009 CV (JKS)), the U.S. District Court, District of Alaska directed the Forest Service to prepare a supplemental environmental impact statement to evaluate and consider roadless areas within the Tongass for recommendation as potential wilderness areas.  On April 26, 2002, the Court enjoined the Forest Service from permitting timber harvest and road building in roadless areas until forty-five days after publication of the final supplemental environmental impact statement.  The Forest Plan Supplemental Environmental Impact Statement was completed and signed in February 2003.  The No Action Alternative was selected, continuing management under the 1997 Forest Plan with no new wilderness recommendations.

The Roadless Area Conservation Rule of January 12, 2001 has been the subject of several lawsuits. Effective January 29, 2004, the Tongass National Forest is temporarily exempted from the prohibitions against timber harvest and road construction in inventoried roadless areas.  This temporary exemption of the Tongass will be in effect until the United States Department of Agriculture promulgates a subsequent final rule concerning the application of the Roadless Rule within the State of Alaska.

## Purpose and Need

The Threemile Timber Harvest Project is designed to respond to the goals and objectives listed in the Forest Plan, and to move the project area toward the desired future condition. The Forest Plan identifies the following goals and objectives:

- Manage, from suitable lands made available for timber harvest, the timber resource for production of sawtimber and other wood products on an even-flow, long-term sustained yield basis and in an economically efficient manner

- Seek to provide a timber supply sufficient to meet the annual market demand for the Tongass National Forest and the demand for the planning cycle

- Provide diverse opportunities for resource uses that contribute to the local and regional economies of Southeast Alaska

- Support a wide range of natural resource employment opportunities within Southeast Alaska's communities

## Decision

This Record of Decision documents my decision to make timber available from the Threemile Project Area.  My decision includes the following:

# Record of Decision

- The location, design, and scheduling of timber harvest and silvicultural practices
- Access management measures such as road closures, road construction and reconstruction, and the location and type of log-transfer facilities
- Mitigation measures and monitoring requirements
- Whether there may be a significant restriction on subsistence uses
- Whether any changes in small old-growth reserves should be made and approved as a non-significant amendment to the Forest Plan

**It is my decision to choose Alternative 6 from the FEIS as the Selected Alternative and I authorize the actions necessary to implement my decision.**

This decision meets the purpose and need for the project, is consistent with the Forest Plan, and is responsive to the issues raised during scoping and to the public comment on the DEIS. Alternative 6, the Selected Alternative, will harvest approximately 19.5 million board feet (mmbf) of timber and construct 4.2 miles of classified road and 4.2 miles of temporary road.

I have approved the non-significant Forest Plan amendment changing the small Old-growth Habitat Reserve (Appendix 1 and Figure R-2).

I have determined that there may be a significant possibility of a significant restriction on subsistence use of deer as a result of the cumulative effects of this project including past management and reasonably foreseeable actions in the project area. There is not a significant possibility of a significant restriction on subsistence uses of other wildlife, fish, shellfish, marine mammals, other foods, and timber resources as a result of this project. I have made this determination after careful review of the subsistence analysis and public input from subsistence users, the Organized Village of Kake, and the Alaska Department of Fish and Game.

I have based this decision upon the results of an analysis including habitat modeling of wildlife population trends, human population trends, subsistence use in the area in which this project occurs as well as the important areas it avoids. I believe the protection measures established by the Forest Plan and the overall project design will minimize impacts to deer and other subsistence resources.

In response to public comments, the Preferred Alternative identified in the DEIS (Alternative 3) was modified to create a new alternative (Alternative 6). This new alternative combined some features of Alternative 4 with some features of Alternative 3. The following modifications were made to Alternative 3 in creating the Selected Alternative:

- Harvest units (Units 1, 2, 3, 4, and 6) in the Apricot Creek area were not included in the Selected Alternative due to numerous concerns expressed about the potential resource impacts in this area. Comments expressed concerns about soil erosion, blowdown, and landslides, as well as the current condition of the Apricot Creek watershed. Concerns were also expressed about the visual impacts and the effects to the recreational resources in the area. No harvest will occur in the Apricot Creek area at this time, however these units will remain in the suitable timber base and

**Exhibit 23, page 7 of 27**

# Record of Decision

may be harvested in the future, pending further environmental analysis and decision.

- Forest Road 6402, which accesses the Apricot Creek area, will remain open.

- Harvest Units 8, 9, 11, 12, and 13 from Alternative 4 were included in the Selected Alternative to respond to comments regarding timber sale economics and supply (Issue 2).

- Some units and portions of units (E30, E32, E33, E36, E37, E38, and E40) designed to reshape existing clearcuts to reduce visual effects of past harvest are not included in the Selected Alternative due to concerns regarding enlarging existing clearcuts.

- Other small helicopter units including Units 14, 18, 19, 20, 21, 22, 23, 24, and 25 are not included in the Selected Alternative because of comments regarding sale economics.

- Units E31 and E39 were not included due to concerns about the stability of the Class III stream in the salvage units.

**Features of the Selected Alternative**

- The Selected Alternative will harvest timber from approximately 665 acres in the project area.  This harvest will provide an estimated 19.5 million board feet of sawlog and utility volume based on estimates of unit volume.  Design features and mitigation measures for these harvest units are described in detail on the Unit Cards in Appendix 2 of the ROD.  Nine of these harvest units totaling 621 acres are within Inventoried Roadless Areas (FEIS, Figure 3-3).

- There will be 4.2 miles of new classified road constructed.  These roads are designed for long-term use and will be placed in storage (Maintenance Level 1) after timber harvest is complete.  Placing a road in storage includes such activities as removing culverts and installing waterbars. However, the roadbed would be mostly left intact and could be reconstructed for future National Forest Service land management activities.  Until that time, the road is not maintained and is not useable for vehicle traffic.

- There will be 4.2 miles of temporary roads constructed.  The temporary roads will be decommissioned as soon as possible after timber harvest.  Decommissioning includes stabilization and restoration measures such as blocking the entrance to a road, installing waterbars, removing culverts, restoring vegetation, and reestablishing former drainage patterns.

- Approximately 8.3 miles of existing road will be placed into storage (Maintenance Level I).

- Through this project analysis six stream crossings have been identified for improvements. The selection of this alternative presents a better opportunity to accomplish these fish passage improvements earlier (see Road Management Objectives in Appendix 2).

- A land-to-barge type log transfer facility (LTF) will be constructed in Threemile Arm.  The LTF will be constructed on the approximate footprint of the existing boat ramp in Threemile Arm. There may be a floating logging camp to facilitate the timber harvest, but no land-based camp is being considered in the project area at

this time.  The operator of the camp will be responsible for securing appropriate permits from state and federal agencies.

- This Record of Decision incorporates mitigation measures to minimize or eliminate adverse environmental effects of timber harvest specified in the Selected Alternative.  These mitigation measures are listed in Chapter 2 of the FEIS and in Appendix 2 of this ROD.  Chapter 2 also contains the project level implementation and effectiveness monitoring planned to determine how well resource management objectives have been met.

- There is a significant possibility of a significant restriction of subsistence use of Sitka black-tailed deer based on projected past, present, and reasonably foreseeable activities in the Threemile Project Area.  This is true for any alternative including the no-action alternative.  The potential foreseeable future and cumulative effects from implementing the Forest Plan, including the no action and action alternatives in the project area, do not present a significant possibility of a significant restriction of subsistence uses of resources other than deer.  The direct effects from the action alternatives in the project area do not present a significant possibility of a significant restriction of subsistence uses of wildlife, fish and shellfish, marine mammals, other foods, and timber resources.  Mitigation measures for minimization of impacts to subsistence resources suggested through agency and public scoping have been incorporated into the Selected Alternative.

- Streamside riparian buffers have been designed that meet or exceed requirements specified by the Forest Plan Riparian standards and guidelines (Forest Plan, pp 4-53 to 4-73). The Selected Alternative does not propose new stream crossings on any Class I or II streams.

## Reasons for the Decision

In making my decision, I worked to assure consideration of all issues and to take into account the competing interests and values of the public.  There were many divergent public, personal, and professional opinions expressed during this analysis process.  The decision will probably not completely satisfy any one particular group or individual.  However, I considered all views, and I believe the decision I have made is a balanced approach to implementing the Tongass Forest Plan.

The Selected Alternative provides the most beneficial mix of resources for the public, within a framework of existing laws, regulations, policies, public needs and desires, and the capabilities of the land, while meeting the stated Purpose and Need for this project.  Specific reasons for the decision include:

- My decision to implement this Selected Alternative conforms to the Forest Plan and sound national forest management.  I have considered the need to help provide a sustained level of timber supply to meet annual and Forest Plan planning cycle market demand, and to provide diverse opportunities for natural resource employment, consistent with multiple use and sustained yield of all renewable forest resources.  The estimated 19.5 mmbf of timber made available through this project would help meet Southeast Alaska timber supply needs.

# Record of Decision

- The Selected Alternative includes some effect on two inventoried roadless areas. Harvest of 292 acres of timber and 4.76 miles of road affect the Camden Inventoried Roadless Area.   The Rocky Pass Inventoried Roadless Area is affected by 329 acres of timber harvest and approximately 3.02 miles of road construction. This harvest and road construction is planned along the edge of the roadless area adjacent to the existing road system.  This harvest represents about 1.3 percent of the Rocky Pass Roadless Area and will not affect its suitability for wilderness designation.  The East Kuiu Inventoried Roadless Area is not affected in the Selected Alternative.  The Selected Alternative would have no effect on any other unroaded area in the Threemile Project Area.  I believe this aspect of my decision balances the need to provide industry with a supply of timber while affording a great amount of consideration of and protection to roadless values.

- I have carefully considered the needs of subsistence users in this decision, particularly those people residing in Kake who depend on north Kuiu Island to provide a portion of their deer harvest.  Throughout the planning process, the interdisciplinary team for this project has worked hard to keep impacts to deer habitat to a minimum while creating economically realistic timber sale opportunities.  This has not been an easy challenge but I believe the Selected Alternative responds to the issues of both timber sale values and deer habitat values well.  This decision will impact the highest value deer habitat to a very small degree (harvests 34 of 980 acres remaining in the project area, or less than 4% of the highest value habitat).  This decision will likewise impact deer populations to a minimal degree, with models predicting a 2.5 percent decrease in overall deer numbers.  While I realize that many people in Kake, including the Organized Village of Kake, oppose any new timber harvest within their customary and traditional hunting areas, I believe this decision minimizes the impacts to subsistence harvest of deer, to the extent possible, while allowing for some timber harvest to take place.

- The Selected Alternative provides positive economic returns while meeting other resource objectives.  The actual value of timber sold would be determined during the timber sale appraisal process.  See Issue 2: Timber Sale Economics and Timber Supply in Chapter 3 of the FEIS for more information.

- The Selected Alternative closes all new roads to vehicle traffic by putting them into storage.  In addition, an additional 8.3 miles of existing roads will be placed into storage.  See Issue 1: Road Development and Access Management in Chapter 3 for more information.

- The Selected Alternative builds a low impact land-to-barge log transfer facility in Threemile Arm.  This type of facility will minimize bark and other woody debris entering the water.  It will be built largely on the footprint of the existing boat ramp to further reduce impacts to the marine environment. Forest Service timber sale administration personnel will work cooperatively with the Alaska Department of Fish and Game to designate a travel corridor through the waters of Threemile Arm to minimize disruption to the local Dungeness crab fishery by log barge operations.

- Transferring logs to barge in Threemile Arm significantly reduces the haul distance thus improving the economics of the timber harvest.  However, authorizing the

# Record of Decision

construction of a new LTF at Threemile Arm does not preclude the option to haul all or part of the logs to Rowan Bay using the existing roads and LTF.

- Harvest in the Apricot Creek area is not included in the Selected Alternative due to numerous comments from the public expressing a variety of concerns for resources in the area (FEIS Appendix C). These lands will remain in the suitable timber base and may be harvested in the future, pending further environmental analysis and decision.

- Stream protection measures and Best Management Practices are expected to preclude measurable effects on fish habitat and water quality. Culverts on existing roads within the project area will be repaired, if required, to provide fish passage. No new road crossings are planned on Class I or II fish streams.

I have carefully considered the timing of this decision in view of ongoing changes in agency regulations and pending litigation. Some of the factors I considered in making this decision include:

- The Forest Plan allows for the activities approved by this decision to take place.

- The repercussions of delaying decisions regarding road building and timber harvest, even for a relatively short period, have a significant effect on the amount of timber available for sale in the next year, due to the time needed for sale preparation activities, appraisal and advertisement.

- Decisions delayed affect other decisions "in line" for consideration, creating impacts to the entire sale program several years into the future.

- The Tongass National Forest will continue to be managed in compliance with Section 101 of the Tongass Timber Reform Act of 1990 (TTRA) which states in part that the Secretary of Agriculture "…shall, to the extent consistent with providing for the multiple use and sustained yield of all renewable forest resources, seek to provide a supply of timber from the Tongass National Forest which (1) meets the annual market demand for timber from such forest and (2) meets the market demand from such forest for each Planning cycle" (Forest Plan ROD, page 37).

## Significant Issues

In the following summary, I detail how key issues are addressed within the Selected Alternative.

Significant issues for the Threemile Timber Harvest Project were identified through public and internal scoping. Similar issues were combined into one statement where appropriate. The following three issues are within the scope of the project decision. These issues are addressed through the Proposed Action and alternatives. Additional concerns were considered but determined not to be significant for the project decisions to be made; they are either already resolved in the Forest Plan, or their resolution falls outside the scope of the Threemile project.

Record of Decision

# Issue 1: Road Development and Access Management

This issue includes decisions about where and for what purpose new roads are needed, where to upgrade existing roads, and where and why existing roads should be closed to vehicle traffic.

The Kuiu Island road system is an isolated road system with no direct access to any community or other road system. For over two decades, the road system on Kuiu Island expanded to access timber stands in fulfillment of the long-term contract between the Forest Service and Alaska Pulp Corporation. In 1993, the long-term contract was terminated, which subsequently slowed the rate of road construction on the island.

The Road Analysis Process (RAP) for the Threemile Project area is a tiered, science-based system of analysis. A Forest-wide RAP, analysis of the whole Tongass National Forest, as well as a Kuiu Island road analysis was used to evaluate the existing road system and recommend road management objectives for these roads.

All of the action alternatives were developed to minimize the amount of open roads necessary to meet management objectives. The Selected Alternative closes all roads that will be constructed and also closes about 8.3 miles of existing roads in the project area.

Construction of the log transfer facility in Threemile Arm is an important part of the transportation system. It will reduce the cost of hauling logs to Rowan Bay and also reduce the cost of road maintenance. Also, it negates the need to haul logs through the Old-growth Habitat Reserve at the head of Threemile Arm.

Dungeness crabs have been fished extensively in Threemile Arm. We have considered several methods to reduce potential conflicts between barge use and commercial fishing in Threemile Arm.

The Forest Service and the Alaska Department of Fish and Game (ADF&G) are working together to monitor black bear populations on Kuiu Island. Harvest levels are monitored by the ADF&G since they are responsible for setting harvest limits. During 2001, the Alaska Board of Game set a harvest "cap" on the numbers of bears to be taken by non-resident hunters on Kuiu Island. The effects of the project on black bear harvest including harvest by road hunters will be minimal. All action alternatives will result in fewer drivable roads in the project area (Chapter 3, Issue 1).

# Issue 2: Timber Sale Economics and Timber Supply

This issue is the economic viability of proposed timber sales, and the potential employment and revenues generated by the project. It includes concerns over defining economic viability, and determining the point at which implementation costs make the sale, and its related employment benefits, prohibitive.

NEPA Economic Analysis Tool (NEAT) was used in the analysis of the alternatives. NEAT calculates the predicted, or expected, bid value of the proposed timber harvest alternative by making adjustments to the regional base period price. The expected bids for both Alternative 4 and 6 are positive, $26.51 and $28.18 respectively. Alternatives 1, 2, and 3 have negative expected bid values. The Selected Alternative provides the greatest economic value while still providing a high level of resource protection and minimizing the effects to subsistence users.

Record of Decision

The Threemile project's range of action alternatives would harvest from 11 mmbf (Alternative 1) to 20.2 mmbf (Alternative 3). The Selected Alternative provides 19.5 mmbf.

In weighing the relative merits of the alternatives related to this issue, I am very much aware that all of the comparisons are estimates and actual revenues, employment, and costs can vary widely in different market conditions.  Even with this variability, however, I believe the comparisons made in the FEIS provide a useful and meaningful way to compare alternatives to one another.

## Issue 3: Inventoried Roadless Areas

There is a concern that timber harvest and construction of roads into roadless areas available for timber management will impair the roadless values of these areas.

The Threemile Project Area is basically a roaded area. Existing roads surround Threemile Arm on both sides of the bay. However, the areas inland from the road system include portions of three Inventoried Roadless Areas: Rocky Pass, Camden, and East Kuiu.

With the exception of the No Action Alternative (Alternative 5), all the alternatives affect some of these roadless areas by timber harvest and/or road building.  An alternative that did not enter inventoried roadless areas was considered but eliminated from detail study because it did not meet both the purpose and need in that it was extremely uneconomical. It also failed to meet Forest Plan standards and guidelines for visual quality due to previous harvest along the existing road system.

The Forest Plan does allocate 80% of the Camden Inventoried Roadless Area, 7% of the Rocky Pass Inventoried Roadless Area, and 64% of the East Kuiu Inventoried Roadless Area to land use designations that allow timber harvest.  The action alternatives in the Threemile FEIS would impact 2.6% or less of any Inventoried Roadless Area.  None of the action alternatives would make the Inventoried Roadless Areas ineligible for consideration as Wilderness areas (Chapter 3, Issue 3).

In the Selected Alternative, the areas that include the highest roadless values for resources other than timber management will be retained.  In the Camden Inventoried Roadless Area, these include the isthmus between Port Camden, Bay of Pillars, and Threemile Arm, the waterfowl hunting area at the head of Port Camden Bay, and the fossil site located on the eastern shore of Port Camden.  In the East Kuiu Inventoried Roadless Area, these include the good anchorages in the bays and harbors, the wildlife habitat in Salt Lagoon-Seclusion Harbor, and the south facing beaches.  In the Rocky Pass Inventoried Roadless Area, these include Rocky Pass, land otter habitat, and sport fishing streams.

Most public concerns were expressed for the harvest activity in the East Kuiu Inventoried Roadless Area in the Apricot Creek area.  The Selected Alternative avoids any harvest or road construction in this area at this time.

## Public Involvement

Public involvement has been instrumental in the identification and clarification of issues for this project.  This has been helpful in the formulation of alternatives and has assisted

# Record of Decision

me in making a more informed decision for the Threemile Timber Harvest project. Public meetings, Federal Register notices, newspaper and radio news releases, open houses, the Tongass National Forest Schedule of Proposed Actions, group and individual meetings, and reviewing comments on the Draft EIS were used to gather input for this project.

**Scoping Letters:** In March 1999 and June 1999, scoping letters were sent to everyone that requested to be on the project mailing list.  A total of 51 responses to the scoping letters were received.

**Notice of Intent:**  A Notice of Intent to Prepare an Environmental Impact Statement was published in the Federal Register in March 1999 and a Revised Notice of Intent was published in June 1999.

**Open Houses:** Multiple open houses and public meetings were held in Petersburg and Kake, during the environmental analysis process in 1999, 2000, and 2001. Open houses were held in Port Protection and Point Baker in October 2000.

**Federally recognized Tribal Governments:**  The Organized Village of Kake, the tribal government within or near the Threemile Project Area, was consulted about any potential impacts or concerns during the development of alternatives and mitigations to this environmental impact statement.  Concerns were expressed about subsistence and heritage resources within the project area.

**Public Comment received in response to the Draft EIS:** Comments on the Threemile Timber Harvest Draft EIS were received from January 19, 2001 to June 26, 2001. Twenty letters were received during the comment period. Each of these letters and the responses to them are included in the FEIS (Appendix C).

**Subsistence Hearing:**  A subsistence hearing for the Threemile Project Area, in accordance with Section 810 of the Alaska National Interest Lands Conservation Act, was held in Kake, Alaska, on July 19, 2001.  The date, time, and location of the subsistence hearing were publicized in the local media.  An open house to describe the analysis process and to answer public questions was held in conjunction with the subsistence hearing.  Public comment on the Draft EIS was also accepted at that time.

**Analysis and Incorporation of Public Comments:**  Public comments and subsistence comments have been analyzed and incorporated into the FEIS.  For an analysis of public comment and the Forest Service response to public comment, see Appendix C of the FEIS.

The FEIS will be filed with the Environmental Protection Agency and will be available for public review.

## Coordination With Other Agencies

From the time scoping was initiated, meetings and site visits with all interested state and federal agencies have occurred.  Issues were discussed and information was exchanged. Personnel from the Alaska Division of Governmental Coordination (now the Alaska Department of Natural Resources, Office of Project Management and Permitting), Alaska Department of Fish and Game, Alaska Department of Environmental Conservation, and

Record of Decision

the U.S. Fish and Wildlife Service visited the project area during the environmental analysis.

Coordination meetings were held with the State of Alaska, including the Department of Fish and Game and the Department of Environmental Conservation. The Alaska Coastal Management Plan (ACMP) consistency review process was initiated upon publication of the Draft EIS through the Office of Project Management and Permitting.

A Biological Assessment was prepared and sent to the National Marine Fisheries Service as part of the Section 7 consultation process under the Endangered Species Act.

Consultation with the U.S. Fish and Wildlife Service resulted in the conclusion that no Biological Assessment was necessary since no terrestrial threatened or endangered wildlife species are present in the project area.

Consultation with the U.S. Fish and Wildlife and the Alaska Department of Fish and Game resulted in the recommendation of adjustments to the small old-growth reserve in VCU 419.

The FEIS identifies the agencies that were informed of and/or involved in the planning process (see *List of Agencies, Organizations, and Individuals Sent Copies of this Statement* in Chapter 4 of the FEIS).

## Alternatives

## Alternatives Considered in Detail

Six alternatives were considered in detail in the FEIS. Each action alternative is consistent with the Tongass Land and Resource Management Plan (1997). For a complete description of each alternative refer to Chapter 2 of the FEIS.

**Alternative 1** – In this alternative, helicopter is the predominant yarding system. No new roads or facilities are planned. Harvest locations are designed to facilitate the placing in storage of approximately 10.4 miles of existing roads no longer needed for timber harvest for a long period of time after this harvest is completed. Alternative 1 harvests approximately 11 mmbf of timber on about 397 acres. The existing Rowan Bay log transfer facility will be used for barging logs.

**Alternative 2** – This alternative uses both helicopter and conventional harvest systems, with emphasis on helicopter. Harvest locations are designed to facilitate the placing in storage of approximately 11.4 miles of existing roads no longer needed for timber harvest for a long period of time after this harvest is completed. Alternative 2 harvests about 14.4 mmbf of timber on approximately 515 acres. An existing boat ramp in Threemile Arm will be reconstructed as a small barge log transfer facility. A sort yard will be constructed near the log transfer facility.

**Alternative 3** – This alternative uses a balance of both helicopter and conventional logging systems. Harvest locations are designed to facilitate the placing in storage of approximately 11.4 miles of existing roads no longer needed for timber harvest for a long period of time after this harvest is completed. Alternative 3 harvests approximately 20.2 mmbf of timber on about 706 acres. An existing boat ramp in Threemile Arm will be

# Record of Decision

reconstructed as a small barge log transfer facility. A sort yard will be constructed near the log transfer facility.

**Alternative 4** – This alternative uses only conventional logging systems. Harvest locations are designed to facilitate the placing in storage of approximately 4.2 miles of existing roads no longer needed for timber harvest for a long period of time after this harvest is completed. Alternative 4 harvests approximately 18.3 mmbf of timber on about 613 acres. An existing boat ramp in Threemile Arm will be reconstructed as a small barge log transfer facility. A sort yard will be constructed near the log transfer facility.

**Alternative 5** – This alternative does not propose any timber harvest or road construction (no action) in the Threemile Project Area, and it is the most responsive to maintaining current wildlife habitat, scenery, and watershed conditions since it defers harvest. It would not move the project area toward the desired future condition that is described in the Forest Plan.

**Alternative 6 (Selected Alternative)** – This alternative is previously described as the Selected Alternative.

## Environmentally Preferred Alternative

Based on a comparison of all the alternatives and the discussion contained within Chapter 3 of the FEIS, Alternative 5, the no action alternative, would cause the least environmental disturbance. Of the action alternatives, Alternative 1 is the environmentally preferred alternative because it constructs no new roads and harvests the least amount of timber.

## Alternatives Not Considered in Detail

In addition to the alternatives described above, several more alternatives were considered during the analysis but eliminated from detailed study. These alternatives were discussed during the development of the alternatives. Some of them were suggested by comments received through public scoping. Some of the aspects of the ideas were modified and used in conjunction with the alternatives considered in detail. Other alternatives would not meet Forest Plan direction for this project. A summary of these, and the reasons they were not analyzed in detail, can be found in Chapter 2 of the FEIS, and further information is available in the planning record.

## Planning Record

The planning record for this project includes the Draft EIS, FEIS, material incorporated by reference, and materials and data which support the analysis on which the decision is based. The planning record is available for review at the Petersburg Ranger District office.

## Mitigation

Mitigation measures are prescribed to avoid, reduce, minimize or eliminate the adverse effects of actions. These measures were applied in the development of the project alternatives, including the Selected Alternative, and in the design of the harvest units and

Record of Decision

road corridors. The *Mitigation Measures* section of Chapter 2 and Appendix B of the FEIS, and Appendix 2 of this ROD discuss mitigation measures.

Mitigation measures applicable to the Selected Alternative include measures contained in the Standards and Guidelines of the Forest Plan and applicable Forest Service Manuals and Handbooks. The FEIS includes site-specific mitigation measures described in Chapter 2 on Unit and Road Cards in Appendix B. These measures are adopted as part of this decision and will be implemented. Measures to avoid or minimize adverse environmental effects of the project have been incorporated into the Selected Alternative.

# Monitoring

A monitoring program is the process by which the Forest Service can evaluate whether the resource management objectives of the final environmental documents have been implemented as specified and whether the steps identified for mitigating the environmental effects were effective. Project level monitoring is specified in Chapter 2 of the FEIS. These monitoring items are part of this decision and will be implemented.

Each monitoring item describes the objective of the monitoring, what will be done and how it will be done. Monitoring activities may reveal results that deviate from planned effects, in which case corrective actions are prescribed. The Petersburg District Ranger is responsible for ensuring that project implementation, mitigation, monitoring, and enforcement are accomplished as specified in the FEIS.

# Findings Required By Law

## National Forest Management Act

The National Forest Management Act (NFMA) requires specific determinations in this Record of Decision: consistency with existing Forest Plans and Regional Guides, a determination of clearcutting as the optimal method of harvesting, if used, and specific authorizations to create openings over 100 acres in size. Specific information and rationale used to develop unit prescriptions is shown on unit cards, in the planning record, in Chapter 3 of the FEIS, and is summarized in this Record of Decision.

### Tongass Land and Resource Management Plan
This decision is consistent with the Forest Plan for the Tongass National Forest. I have reviewed the management direction, standards and guidelines, and the schedule of activities for the project area included in the Selected Alternative, and find the Selected Alternative to be consistent with these elements. The activities authorized in this decision are consistent with the standards and guidelines and management prescriptions of the Forest Plan.

### Use of Even-aged Management  (when there is clearcutting)
The Forest Plan (4-96 to 4-97) gives guidance when to use even-aged management. This direction is based on the National Forest Management Act, Section 6 (g)(3)(F)(i), which requires the Forest Service to insure that clearcutting and other harvest treatments designed to regenerate an even-aged stand of timber, will be used as a cutting method on National Forest System lands only where 1) for clearcutting, it is determined to be the

# Record of Decision

optimum method, and 2) for other such cuts, it is determined to be appropriate, to meet the objectives and requirements of the relevant land management plan.

For the Threemile project area, clearcutting (an even-aged management method) is used on 351 acres to preclude or minimize the occurrence of potentially adverse impacts from windthrow.  It is applied where windthrow potential is moderate to high.  Clearcutting is also used to minimize mistletoe infestations, logging damage or other factors affecting forest health.  In the Threemile project, the clearcut prescription is applied primarily to existing even-aged and multiple cohort stands of windthrow origin.  Specific information and rationale for use of this prescription is shown on the unit cards attached with this Record of Decision, in the project planning record, in Chapter 3 of the Final EIS in Chapter 3, and the rationale is summarized in this Record of Decision and in the silvicultural prescriptions.  Where used, this prescription has been deemed optimal related to site-specific considerations as described above.

**Use of Even-aged Management  (for clearcuts with reserves)**
The Forest Plan (4-96 to 4-97) gives guidance when to use even-aged management.  This direction is based on the National Forest Management Act, Section 6 (g)(3)(F)(i), which requires the Forest Service to insure that clearcutting and other harvest treatments designed to regenerate an even-aged stand of timber, will be used as a cutting method on National Forest System lands only where 1) for clearcutting, it is determined to be the optimum method, and 2) for cuts, such as clearcuts with reserves, it is determined to be appropriate, to meet the objectives and requirements of the relevant land management plan.

**Use of Two-Aged and Uneven-aged Management**
Additional silvicultural systems may be used to meet stand objectives. These include two aged and uneven aged which are designed to maintain more than one age class.  Although clearcutting may be used to achieve a two-aged-stand, it is only necesary to deem it optimal when it is being used to regenerate even-aged stands.

**Harvest Openings Over 100 Acres in Size**
There are no harvest openings over 100 acres proposed for this project. Unit 15 would harvest timber from approximately 140 acres using a combination of small clearcuts and partial harvest techniques. It would not create an opening in excess of 100 acres, but would result in a number of small openings totaling approximately 70 acres.

# Tongass Timber Reform Act (TTRA)

Harvest units were designed and located to maintain a minimum 100-foot buffer for all Class I streams and Class II streams that flow directly into Class I streams as required in Section 103 of the TTRA.  As discussed in Appendix B of the FEIS, the actual widths of these buffers will often be greater than the 100-foot minimum.  The design and implementation direction for the Selected Alternative incorporate Best Management Practices (BMPs) and Forest Plan standards and guidelines for the protection of all stream classes.

# Endangered Species Act

Actions authorized in the Selected Alternative are not anticipated to have a direct, indirect, or cumulative effect on any threatened or endangered species in the Threemile

Project Area.  The National Marine Fisheries Service has concurred that the actions described within the proposed project are not likely to adversely affect threatened and endangered species.  A complete biological assessment for marine Threatened and Endangered Species is included in the planning record for this project.  Consultation was done with the U.S. Fish and Wildlife Service and no terrestrial threatened or endangered species are known to occur in the Threemile Project Area.  I have determined that this action will not have any adverse impacts on any threatened or endangered species.

## Bald Eagle Protection Act

A Memorandum of Understanding (MOU) between the Forest Service and the U. S. Fish and Wildlife Service to facilitate compliance with the Bald Eagle Protection Act restricts management activities within 330 feet of an eagle nest site.  The selected alternative is not anticipated to have a significant direct, indirect, or cumulative affect on any bald eagle nests.

## Clean Water Act

The design of harvest units for the Selected Alternative was guided by standards, guidelines and direction contained in the Forest Plan and applicable Forest Service manuals and handbooks.  The Unit Cards and Road Cards (Appendix B) contain specific details on practices prescribed to prevent or reduce non-point sediment sources. Reasonable implementation with site-specific application and monitoring of approved BMPs is expected to comply with applicable State Water Quality Standards Regulations.

## Essential Fish Habitat

The potential effects of the project on essential fish habitat are discussed in Chapter 3 of the FEIS.  This discussion includes reference to the Magnuson-Stevens Fisheries Conservation Act that requires the Forest Service to consult with the National Marine Fisheries Service on projects that may affect Essential Fish Habitat. It also includes a description of the essential fish habitat in the project area, a description of the proposed activities, and a description of the proposed mitigation measures that will be implemented to protect these essential habitats.

The DEIS was provided to the National Marine Fisheries Service to formally initiate the consultation process according to the agreement between the Forest Service and the National Marine Fisheries Service on the method to complete essential fish habitat consultation using National Environmental Policy Act Procedures.  The DEIS was provided in accordance with this agreement dated August 25, 2000.

The descriptions and the analysis lead me to a finding that the Threemile Timber Harvest is unlikely to adversely affect essential fish habitat.  The National Marine Fisheries Service did not respond to the discussion or the finding in the DEIS during the comment period.  Formal essential fish habitat consultation is complete in accordance with the agreement between the National Marine Fisheries Service and the Forest Service.

## National Historic Preservation Act

Heritage resource surveys of various intensities have been conducted in the project area. The State Historic Preservation Officer has been consulted, and I have complied with the provisions of 36 CFR part 800.  I have determined that there will be no significant effects on cultural resources.

Record of Decision

## Federal Cave Resource Protection Act of 1988

The actions in the Selected Alternative will not have a direct, indirect, or cumulative effect on any significant cave in the Threemile Project Area.  No cave resources have been documented in the project area and no caves were discovered during fieldwork done for this analysis.

## ANILCA Section 810, Subsistence Evaluation and Findings

A subsistence hearing was held in Kake, Alaska on July 19, 2001.  Kake is the community most likely to be affected by changes in subsistence resource availability on Kuiu Island.  Nine people attended the meeting, six of whom are Kake residents.  Three of the Kake residents provided oral testimony.  One non-resident of Kake also provided oral testimony. Their testimonies centered on impacts of partial timber harvest to deer habitat, the amount of timber harvest near Native communities, timber harvest in Apricot Creek area (see Figure R-1), and the amount of open roads used for guided bear hunts.

The evaluations in the Subsistence Report on abundance or distribution, access, and competition for harvested resources in the project area indicate that there is a significant possibility of a significant restriction on subsistence uses of deer.  There will not be a significant possibility of a significant restriction on subsistence uses of other wildlife, fish, shellfish, marine mammals, other foods, and timber resources as a result of this sale.

**Subsistence Determinations**

Section 810 (a)(3) of ANILCA requires that when a use, occupancy, or disposition of public lands may result in a significant possibility of a significant restriction, a determination must be made whether (1) such a restriction is necessary, consistent with sound management principles for the utilization of public lands,  (2) the proposed activity involves the minimum amount of public lands necessary to accomplish the purposes of the use, and (3) reasonable steps will be taken to minimize adverse impacts on subsistence uses and resources resulting from the actions.

**Necessary, Consistent with Sound Management of Public Land** – The Selected Alternative has been examined to determine whether the associated potential restriction to subsistence use is necessary, consistent with the sound management of public lands.  In this regard, the laws and direction that have been considered include: 1) the National Forest Management Act of 1976 and its implementing regulations; 2) the Alaska National Interest Lands Conservation Act (ANILCA) of 1980; 3) the Tongass Land and Resource Management Plan (1997, as amended); 4) the Tongass Timber Reform Act (TTRA) of 1990; 5) the Alaska State Forest Practices Act; 6) the Alaska Coastal Management Program, 7) the Multiple-Use Sustained Yield Act (1960), and 8) USDA-FS Subsistence Management and Use Handbook (FSH 2609.25).

Management activities on National Forest System lands must provide for the multiple use and sustained yield of renewable forest resources in accordance with the Multiple-Use Sustained Yield Act of 1960.   Multiple use is defined as "the management of all the various renewable surface resources of the National Forest System so that they are utilized in the combination that will best meet the needs of the American people (36 CFR 219.3).  The alternatives presented in the FEIS represent different ways of managing the

# Record of Decision

resources of the Threemile Project Area in combinations that are intended to meet these needs. Each provides a different mix of resource uses and opportunities, and each has some potential to affect subsistence uses.  Given the framework and emphasis of the Selected Alternative, the possibility of a restriction is necessary, consistent with sound management of public land.

ANILCA Title VIII places an emphasis on the maintenance of subsistence resources and lifestyles.  However, the Act also provides for adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people and recognizes that public lands are necessary and appropriate for more intensive uses.  The Act also requires the Forest Service to make available 4.5 billion board feet of timber per decade from the Tongass National Forest.  The TTRA removed the 4.5 billion board foot requirement, but directs the Forest Service to seek to meet market demand for timber to the extent consistent with providing for the multiple use and sustained yield of all renewable forest resources, and subject to applicable law.

As described in Appendix A of the FEIS, the Selected Alternative is necessary as a component of the timber management program designed to implement the Forest Plan and to meet TTRA direction.  There is currently a market demand for timber, a limited timber supply from other sources, and an under-utilized mill capacity in the region.  The volume from the Selected Alternative is a component of the 10-year timber sale schedule, which attempts to provide timber to industry in an even-flow over the planning cycle.  The Selected Alternative can help meet the Forest Plan and TTRA objectives, while also providing reasonable protection measures for forest resources, especially for subsistence. It is consistent with the Forest Plan, laws, regulations, policies, public needs, and the capabilities of the land.

Based on a review of the subsistence hearing testimony and the analysis conducted in the FEIS, it is apparent that all of the alternatives will involve some potential impact to subsistence deer use in the future. Due to the cumulative effect of past, present and reasonably foreseeable actions, there is no alternative, including the no action alternative, that would meet Forest Plan and TTRA objectives and yet completely avoid a significant possibility of a subsistence restriction somewhere in the Tongass National Forest.  From the analysis of the information presented in the FEIS and this ROD, and the guidance provided by the documents and laws listed above, I have determined that the actions involved in the implementation of the Selected Alternative are necessary, consistent with sound management of public lands, and strike the best balance between meeting the needs of the public and protecting the forest resources.

**Amount of Land Necessary to Accomplish the Purpose of the Proposed Action** – The amount of public land involved to implement the Selected Alternative (considering sound multiple use management of public lands) is the minimum necessary to accomplish the purpose of the Selected Alternative.  Most of the Tongass National Forest is used by one or more rural communities for subsistence deer hunting purposes.  It is not possible to lessen timber harvest in one area and concentrate it in another locale without impacting one or more rural communities' important subsistence use areas.  In addition, harvestable populations of subsistence wildlife species could not be maintained in a natural distribution across the forest if harvest were concentrated in specific areas.  A well-

# Record of Decision

distributed population of species is required by the National Forest Management Act and is one of the objectives of the Forest Plan.

The Forest Plan allocated many of the important subsistence use areas to land use designations that do not allow timber harvest. Other areas that are important to subsistence use were protected through standards and guidelines such as the 1,000-foot beach and estuary buffers and the streamside Riparian Management Areas that do not allow timber harvest. Of the 21,660 acres of National Forest System lands within the Threemile Project Area, the Forest Plan allocated approximately 12 percent of the area to the non-development land use designations of Old-growth Habitat and Semi-Remote Recreation, which do not allow timber harvest, and approximately 88 percent to development land use designations such as Timber Production, Modified Landscape, and Scenic Viewshed. These designations provide for resource use and development for commodity resources such as timber.

The Selected Alternative uses sound timber harvest unit design and logical extensions of the road system. The minimum amount of land and roading was used to resolve resource concerns while meeting the purpose and need for this project in a practical and efficient manner. The Selected Alternative harvests only three percent of the total Threemile Project Area. Other alternatives involve less total land acreage but do not produce the mix and balance of resource uses described in the Forest Plan, TTRA, and ANILCA.

Partial harvest treatments are used for some selected units. Although the partial harvest units involve more acreage than traditional clearcutting units, the effects to resources is expected to be somewhat less than the impact of clearcutting, especially for future effects, by providing more constant forage production. The Selected Alternative meets or exceeds the Forest Plan standards and guidelines.

Past harvest practices of clearcutting in the Threemile Project Area will also affect the future deer habitat capability. The decrease in deer habitat capability for the no action alternative is predicted to be 12 percent by the 2040, when estimated future deer habitat capability is compared to conditions before large-scale timber harvesting occurred in the project area. This decline will occur when the existing second-growth stands reach complete canopy closure, which will result in a reduction of forage for deer. The use of partial harvest, as designed for this project, will not create the large openings that past clearcutting did, and future changes in habitat capability will not be as great as with clearcutting.

The greatest risk to meeting subsistence demand in the future is primarily related to the anticipated human population growth and its associated increase in subsistence hunter demand when compared to the habitat capability to produce deer. This anticipated population growth will happen independent of this proposed project. An 18% growth rate per decade in human populations was assumed for years 1954-2010 and a 15% growth rate was assumed for years 2010-2095 in analyzing subsistence hunter demand. However, this estimation in growth has not reflected actual growth. In the past decade, local populations have increased up to 1.5% and some community populations have actually decreased by as much as 10.2%.

Management activities cannot completely avoid all subsistence areas due to their location and broad extent across the Forest. Other areas that could be harvested may be limited by

# Record of Decision

additional resource concerns such as soil and water protection, high-value wildlife habitat, economics, scenic quality, or unfeasible unit and road design. The impact of viable timber harvest projects usually includes the alteration of old-growth habitat, which reduces habitat capability for old-growth associated species.

The Threemile Project involves the minimum amount of public land necessary and strikes a balance between meeting the needs of the public and protecting forest resources. Choosing any alternative (including the no-action alternative) other than the Selected Alternative or locating harvest in another location on Kuiu Island would not avoid or substantially lessen the risk to subsistence use in the future.

**Reasonable Steps to Minimize Adverse Impacts Upon Subsistence Uses and Resources** – The Forest Plan took considerable steps to minimize adverse impacts to subsistence uses and resources. Forest Plan standards and guidelines protect important deer winter habitat. Other reasonable steps taken to minimize adverse impacts to subsistence resources include: the overall Forest Plan land use designation strategy, the old-growth reserve strategy, travel and access management planning, Forest Plan standards and guidelines for stream, beach and estuary buffers, and the use of silvicultural systems that maintain components of overstory tree canopy, such as two-aged and uneven-aged management.

The Selected Alternative will construct 4.2 miles of classified roads, none of which will be left open for public use after timber harvest. All temporary roads will be closed after timber harvest. In addition to closing all new roads, 8.3 miles of existing road will be closed to vehicle traffic (see the Transportation Section in Chapter 3 of the FEIS).

Most of the high value deer winter habitat that is available to be harvested is not proposed for timber harvest as part of the Threemile Project. Figure 3-22 and Table 3-41 in the FEIS displays deer habitat values.

The Selected Alternative reflects a reasonable balance between the projected need for timber from the project area to help meet the Forest Plan, ANILCA, and TTRA timber-related objectives, and the continued protection of subsistence uses and resources. Impacts on subsistence have been minimized throughout the design of the individual harvest units and road corridors, and through the formulation of the alternatives. I have determined that reasonable measures to minimize impacts on subsistence have been adopted to the maximum extent practicable while still meeting the purpose and need for this project.

## Coastal Zone Management Act

The Coastal Zone Management Act of 1972 (CZMA), while specifically excluding Federal lands from the coastal zone, requires that a federal agency's activities be consistent with the enforceable standards of a state's coastal management program to the maximum extent practicable when the agency's activities affect the coastal zone.

The enforceable standards for timber harvest activities are found in the State Forest Practices Act. The standards and guidelines for timber management activities in the Threemile Project Area meet or exceed the standards in the State Forest Practices Act.

I have determined that the proposed activities are consistent with the Alaska Coastal Management Program to the maximum extent practicable. The Alaska Office of Project

# Record of Decision

Management and Permitting has reviewed this determination and concurred with the finding.

## Consumers, Civil Rights, Minorities and Women

No negative impacts to the civil rights of individuals or groups, including minorities and women, are anticipated to be associated with this project. Additional information can be found in the Forest Plan Revision FEIS Chapter 3 and Appendix H, as well as Chapter 3 of the Threemile Project Area FEIS.

## Executive Orders

**EO 11593** – Executive Order 11593 directs federal agencies to provide leadership in preserving, restoring, and maintaining the historic and cultural environment of the Nation. The work that was accomplished in accordance with Section 106 of the National Historic Preservation Act for the Threemile Project Area meets the intent of this Executive Order.

**EO 11988** – Executive Order 11988 directs Federal agencies to take action to avoid, to the extent possible, the long and short-term adverse impacts associated with the occupancy and modification of floodplains. The numerous streams in the Threemile Project Area make it impossible to avoid all floodplains during timber harvest and road construction. The design of the proposed developments and the application of Best Management Practices combine to minimize adverse impacts to floodplains.

**EO 11990** – Executive Order 11990 requires federal agencies to avoid, to the extent possible, the long and short-term adverse impacts associated with the destruction or modification of wetlands. Soil moisture regimes and vegetation on some wetlands may be altered in some harvest units; however, affected wetlands would still be classified as wetlands and function as wetlands in the ecosystem.

This project avoids impacting wetlands whenever practicable, but because wetlands are so extensive in the Threemile Project Area, it is not feasible to avoid all wetland areas. Effects will be minimized by avoiding the use of wetlands as sites for overburden disposal, avoiding road construction through wetlands whenever practicable, and by closing all new roads after timber harvest. Implementation of BMPs, minimizing ditching, and providing adequate cross drainage will also help minimize the amount of wetlands affected.

**EO 12962** – Executive Order 12962 directs federal agencies to conserve, restore and enhance aquatic systems to provide for increased recreational fishing opportunities nationwide. Section 1 of the Executive Order is most pertinent to the proposed activity. Section 1 directs federal agencies to evaluate effects on aquatic ecosystems and recreational fisheries, develop and encourage partnerships, promote restoration, provide access, and promote awareness of opportunities for recreational fishery resources.

The effects of this project have been evaluated throughout the FEIS, including effects to freshwater and marine resources. Partnerships are continuing to be used to leverage federal project funds to address water quality concerns in areas of the Tongass National Forest, although none have been proposed in conjunction with this project.

Record of Decision

Under the Selected Alternative, new road closures and closure of some existing roads would only provide access for recreational fishing opportunities to those willing to walk into the project area. Since most recreational fishing is expected to remain at saltwater and at other locations accessible by roads, the impact of improved access on recreational fishing opportunities is expected to be minor.

**EO 12898** – Executive Order 12898 directs federal agencies to identify and address the issue of environmental justice, such as adverse human health and environmental effects of agency programs that disproportionately impact minority and low-income populations. Implementation of the selected alternative will not cause adverse health or environmental effects that disproportionately impact minority and low-income populations. The timber sale schedule for the Tongass National Forest attempts to distribute harvest activities across all suitable forest lands to not affect any one community disproportionately.

**EO 13007** – Executive Order 13007 directs federal agencies to accommodate access to and ceremonial use of American Indian sacred sites by Indian religious practitioners and to avoid adversely affecting the physical integrity of such sacred sites. There are no known sacred Indian sites in the Threemile Project Area. An interagency field review occurred in July 2000. The Petersburg Indian Association and the Organized Village of Kake were both invited. Members of the interdisciplinary team met with members of the Organized Village of Kake on January 24, 1999. The State Historic Preservation Officer has been consulted and concurred with our finding that no known historic properties are in the area of potential effects.

**EO 13186** - Executive Order 13186 directs federal agencies to evaluate the effects of actions and agency plans on migratory birds, with emphasis on species of concern. The sections on Wildlife and Threatened and Endangered Species in this chapter provide information on anticipated effects to selected bird species in the project area. None of the proposed activities are expected to have a measurable negative effect on migratory bird populations, although individuals or small groups and their nests may be affected.

# Federal and State Permits

Federal and State permits necessary to implement the authorized activities are listed in Chapter 1 of the FEIS.

# Implementation Process

Implementation of this decision may occur no sooner than 30 days after the date of publication of the Notice of Availability of the FEIS in the Federal Register, or 50 days following publication of the public notice of the decision in the *Juneau Empire*, published in Juneau, Alaska, whichever is later. The timber sale may be offered in one or more sales.

The Selected Alternative will be implemented in accordance with Forest Service Manual and Handbook direction for timber sale project implementation. This will ensure execution of the actions, environmental standards, and mitigation measures approved by this decision, and compliance with TTRA and other laws. All Best Management Practices will be applied to the Selected Alternative.

# Record of Decision

Implementation of all activities authorized by the Record of Decision will be monitored to ensure that they are carried out as planned and described in the FEIS.

Appendix 2 of this document contains harvest unit plans and road management objectives. These plans and objectives are a significant part of this decision because they document the specific resource concerns, management objectives, and mitigation measures to govern the layout of the harvest units and construction of roads. They will be used during the implementation process to assure that all aspects of the project are implemented within the standards and guidelines and that resource impacts will not be greater than those described in the FEIS.

## Procedure for Changes During Implementation

Proposed changes to the authorized project actions will be subject to the requirements of the National Environmental Policy Act (NEPA), the National Forest Management Act of 1976 (NFMA), Section 810 of the Alaska National Interest Lands Conservation Act (ANILCA), the Tongass Timber Reform Act (TTRA), the Coastal Zone Management Act (CZMA), and other laws concerning such changes.

In determining whether and what kind of NEPA action is required for proposed changes during implementation, I will consider the criteria for whether to supplement an existing environmental impact statement (EIS) in 40 CFR 1502.9(c), and FSH 1909.15, sec. 18, and in particular, whether the proposed change is a substantial change to the Selected Alternative as planned and already approved, and whether the change is relevant to environmental concerns. Connected or interrelated proposed changes regarding particular areas of specific activities will be considered together in making this determination. The cumulative impacts of these changes will also be considered.

The intent of field verification is to confirm inventory data and to determine the feasibility and general design and location of a unit or road, not to locate final boundaries or road locations. Minor adjustments to unit boundaries are also likely during final layout for the purpose of improving logging system efficiency. This will usually entail adjusting the boundary to coincide with logical logging setting boundaries. Many of these minor changes will not present sufficient potential impacts to require any specific documentation or other action to comply with applicable laws. Some minor changes may still require appropriate analysis and documentation to comply with FSH 1909.15, sec. 18.

Record of Decision

## Right to Appeal

This decision is subject to administrative appeal. Organizations or members of the general public may appeal this decision according to Title 36 Code of Federal Regulations (CFR) 215. The appeal must be filed within 45 days of the date that legal notification of this decision is published in the *Juneau Empire*, the official newspaper of record. The Notice of Appeal must be filed in duplicate with:

> Regional Forester
> Alaska Region
> U. S. Department of Agriculture, Forest Service
> P.O. Box 21628
> Juneau, AK 99802-1628

It is the responsibility of those who appeal a decision to provide the Regional Forester sufficient written evidence and rationale to show why the decision by the Forest Supervisor should be changed or reversed. This written Notice of Appeal must:

- State that the document is a Notice of Appeal filed pursuant to 36 CFR Part 215;
- List the name, address, and if possible, the telephone number of the appellant;
- Identify the decision document by title and subject, date of the decision, and name and title of the Responsible Official;
- Identify the specific change(s) in the decision that the appellant seeks or portion of the decision to which the appellant objects;
- State how the Responsible Official's (Forest Supervisor's) decision fails to consider comments previously provided, either before or during the comment period specified in 36 CFR 215.6, if applicable, and how the appellant believes the decision violates law, regulation or policy.

For additional information concerning this decision, contact Jim Brainard or Tiffany Benna, Threemile Project Coordinators, P. O. Box 1328, Petersburg, AK 99833, or call (907) 772-3841.


_____
FORREST COLE
Forest Supervisor

4.23.04
_____
Date