BRUCE M. LANDON
Department of Justice
Environment & Natural Resources Division
801 B Street, Suite 504
Anchorage, Alaska 99501-3657
Phone: (907) 271-5452
Facsimile: (907) 271-5827
Email: bruce.landon@usdoj.gov

Attorney for Federal Defendants

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| ORGANIZED VILLAGE OF KAKE, SOUTHEAST ALASKA CONSERVATION COUNCIL, NATURAL RESOURCES DEFENSE COUNCIL, SIERRA CLUB, THE WILDERNESS SOCIETY, and CENTER FOR BIOLOGICAL DIVERSITY, | ) ) ) ) ) ) ) | Case No. 1:04-cv-0029 (JKS) |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| UNITED STATES FOREST SERVICE; UNITED STATES DEPARTMENT OF AGRICULTURE; MARK REY, in his official capacity as Under Secretary of Agriculture; DENNIS E. BSCHOR, in his official capacity as Alaska Regional Forester; and FORREST COLE, in his official capacity as Forest Supervisor for Tongass National Forest, | ) ) ) ) ) ) ) ) | |
| Defendant. | ) ) ) | |

## FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR RELIEF PENDING REVISION OF THE TONGASS LAND MANAGEMENT PLAN

US RELIEF BRIEF

TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A. The Revision of the Tongass Land Management Plan . . . . . . . . . . . . . . . . . . . . . . . 2

    B. Pending Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C. Proceedings in *NRDC I* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    D. Modification of the Timber Sale Schedule in Response to the Ninth Circuit's Decision
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    E. Classification of Projects Against Which Plaintiffs Seek Relief . . . . . . . . . . . . . . . 8

    F. Relationship Between the FY 2006 and FY 2007 Sale Schedules and the Timber
      Needs of Mills in Southeast Alaska . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I.  RELIEF IN THIS ACTION MUST BE LIMITED TO THE SPECIFIC TIMBER SALE
    PROJECTS THAT ARE THE SUBJECT OF THIS ACTION . . . . . . . . . . . . . . . . . . . . 10

II.  RELIEF AGAINST THE UPPER CARROLL, LINDENBERG, RED MOUNTAIN AND
    SYNCHRO SALES IS TIME-BARRED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

III.  NO RELIEF CAN BE GRANTED AGAINST THE SKIPPING COW AND NORTH
    CORNER SALES BECAUSE PLAINTIFFS FAILED TO EXHAUST THEIR
    ADMINISTRATIVE REMEDIES WITH REGARD TO THOSE SALES . . . . . . . . . . 16

IV.  AN INJUNCTION AGAINST THE SIGNING OF SITE-SPECIFIC RECORDS OF
    DECISION WOULD BE INCONSISTENT WITH *OHIO FORESTRY,* THE
    ADMINISTRATIVE PROCEDURE ACT AND BASIC NEPA LAW, AND IS NOT
    NECESSARY FOR THE PROTECTION OF THE ENVIRONMENT . . . . . . . . . . . . 18

    A. The Requested Relief is Inconsistent with *Ohio Forestry* and the Administrative
      Procedures Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    B. Enjoining the Signing of Future RODs is Not Necessary to Prevent Irreparable Harm
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      C. <u>Nothing in the CEQ Regulations Prohibits the Issuance of Site-Specific RODs</u> . . . . <u>28</u>

V. VACATING EXISTING SITE-SPECIFIC RODS IS NOT NECESSARY TO PREVENT
      IRREPARABLE HARM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>29</u>

VI. PRUDENTIAL CONSIDERATIONS COUNSEL AGAINST ATTEMPTING TO
      PERFORM A WEIGHING OF THE EQUITIES WITH REGARD TO PLAINTIFFS'
      BROAD PRAYER FOR INJUNCTIVE RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>31</u>

VII. PLAINTIFFS PROVIDE NO REASONED BASIS FOR ENJOINING ALL TIMBER
      HARVEST ON KUIU ISLAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>35</u>

VIII. THE PUBLIC INTEREST MILITATES AGAINST THE ISSUANCE OF THE BROAD
      INJUNCTION SOUGHT BY PLAINTIFFS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>39</u>

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>42</u>

TABLE OF AUTHORITIES

FEDERAL CASES

Alaska Wilderness Recreation & Tourism Ass'n v. Morrison, 67 F.3d 723 (9th Cir. 1995)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 31

Amoco Production Co. v. Village of Gambell, 480 U.S. 531 (1987) . . . . . . . . . . . . . . . . . 22, 31

Bastek v. Federal Crop Insurance Corporation, 145 F.3d 90 (2d Cir. 1998) . . . . . . . . . . . . . . . 17

Bethlehem Steel Corp. v. Environmental Protection Agency, 669 F.2d 903 (3rd Cir. 1982) . . . 17

Calhoun v. United States Department of Agriculture, Farm Service Agency, 920 F.Supp. 696
(N.D. Miss. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Chenault v. United States Postal Service, 37 F.3d 535 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . 15

City of Tenakee Springs v. Block, 778 F.2d 1402 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . 3

Federal Trade Commission v. Standard Oil of California, 449 U.S. 232 (1980) . . . . . . . . . 24, 25

Forest Guardians v. Dombeck, 131 F.3d 1309 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . 16, 40

Friends of the Earth v. Bergland, 576 F.2d 1377 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . 23

Friends of the Earth v. Coleman, 518 F.2d 323 (9th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . 42

Gleichman v. United States Dep't of Agriculture, 896 F.Supp. 42 (D. Me. 1995) . . . . . . . . . . . 17

Hanlon v. Barton, 740 F.Supp. 1446 (D. Alaska 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 36

Hecht v. Bowles, 321 U.S. 321 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Idaho Sporting Congress v. Rittenhouse, 305 F.3d 957 (9th Cir. 2002) . . . . . . . . . . . . . 12, 20, 34

Inland Empire Public Lands Council v. U.S. Forest Service, 88 F.3d 754 (9th Cir. 1996) . . . . . . 3

Kern v. United States Bureau of Land Management, 284 F.3d 1062 (9th Cir. 2002)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 18, 20

Laguna Greenbelt, Inc. v. Department of Transportation, 42 F.3d 517 (9th Cir. 1994) . . . . . . . 42

Lujan v. National Wildlife Federation, 497 U.S. 871 (1990) . . . . . . . . . . . . . . . . . . . . . . . . 11, 19

Massachusetts v. Watt, 716 F.2d 946 (1st Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

McBride Cotton and Cattle Corp. v. Veneman, 290 F.3d 973 (9th Cir. 2002) . . . . . . . . . . 17, 18

McCarthy v. Madigan, 503 U.S. 140 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Native Ecosystems Council v. Bosworth, 2005 WL 2387594 (D. Idaho 2005) . . . . . . . . . . . . 13

Natural Resources Defense Council v. United States Forest Service, 421 F.3d 797 (9th Cir. 2005)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 6, 7, 10, 20, 27, 31, 41

Northern Cheyenne Tribe v. Hodel, 851 F.2d 1152 (9th Cir. 1988) . . . . . . . . . . . . . . . 23, 25, 31

Northwest Ecosystem Alliance, 2006 WL 44361 (W.D. Wash. 2006) . . . . . . . . . . . . . . . . . . 22

Ohio Forestry Ass'n v. Sierra Club, (Ohio Forestry) 523 U.S. 726 (1998)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 10-12, 19-21, 24, 27

ONRC Action v. Bureau of Land Management, 150 F.3d 1132 (9th Cir. 1998) . . . . . . . . . . . . 40

Papenthien v Papenthien, 120 F.3d 1025 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Sierra Club v. Cargill, 732 F. Supp. 1095 (D. Colo. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Sierra Club v. Hathaway, 579 F.2d 1162 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Sierra Club v. Hennesey, 695 F.2d 643 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Sierra Club v. Marsh, 872 F.2d 497 (1st Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

Sierra Club v. Robertson, 28 F.3d 753 (8th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

South Carolina Dept. of Wildlife & Marine Resources v. Marsh, 899 F.2d 99 (4th Cir. 1989)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Tlingit and Haida Indians of Alaska v. United States, 177 F.Supp. 452 (Ct. Cl. 1959) . . . . 35, 38

TwoRivers v. Lewis, 174 F.3d 987 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Warm Springs Dam Task Force v. Gribble, 565 F.2d 549 (9th Cir. 1977) . . . . . . . . . . . . . . . . 23

Weinberger v. Romero-Barcelo, 456 U.S. 305, 311 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

FEDERAL STATUTES

5 U.S.C. § 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

7 U.S.C. § 6912(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

16 U.S.C § 1604 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

16 U.S.C. § 1604(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

16 U.S.C. § 1604(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

16 U.S.C. § 1604(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

16 U.S.C. § 1604(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

28 U.S.C. § 2401(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

National Environmental Policy Act (NEPA), 42 U.S.C. § 4331 . . . . . . . . . . . . . . . . . . . . . 4, 12

National Forest Management Act (NFMA), 16 U.S.C. § 1601 . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Section 101 of the Tongass Timber Reform Act, Pub. L. 101-626, November 28, 1990, 104 Stat.
626 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Section 338 of the Interior Appropriations Act of 2004, Pub. L. No. 108–108, 117 Stat. 1314
(Nov. 10, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 15

Section 416 of the 2006 Interior & Related Agencies Appropriations Act of 2006, Pub. L. 109-
54, August 5, 2005, 119 Stat. 499, 551-52 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

FEDERAL REGULATIONS

36 CFR § 215.15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

36 CFR § 215.15(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

US RELIEF BRIEF                              v

36 CFR § 219.17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

36 CFR § 215.11(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

40 CFR § 1500.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

40 CFR § 1506.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 30

58 Fed. Reg. 19,370 – 19,371 (April 14, 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

68 Fed. Reg. 75136-01 (December 30, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 42

INTRODUCTION

This action is one of four pending actions[1] in which a number of plaintiffs seek review of

site-specific timber sale projects in the Tongass National Forest (Tongass) based on claims that

both the revised Tongass Land Management Plan (TLMP) and the site-specific environmental

impact statements (EISs) were defective.  In *Natural Resources Defense Council v. United States*

*Forest Service, (NRDC I)* 421 F.3d 797 (9th Cir. 2005), the Ninth Circuit found a number of

defects in the TLMP Final EIS (FEIS) and Record of Decision (ROD).  The Circuit remanded to

this Court "to conduct such further proceedings as are appropriate, and consistent with this

opinion, to address the scope of permanent injunctive relief."  *Id.* at 816 n.29.

In an effort to avoid the need for lengthy proceedings regarding relief, the Forest Service

revised its timber sale schedule so as to defer sales of timber from any of the site-specific

projects at issue in all four cases until after the expected date for the signing of the new TLMP

ROD in the summer of 2007.  Consistent with federal defendants' position set forth in the Joint

Status Report in *NRCD I*, filed February 15, 2006, federal defendants are willing to stipulate that

they will not advertise for sale any timber from the site-specific projects at issue in *NRDC I,*

*NRDC III* and this action pending issuance of the new TLMP ROD or January 1, 2008,

whichever comes first.[2]  Federal defendants would make the same stipulation with regard to the

---

[1]    The other three actions are *Natural Resources Defense Council v. United States Forest*
*Service, (NRDC I) (Consolidated)),* J03-029 CV (JKS) (D. Alaska); *Natural Resources Defense*
*Council v. United States Forest Service, (NRDC III)* J04-010 CV (JKS) (D. Alaska); and
*Southeast Alaska Conservation Council v. United States Forest Service, (SEACC v. USFS)* J06-
005 CV (JWS) (D. Alaska).

[2]    This stipulation does not extend to the Buckdance/Madder and Fusion sales.  Both sales
were the subject of interim or partial settlement agreements in *NRDC I.*  Plaintiffs do not seek
                                                                    (continued...)

US RELIEF BRIEF                     1

Emerald Bay timber sale project, which is the subject of *SEACC v. USFS*.  Such a stipulation would eliminate any need for further injunctive proceedings in the pending cases.

Plaintiffs seek to go outside the specific timber sale projects at issue in the pending cases and request injunctive relief against existing timber sale projects that plaintiffs chose not to challenge prior to the running of the statute of limitations for those projects.  They also seek generally to enjoin the agency from signing future site-specific RODs involving roadless areas or Kuiu Island.  Such relief is prohibited by the Supreme Court's decision in *Ohio Forestry Ass'n v. Sierra Club, (Ohio Forestry)* 523 U.S. 726 (1998), which requires forest plan challenges to be brought against each site-specific project rather than on a forest-wide basis.

Accordingly, the appropriate course is for the Court to approve the stipulation lodged with the Court as Fed. Def. Exh. 1 to this brief, and to deny all other relief sought by plaintiffs.  Federal defendants have lodged a proposed order to that effect.

BACKGROUND

A.  The Revision of the Tongass Land Management Plan

_____Under the Forest and Rangeland Renewable Resources Planning Act of 1974, as amended by the National Forest Management Act (NFMA), the Secretary of Agriculture is required to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System."  16 U.S.C. § 1604(a).  NFMA provides that "resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans." 16 U.S.C. § 1604(i).

---

[2/](...continued)
relief with regard to those sales.

US RELIEF BRIEF                          2

As to those activities about which a plan provides programmatic guidance, the fact that a proposed activity is consistent with the applicable forest plan does not mean that it will actually go forward, or that it can be undertaken without further scrutiny. *City of Tenakee Springs v. Block,* 778 F.2d 1402, 1406 (9th Cir. 1985). Rather, when an individual project (such as a timber sale) is proposed, the agency undertakes an individualized assessment of its likely environmental effects and renders a formal decision regarding it. *See* 53 Fed. Reg. at 26,832; 58 Fed. Reg. 19,370 – 19,371 (April 14, 1993); *Inland Empire Public Lands Council v. U.S. Forest Service*, 88 F.3d 754 (9th Cir. 1996); *Sierra Club v. Robertson*, 28 F.3d 753, 758 (8th Cir. 1994).

A forest plan is permissive in nature. It sets limitations on what can occur on the national forest through land use designations, and standards and guidelines. *Ohio Forestry,* 523 U.S. at 729. It sets a decadal limitation (the ASQ) on the amount of timber which can be sold from the forest. *Id*. It does not by itself authorize or require any development on the national forest. *Id*. Rather, through the consistency requirement of NFMA, it places conditions on the potential individual projects. 16 U.S.C. § 1604(i).

In 1979, the Forest Service published the original forest plan for the Tongass. TLMP FEIS 1-1, Fed. Def. Exh. 4. The Forest Service began the public process for revising TLMP in the late 1980's. *Id*. at 1-3, Fed. Def. Exh. 4. After a decade of extraordinary effort including the publication of numerous environmental analysis documents, the Regional Forester signed the 1997 Record of Decision for and adopted the revised TLMP in May 1997. *NRDC I,* 421 F.2d at 801.

Upon administrative appeal, the Under Secretary of Agriculture issued a 1999 ROD, modifying the 1997 plan in a number of ways. Fed. Def. Exh. 5. In *Alaska Forestry Ass'n v.*

*United States Dept. of Agriculture,* J00-013CV, consolidated with J00-009CV (JKS) (D. Alaska) (Order filed March 30, 2001)*,* this Court vacated the 1999 ROD.[3/]

In the consolidated case of *Sierra Club v. Rey,* J00-009CV (JKS) (D. Alaska)(March 30, 2001), this Court held that the 1997 TLMP violated the National Forest Management Act (NFMA), 16 U.S.C. § 1601 *et seq.,* and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4331 *et seq.* because the agency had not considered alternatives that would have made recommendations for additional wilderness areas on the Tongass.  The Court remanded for preparation of a supplemental environmental impact statement (SEIS) to consider roadless areas for possible wilderness recommendation.  *Id.*  The agency prepared the required SEIS and, in 2003, issued its 2003 ROD.  *NRDC I,* 421 F.3d at 804-05.  The 2003 ROD recommended no additional roadless areas in the Tongass for wilderness designation.  *Id.* at 805.   In Section 335 of the 2003 Omnibus Appropriation Act, Pub. L. 108-7 (Feb. 20, 2003), Congress prohibited judicial review of that decision.

B.  Pending Litigation

Both prior to and after the 1997 TLMP revision, the Forest Service has prepared EISs and RODs for site-specific timber sale projects and sold such sales on the Tongass.  In Section 338 of the Interior Appropriations Act of 2004, Pub. L. No. 108–108, 117 Stat. 1314 (Nov. 10, 2003), Congress provided that any application for review of such Records of Decision had to be filed within 30 days after exhaustion of the Forest Service administrative appeals process or within 30

---

[3/]      Local Rule 7.1(c)(2) permits the Court to take judicial notice of its own case files. Accordingly, federal defendants have not filed as exhibits copies of the pleadings and orders in case files cited in this case.  Federal defendants would be happy to provide courtesy copies to the Court upon request.

days of enactment of the Act, if the administrative appeals process had been exhausted prior to enactment of the Act.

On December 9, 2003, environmental plaintiffs brought *NRDC I,* J03-029 CV (JKS) (D. Alaska) challenging the following site-specific timber sale RODs, raising claims that both the TLMP revision and the site-specific EISs and RODs were defective:

Finger Mountain (June 2003)[4/]

Cholmondeley (April 2003)

Sea Level (May 1999)

Canal Hoya (April 1999)

Crane and Rowan (June 1998)

Chasina (April 1998)

On January 8, 2004, environmental plaintiffs brought *Natural Resources Defense Council v. United States Forest Service (NRDC II),* J04-002 CV (JKS) (D. Alaska) challenging the Madan timber sale project.  By order filed April 1, 2004, the Court consolidated *NRDC I* and *NRDC II.*  All subsequent filings in the two cases have been in *NRDC I.*

On March 23, 2004, environmental plaintiffs brought *Natural Resources Defense Council v. United States Forest Service, (NRDC III),* challenging the 2003 ROD for the Woodpecker timber sale project.   *NRDC III* has not been consolidated with any other case.

On November 5, 2004, plaintiffs brought *Organized Village of Kake v. United States Forest Service,* J04-029 CV (JKS) (D. Alaska) challenging the Threemile timber sale project.

---

[4/]     The year in parentheses indicates that year of the signing of the site-specific ROD for the project.

US RELIEF BRIEF                    5

This case has not been consolidated with any other case.

On March 23, 2006, environmental plaintiffs brought *Southeast Alaska Conservation Council v. United States Forest Service, (SEACC v. USFS)* J06-005 CV (D. Alaska), challenging the Emerald Bay timber sale project.  That case has not been consolidated with any other case.

The various complaints contain differing allegations relative to claimed defects in the site-specific EISs and RODs, but raise identical claims with regard to defects in the TLMP FEIS and ROD.

C.  Proceedings in *NRDC I*

On July 27, 2004, this Court granted judgment to the Forest Service on all counts in *NRDC I.*  Plaintiffs appealed.  On appeal, plaintiffs pursued their claims relating to alleged defects in the TLMP FEIS and ROD, but not those claims relating to the site-specific EISs and RODs.  *See, NRDC I,* 421 F.2d 797 (9th Cir. 2005).   The Ninth Circuit found that the TLMP ROD and FEIS were defective because they misinterpreted certain market demand projections prepared by Forest Service experts Brooks and Haynes in 1997, and because the TLMP FEIS inadequately considered the cumulative impacts of harvest of high volume timber on the Tongass.  *Id.*  The Circuit remanded to this Court "to conduct such further proceedings as are appropriate, and consistent with this opinion, to address the scope of permanent injunctive relief."  *Id.* at 816 n.29.  Nothing in the Ninth Circuit's decision vacated the 1997 Plan, nor do plaintiffs seek to have this Court vacate that Plan.  Motion for Equitable Relief Pending Revision of the Tongass Land Management Plan (Plnts' Remedy Brief) at 4-5.

On remand, the parties to *NRDC I,* reported by Joint Status Report filed in that case on February 12, 2006, their view that *NRDC I* should not be consolidated with *NRDC III* or this

action, because the three cases include differing claims against the site-specific RODs and EISs.

However, because the three cases raise the same challenges to the forest plan, the parties agreed

that "any deliberations regarding injunctive relief by virtue of the plan defects identified by the

Ninth Circuit should include consideration of any injunctive relief sought in those two actions."

The parties proposed to accomplish the simultaneous consideration of injunctive relief

(due to defects in the TLMP FEIS and ROD) in all three cases by filing separate motions for

relief in the three cases, using the same briefing schedule and largely incorporating by reference

(and as exhibits) the contents of the lead brief in one of the cases into the filings in the other

cases.   Plaintiffs have filed their lead brief in this action, and defendants do the same.

D.   Modification of the Timber Sale Schedule in Response to the Ninth Circuit's Decision

            In response to the Ninth Circuit's decision, the Forest Service has embarked on the

preparation of a supplemental TLMP EIS to address the deficiencies identified by the Circuit.

Completion of the new TLMP EIS and ROD is scheduled for July 2007.  Declaration of Forrest

Cole ¶ 3, Fed. Def. Exh. 2.

The Forest Service periodically issues timber sale schedules of anticipated future sale

offerings.  *Id.* ¶ 4.  As explained in the Declaration of Forrest Cole, the Forest Service has

modified its timber sale schedule on the Tongass for the period preceding the expected

completion date of the new TLMP ROD in three important respects.

1.  The timber sale schedule delays until at least fiscal year (FY) 2008, the sale of any

timber authorized by the timber sale project RODs at issue in the complaints set forth in part B

above.  The only exceptions are the Buckdance/Madder and Fusion sales.  Both sales were the

subject of interim or partial settlement agreements in *NRDC I*.  Plaintiffs have excluded both

sales from their injunction request. Plnts' Remedy Brief at 26.

2.  During FY 2006 and that portion of FY 2005 after the Ninth Circuit's decision in

*NRDC I,* the Forest Service scheduled timber sales that included roadless volume only if those

sales were authorized by a site-specific decision document as to which plaintiffs failed to exhaust

their administrative remedies or for which the statute of limitations has expired.

3.  During FY 2007, only two sales including any harvest or road construction in roadless

areas (Straight Creek in the Kuiu project and Scratchings in the Scratchings project)  not fitting

the description in the preceding paragraph are scheduled for possible sale.  Those two sales were

scheduled because they have a low proportion of roadless area volume to roaded area volume,

and because they involve only extensions to an already existing road system in the vicinity.

Declaration of Forrest Cole ¶ 8, 12, Fed. Def. Exh. 2.

E.  Classification of Projects Against Which Plaintiffs Seek Relief

_____From the above descriptions, it is possible to divide the projects against which plaintiffs

seek relief into two groups, each of which can be divided into subgroups.  The projects of all

groups and subgroups share the fact that they include at least some timber harvest or road

construction within roadless areas or on Kuiu Island.

The first group (group 1) consists of those timber sale projects that already have a site-

specific ROD.  Plaintiffs seek to vacate all such existing RODs.  Group 1 may be divided into

two subgroups.

The first subgroup (group 1A) consists of the site-specific RODs listed in the complaints

in the four cases (*NRDC I* consolidated*, NRDC III,* this case, and *SEACC v. USFS)*  pending

before this Court.   The Forest Service has modified its timber sale schedule and submitted a

stipulation that it will not offer timber from those projects until well after the expected

completion date of the new TLMP ROD, except for the Buckdance/Madder and Fusion sales,

against which plaintiffs seek no relief.

The second subgroup (group 1B) consists of RODs that already exist, but against which

no relief can be granted either because the statute of limitations has expired, or because plaintiffs

failed to exhaust their administrative remedies.  Some sales under those projects are already

under contract or in the final stages of award (Upper Carroll II, Lindenberg, Skipping Cow, Red

Mountain sales).  Another (North Corner) is scheduled for sale in FY 2007.

The second main group (group 2) consists of those projects for which no ROD has yet

been signed.  Plaintiffs seek to enjoin the signing of any site-specific RODs.  This group may

likewise be divided into two subgroups.

Subgroup 2A consists of those proposed projects that are sufficiently progressed in the

NEPA process that it is reasonable to believe that a site-specific EIS will be signed prior to the

completion of the new TLMP ROD, but for which no timber sales are scheduled until after the

expected completion date of the new TLMP ROD.

Subgroup 2B likewise consists of those proposed projects that are sufficiently progressed

in the NEPA process that it is reasonable to believe that the agency will sign a site-specific ROD

prior to completion of the new TLMP ROD.  Assuming the agency chooses an action alternative,

the agency proposes to sell timber from this subgroup prior to the completion of the new TLMP

ROD.  The only projects in this subgroup are the Kuiu and Scratchings projects.  Those projects

were chosen because they involve a relatively small proportion of roadless timber to roaded

timber.

F.  Relationship Between the FY 2006 and FY 2007 Sale Schedules and the Timber Needs of
Mills in Southeast Alaska

_____Alaska Forestry Association (AFA) has intervened in this action and is best placed to

describe the volume needs of the timber industry, and to what extent the FY 2006 and FY 2007

sale schedule, along with timber already under contract respond to that need.  It is important,

however, not to confuse the sales appearing on the Forest Service modified timber sale schedules

with actual timber that can necessarily respond to industry volume needs.  As explained in the

Declaration of Forrest Cole ¶ 13, Fed. Def. Exh. 2, the scheduled timber sales are subject to a

number of contingencies that make it unlikely that the planned volume will be offered in its

entirety.  The FY 2006 and FY 2007 schedules include sales for which no site-specific EIS and

ROD has been signed.  *Id.*  It also includes sales not yet appraised. *Id.* at ¶ 13.  The Forest

Service cannot offer sales that appraise negatively.  *Id.*  At this time, it cannot be determined how

much of the scheduled volume will actually be available for sale.

ARGUMENT

THE COURT SHOULD APPROVE FEDERAL DEFENDANTS' STIPULATION AND
OTHERWISE DENY THE RELIEF SOUGHT BY PLAINTIFFS

_____

I.  RELIEF IN THIS ACTION MUST BE LIMITED TO THE SPECIFIC TIMBER SALE
PROJECTS THAT ARE THE SUBJECT OF THIS ACTION

In *Ohio Forestry,* 523 U.S. 726 (1998), the Supreme Court held that plaintiffs challenging

a forest plan must do so in a case challenging a specific timber sale.  Plaintiffs in that case

challenged the lawfulness of a forest plan on the ground that the plan permitted too much logging

and too much clearcutting.  *Id.* at 728.  The Supreme Court held that such a challenge was not

US RELIEF BRIEF                    10

ripe for review.  *Id*. at 732.

Plaintiffs treat *Ohio Forestry* as if it merely requires that an initial challenge to a forest plan be made with reference to a specific timber sale, and that once there is one sale to challenge, the necessity of bringing suit against additional site-specific timber sales evaporates.  That reading is flatly inconsistent with the Court's opinion.  The Court rejected Sierra Club's argument that it would be "cheaper, to mount one legal challenge against the Plan now, than to pursue many challenges to each site-specific logging decision to which the Plan might eventually lead" *Id.*  at 734, stating that the costs of bringing multiple actions did not affect the ripeness analysis.  *Id.* at 735.  The Court noted that while Sierra Club would have to sue on a project-by-project basis, "one initial site-specific victory (if based on the Plan's unlawfulness) could ... *through preclusion principles*, effectively carry the day." *Id.* at 734-35 (emphasis added).  The Court contemplated repeated suits against the implementation of a plan, noting that "the disadvantages of premature review ... outweigh the additional costs of – even repetitive– post-implementation litigation."  *Id.*  The Court quoted with approval the language of *Lujan v. National Wildlife Federation,* 497 U.S. 871, 894 (1990):

> The case-by-case approach ... is understandably frustrating to an organization such as respondent, which has as its objective across-the-board protection of our Nation's ... forests....  But this is the traditional, and remains the normal, mode of operation of the courts.

*Ohio Forestry,* 523 U.S. at 735.

The Court indicated that review was improper without "the focus that a particular logging proposal could provide."  *Id.* at 736.  Plan review is available only in the context of a challenge to a specific sale, and then only to the extent that "the present Plan then matters."  *Id.* at 734.  The

Court recognized that the agency could make plan defects irrelevant through its implementation of site-specific projects.  *Id.* at 735-736.

District court and Ninth Circuit decisions have followed the Supreme Court's admonition and refused forest-wide relief based upon plan level defects, instead requiring plaintiffs to file challenges to individual site-specific projects.  In *Idaho Sporting Congress v. Rittenhouse,* 305 F.3d 957, 974 (9th Cir. 2002), the Ninth Circuit held that the Forest Plan standard for maintaining viability of old-growth dependent species was invalid at the time of the approval of specific timber sales.  *Id.* at 967.  The Circuit rejected the plaintiffs' request for a forest-wide injunction against all logging, stating that "such a sweeping remedy is not warranted" and that review should occur "[a]t such time as the Forest Service seeks to approve future logging."  because "we prefer to consider such issues in the context of site-specific actions if and when they actually occur."  *Id.*  The Circuit also indicated that  "interim standards" during the plan amendment process might allow site-specific actions to take place during that amendment process.  *Id.*  Consequently, the Circuit limited the injunction in that case to the two site-specific sales before the court.

The Ninth Circuit does permit plan level challenges alleging violations of the National Environmental Policy Act (NEPA) 42 U.S.C. 4331 *et seq.* as soon as the plan is issued pursuant to an allegedly defective EIS.  *Kern v. United States Bureau of Land Management,* 284 F.3d 1062, 10770-71 (9th Cir. 2002).  In that same case, however, the Circuit ruled that a NEPA violation with regard to the plan does not necessarily invalidate a site-specific project.

> We do not hold that no EA for a site-specific project can ever be adequate if the
> project is undertaken pursuant to an RMP for which there is an inadequate EIS.

> Rather, we hold that the impacts, including the cumulative impacts, of the site-specific project must be fully analyzed in any EA for that project. If, as is the case here, there is no analysis in the EIS, the scope of the required analysis in the EA is correspondingly increased.

*Id.* at 1078. Accordingly, in determining the validity of two timber sales, the Circuit determined first whether there was a NEPA defect in the plan, and then whether the site-specific NEPA document cured the plan defect as to that site-specific project. *Id.*

Consistent with *Ohio Forestry, Rittenhouse* and *Kern,* the District Court for the District of Idaho recently found defects in a forest plan, but limited the injunction to the two specific sales before the court, rejecting plaintiffs' request for a forest-wide injunction against further logging. *Native Ecosystems Council v. Bosworth,* 2005 WL 2387594 (D. Idaho 2005). The district court noted that it would consider sales only as they became "imminent," consistent with the principle in *Ohio Forestry* that plan challenges can only be made when "harm from logging is imminent" and the forest plan "plays a causal role with respect to the imminent harm from the logging." *Id.* *1. The court ruled that *Ohio Forestry "*held that the Court had no jurisdiction to consider general challenges to a Forest Plan, but was restricted to hearing disputes over site-specific projects that had been approved under the Forest Plan. That decision precludes NEC from making a broad-based challenge to the RFP that is not tied to a site-specific project." *Native Ecosystems Council v. Bosworth,* 2005 WL 2387594 at * 6. *See also, Forest Conservation Council v. United States Forest Service,* C02-1293C (W.D. Wash., Order filed Sept. 14, 2004) (dismissing claim against the N. W. Baranof timber sale project as time-barred, and dismissing on *Ohio Forestry* grounds "claims directed at the validity of the Tongass LRMP, taken separately from numerous challenges to site-specific projects."), Fed. Def. Exh. 9 at 13.

Thus regardless of whether the claim arises under NEPA or NFMA relief against a specific project requires an action against that specific project.

The only projects against which plaintiffs have brought an action are listed in part B of the Background section of this brief. They constitute subgroup 1A as described in part E of the Background section. This is the only subgroup for which the Court could provide relief under *Ohio Forestry* and *Kern.* However, the agency has modified its timber sale schedule and submitted a stipulation that it will delay sales from this subgroup until after the expected completion date of the new TLMP ROD. No relief is necessary with regard to this subgroup other than the approval of the stipulation.

## II.  RELIEF AGAINST THE UPPER CARROLL, LINDENBERG, RED MOUNTAIN AND SYNCHRO SALES IS TIME-BARRED

Plaintiffs seek (Plnts' Remedy Brief at 17) relief against the Upper Carroll II, Lindenberg, Red Mountain and Synchro[5] sales, none of which was challenged in the complaints in the cases pending before the Court.   Each of those sales was authorized by a site-specific ROD in 1996.[6] Plaintiffs' claim for relief is barred not only by *Ohio Forestry,* but also by the running of the statute of limitations against challenges to those projects. These sales fall within subgroup 1B as

---

[5]      Until recently, the Synchro sale was scheduled for sale in FY 2007. It has been removed from the sale schedule because it did not receive a positive appraisal. Declaration of Forrest Cole ¶ 13, 14.

[6]      The Upper Carroll II sale is authorized by the Upper Carroll ROD (1996), Plnts' Exh. 4; Lindenberg by the South Lindenberg ROD (1996), Plnts' Exh. 5; Red Mountain by the King George ROD (1996), Plnts' Exh. 3; and Synchro by the N.W. Baranof ROD (1996), Plnts' Exh. 2. In 2004, the district court for the District of Western Washington dismissed claims against the N. W. Baranof project as barred by 28 U.S.C. § 2401(a). *Forest Conservation Council v. United States Forest Service,* C02-1293C (W.D. Wash., Order filed Sept. 14, 2004), Fed. Def. Exh. 9 at 13.

described in part E of the background section.

Under Section 338 of the Interior Appropriations Act of 2004, Pub. L. No. 108–108, 117 Stat. 1314 (Nov. 10, 2003), any challenge to timber sale RODs in the Alaska region had to be filed within 30 days of November 10, 2004,  if, as was the case with these sales,  the administrative appeals process had been exhausted prior to that date.[7]

Thus, plaintiffs were required to bring any challenge to those projects by December 10, 2003.  Plaintiffs brought *NRDC I*, challenging six other site-specific timber sale projects, but did not include any of these four projects in that complaint.  The opportunity for judicial review has passed and all claims against the projects are time-barred.[8]

Even if Congress had never enacted Section 338, the claims would still be time-barred. The general statute of limitations on non-tort claims against the United States provides that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."  28 U.S.C. § 2410(a).  Thus, it is now too late to bring an action against any of the projects.  To the extent plaintiffs claim that the site-specific decision was itself defective, that claim arose when the administrative appeals on the

---

[7]     The administrative appeals process had to be exhausted for all four sales prior to November 30, 2004.  By regulation, all administrative appeals of timber sale projects are decided within 90 days of the ROD.  36 CFR § 215.15.  Thus the appeals process for a ROD issued in 1996 would be exhausted in 1997 at the latest.

[8]     Plaintiffs cannot argue that because Section 338 was a provision in an appropriations act, it expired at the end of fiscal year 2004.  Where an action becomes barred while a statute of limitations is in effect, the subsequent repeal or extension of that statute of limitations does not revive the previously barred claim.  *Chenault v. United States Postal Service,* 37 F.3d 535, 538-39 (9th Cir. 1994); *TwoRivers v. Lewis,* 174 F.3d 987, 993 (9th Cir. 1998); *Papenthien v. Papenthien,* 120 F.3d 1025 (9th Cir. 1997).  Consequently, any challenge to those projects has been barred and cannot be revived.

projects were decided in 1996 or 1997.  To the extent that plaintiffs claim that the project

decisions were rendered invalid by the issuance of the defective TLMP revision, such claims

accrued at the latest in 1999 when the administrative appeal on the TLMP revision issued.  *See*

1999 ROD, Fed. Def. Exh. 5.  In either event, the claim is time-barred.

Moreover, it is difficult to see how the Ninth Circuit's decision in *NRDC I* could possibly

result in a claim against sales under these four projects.  They were all decided under the 1979

TLMP as amended, *prior* to the 1997 ROD.  The defects the Ninth Circuit found in the 1997

ROD and FEIS are, therefore, irrelevant to those projects.  *Forest Guardians v. Dombeck,* 131

F.3d 1309 (9th Cir. 1997) (amendments to forest plans need not apply retroactively to projects

that had already been authorized).

### III.  NO RELIEF CAN BE GRANTED AGAINST THE SKIPPING COW AND NORTH CORNER SALES BECAUSE PLAINTIFFS FAILED TO EXHAUST THEIR ADMINISTRATIVE REMEDIES WITH REGARD TO THOSE SALES

The ROD for the Skipping Cow project was issued in 2000.  Declaration of Forrest Cole

¶ 6.  Administrative appeals had to be filed within 45 days of the publication date of the ROD.

36 CFR § 215.15(a).  No party filed an administrative appeal against the Skipping Cow ROD.

Declaration of Forrest Cole ¶ 6, Fed. Def. Exh. 2.  The EA for the Doughnut project was issued

in 2000.  *Id* at ¶ 11.  The North Corner sale is part of that project.  *Id.*  The North Corner sale

consists of 1.5 mmbf, scheduled for sale in FY 2007.  *Id.*  No plaintiff in any of the pending cases

filed an administrative appeal against the Doughnut project.  *Id.*  These projects fall within

subgroup 1B as described in part E of the Background section of this brief.  Because plaintiffs

failed to exhaust their administrative remedies, they cannot obtain relief against these sales.

The doctrine of exhaustion of administrative remedies prevents a party from seeking

judicial review of agency action without completing of all administrative remedies which the agency by regulation requires. *See, Bethlehem Steel Corp. v. Environmental Protection Agency,* 669 F.2d 903, 906-07 (3rd Cir. 1982). The exhaustion requirement is particularly strict when statutorily required. *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992) ("[w]here Congress specifically mandates, exhaustion is required.").

In the 1994 Department of Agriculture Reorganization Act, Congress explicitly mandated exhaustion of administrative remedies before a party may bring an action against the Department of Agriculture or any of its offices or officers. 7 U.S.C. § 6912(e). The courts that have analyzed the exhaustion provision in the Department of Agriculture Reorganization Act have observed that "[i]t is hard to imagine more direct and explicit language requiring that a plaintiff suing the Department of Agriculture, its agencies, or employees, must first turn to any administrative avenues before beginning a lawsuit." *Bastek v. Federal Crop Insurance Corporation*, 145 F.3d 90, 94-95 (2d Cir. 1998); *Gleichman v. United States Dep't of Agriculture*, 896 F.Supp. 42, 44 (D. Me. 1995); *Calhoun v. United States Department of Agriculture, Farm Service Agency*, 920 F.Supp. 696, 702 (N.D. Miss. 1996). In the Ninth Circuit, failure to failure to exhaust the administrative remedies required by 7 U.S.C. § 6912(e) will only be excused when the suit alleges a constitutional claim which is (1) collateral to a substantive claim of entitlement, (2) colorable, and (3) one whose resolution would not serve the purposes of exhaustion. *McBride Cotton and Cattle Corp. v. Veneman,* 290 F.3d 973, 980 (9th Cir. 2002). This case involves no constitutional claims. Accordingly, plaintiffs' failure to exhaust their administrative remedies with regard to the Skipping Cow and North Corner sales precludes a claim against them now.

Thus, not only are the Skipping Cow and North Corner sales outside the scope of the

pending actions, but no new action could be filed against them.  Accordingly, no relief can be

issued against those sales.

IV.  AN INJUNCTION AGAINST THE SIGNING OF SITE-SPECIFIC RECORDS OF
DECISION WOULD BE INCONSISTENT WITH *OHIO FORESTRY,* THE
ADMINISTRATIVE PROCEDURE ACT AND BASIC NEPA LAW, AND IS NOT
NECESSARY FOR THE PROTECTION OF THE ENVIRONMENT

_____Plaintiffs seek to enjoin the Forest Service from signing any new site-specific RODs

involving any timber harvest or road construction in roadless areas or on Kuiu Island.  Such

proposed projects with no existing EIS constitute group 2 as described in part E of the

background section.

    A.  The Requested Relief is Inconsistent with *Ohio Forestry* and the Administrative
Procedures Act

As explained in part I above, the Supreme Court in *Ohio Forestry* made clear that

plaintiffs claiming defects in a forest plan must raise those defects in cases against site-specific

timber sale projects.  The Supreme Court required plaintiffs to pursue their claims on a project-

by-project basis, rejecting arguments that it would be cheaper for plaintiffs to file one plan-wide

case than to pursue many challenges to each site-specific logging decision to which the Plan

might eventually lead"  *Id.*  at 734.

Because a plan claim must be raised as part of a challenge to a specific timber sale

project,[9] it follows that no relief can be issued against such a project until that particular project

_____

[9]     As explained in part I, above, the Ninth Circuit permits NEPA claims against a forest
plan as soon as the plan has been adopted.  *Kern v. United States Bureau of Land Management,*
284 F.3d at 1070-71.  However, the Circuit simultaneously held that a NEPA defect in a plan EIS
does not necessarily invalidate a site-specific project, which may be valid if it contains the
appropriate analysis missing from the plan EIS.  *Id.* at 1078.  Consequently, relief against a
project is premature until the Court can determine whether the site-specific EIS remedies the
                           (continued...)

is ready for judicial review.  Except where a statute specifically provides for review of interlocutory agency action, the Administrative Procedure Act (APA) limits judicial review to "final agency action." 5 U.S.C. § 704; *Lujan v. National Wildlife Federation,* 497 U.S. 871, 894 (1990).  There is no final agency action with regard to a timber sale until the agency has issued its ROD or Decision Notice for the sale and resolved any administrative appeal filed.  36 CFR §§ 215.11(a) and 215.21.  Plaintiffs, accordingly, ask this court to issue injunctive relief against an action over which the Court has no jurisdiction because there is not yet any final agency action.

Enjoining the signing of future site-specific RODs is likewise inconsistent with the Supreme Court's admonition that claims against a plan must be brought with regard to site-specific timber sale projects, but even then "if (but only if) the Plan then matters, i.e., if the Plan plays a causal role with respect to the future, then-imminent, harm from logging." *Ohio Forestry* 523 U.S. at 734.  The Supreme Court's insistence on deferring review over site-specific projects until such time as they become final and imminent arises from its recognition that "immediate judicial review directed at the lawfulness of logging and clearcutting could hinder agency efforts to refine its policies ... through application of the Plan in practice, e.g., in the form of site-specific proposals...." *Id.* at 735.  The Supreme Court warned against review "without the benefit of the focus that a particular logging proposal would provide." *Id.* 736. The Supreme Court believed that the courts should not focus on whether "the Plan as a whole is 'improperly skewed' [but] rather on 'whether the decision to allow clearcutting on a particular site was improper, say because the site was better suited to another use or logging there would cumulatively result in too

---

[9]/(...continued)
defects in the plan EIS as to the specific project.  Such a determination can only be made once the site-specific ROD is issued.

many trees' being cut.'" *Id.* That determination can only be made after there is a site-specific ROD.

The Ninth Circuit has likewise recognized that a plan defect does not necessarily invalidate every site-specific project, recognizing, for example, that "interim standards" might cure a plan deficiency. *Idaho Sporting Congress v. Rittenhouse,* 305 F.3d 957, 974 (9th Cir. 2002) *see also, Kern v. United States Bureau of Land Management,* 284 F.3d at 1078. Accordingly, an injunction against the signing of future ROD is inappropriate because it deprives the agency of the opportunity to correct plan defects through site-specific implementation.

The inappropriateness of enjoining the signing of future RODs may be illustrated with reference to the Kuiu timber sale project. Plaintiffs seek to enjoin the signing of a ROD for that project. Plnts' Remedy Brief at 18. No FEIS or ROD has issued for that project, but the agency did publish a DEIS (Fed. Def. Exh. 6) on it in January 2006.

Review of the DEIS for the Kuiu project reveals that it discusses the matters that the Ninth Circuit found defective in the revised TLMP in *NRDC I.* The Ninth Circuit found the 1997 ROD and FEIS defective because they used an incorrect interpretation of the Brooks and Haynes projections of market demand. *NRDC I,* 421 F.3d at 807-14. The Circuit also found defective the discussion of the environmental effects of logging of high-volume old-growth. The Kuiu DEIS uses the correct interpretation of the Brooks and Haynes projections. Kuiu DEIS at App. A-7, Fed. Def. Exh. 6. It also has an extensive discussion on the impacts from cumulative effects of harvest of high volume timber. *See e.g.*, Kuiu DEIS at 3-38 to 3-41, 3-157 to 3-159. Fed. Def. Exh. 6. The DEIS considers the no-action alternative, which essentially involves the consideration of whether "the site was better suited to another use or [whether] logging there

would cumulatively result in too many trees' being cut" as foreseen by the Supreme Court in *Ohio Forestry,* 523 U.S. at 736.  The DEIS also contains an extensive discussion of wildlife habitat and subsistence with specific analysis of the impacts on viability and fragmentation. Kuiu DEIS at 3-23 to 3-96, Fed. Def. Exh. 6.

By virtue of the analysis already in the DEIS, it may be that the defects in the TLMP FEIS and ROD no longer matter to this site specific project.  But, of course, that is not really the relevant question.  The relevant question will be whether the information and analysis in the eventual Kuiu FEIS and ROD make the plan defects no longer matter.  That question cannot be answered until such time as the Kuiu FEIS and ROD actually issue, and then only after exhaustion of administrative remedies.

Plaintiffs rely on this Court's Order Clarifying Injunction  in *Sierra Club v. Rey,* J00-009 CV (JKS) (D. Alaska, March 30, 2001), for the proposition that the Court can and should enjoin the signing of future RODs.  Crucial distinctions existing between these cases and *Sierra Club v. Rey* preclude such reliance.

In *Sierra Club v Rey,* the plaintiffs challenged the failure of the Forest Service to include in the FEIS for the TLMP revision alternatives that would recommend additional wilderness designations.   Because wilderness recommendations are made only as part of the forest plan process, the case presented the unusual instance where a forest plan could be challenged without regard to a specific timber sale  --  because a site-specific decision to choose the no-action alternative still could not result in a wilderness recommendation, plaintiffs were permitted to

bring a pre-implementation challenge on that specific claim.[10]  Plaintiffs' challenges here, on the other hand, are controlled by *Ohio Forestry.*

Second, *Sierra Club v. Rey* turned on the specific directive in 36 CFR § 219.17 that the Forest Service evaluate and consider for recommendation as potential wilderness each inventoried roadless area.   The regulation designated both the specific land involved and the type of analysis required.  Here, on the other hand, the Ninth Circuit merely held that the agency's misinterpretation of the Brooks and Haynes market demand projections could have affected its general weighing of competing goals for the forest, and that additional analysis was necessary with regard to the cumulative impacts from harvest of high volume timber.  While it could be said that this Court determined in *Sierra Club v. Rey* that the plan was defective with respect to a specific class of land, i.e. roadless areas, the same cannot be said for the Ninth Circuit's decision.

B.  Enjoining the Signing of Future RODs is Not Necessary to Prevent Irreparable Harm

As the Ninth Circuit recognized in *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison (AWRTA)*, 67 F.3d 723, 731 (9th Cir. 1995), even in instances where a court finds a violation of an environmental statute, there is a "fundamental principle that an injunction is an equitable remedy that does not issue as of course."  *Accord, Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 542 (1987), citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982).  No injunctive relief can issue without a finding of irreparable injury.  *Amoco Production*

_____

[10]      The only other case on which plaintiffs rely for the proposition that the court should go outside the site-specific projects listed in the complaints in these actions is *Northwest Ecosystem Alliance v. Rey,* 2006 WL 44361 (W.D. Wash. 2006).  Suffice to say that that case never even considered the implications of *Ohio Forestry.*  Moreover, the court in that case enjoined "logging or ground-disturbing projects," Slip Op. at *7, rather than enjoining the signing of future site-specific RODs or vacating existing site-specific RODs.

*Co. v. Village of Gambell,* 480 U.S. at 542.  Even when irreparable injury is present:

> In each case, a court must balance the competing claims of injury and consider the effect on each party of the granting or withholding of the requested relief.

AWRTA, 67 F.3d at 732.  In addition, the court must consider and make specific findings on the record of the public interest.  *Northern Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1157 (9th Cir. 1988).

Even in NEPA cases an injunction must be "tailored to restrain no more than what is reasonably required to accomplish its ends."  *North Carolina v. City of Virginia Beach,* 951 F.2d 596, 602 (4th Cir. 1991); *South Carolina Dept. of Wildlife & Marine Resources v. Marsh,* 899 F.2d 99, 100 (4th Cir. 1989) (both reversing injunctions entered on the "bureaucratic momentum" theory).  The essence of equity jurisdiction is to mold each decree to the necessity of the particular case; it is distinguished by flexibility rather than rigidity.  *Sierra Club v. Cargill*, 732 F. Supp. 1095, 1102 (D. Colo. 1990), *rev'd and remanded on other grounds*, 11 F.3d 1545 (10th Cir. 1993), citing *Hecht v. Bowles*, 321 U.S. 321, 329 (1944).  The goal is to arrive at a "'nice adjustment and reconciliation' between the competing claims...."  *Weinberger v. Romero Barcelo*, 456 U.S. 305 at 312 (1982).

In balancing the equities, "the environmental concerns of the movants must be weighed against the societal interests which will be adversely affected by the relief requested."  *Warm Springs Dam Task Force v. Gribble*, 565 F.2d 549, 551 (9th Cir. 1977).  Under NEPA, the courts will not issue injunctions only as prophylactic or punitive measures.  *Friends of the Earth v. Bergland*, 576 F.2d 1377, 1379 (9th Cir. 1978).

Plaintiffs devote much effort in their brief to attempting  to demonstrate that "logging of

old growth on the Tongass also causes irreparable harm, because it takes hundreds of years for the forest to regain its original characteristics." Plnts' Remedy Brief at 6. However, the signing of a site-specific ROD without an actual sale results in no logging or any other on-the-ground disturbance.

Plaintiffs allege only two types of harm in support of their prayer that the Court enjoin the signing of future RODs, neither of which constitutes irreparable harm. First, plaintiffs allege that if the agency is permitted to continue signing RODs, plaintiffs will likely be forced to file new site-specific lawsuits challenging those RODs. Such litigation costs cannot be considered harm, *Ohio Forestry* 523 U.S. at 735, and certainly not environmental harm. *See also, Federal Trade Commission v. Standard Oil of California,* 449 U.S. 232, 244 (1980) ("Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury."). Indeed such serial litigation of site-specific projects is precisely the mechanism the Supreme Court indicated was proper in *Ohio Forestry.*

Second, plaintiffs vaguely allege that signing site-specific RODs now would cause "prejudice to the planning process that results from the agency's continued actions making commitments to logging places that should be considered for protection." Plnts' Remedy Brief at 14. The record belies the theory that the signing of site-specific RODs prejudices the forest planning process. Numerous areas in the Tongass have been placed in non-development land use designations (LUDs) after the issuance of a site-specific timber sale project ROD. For example, the 1997 TLMP ROD placed the Chicken Creek sale, previously authorized in the Eight-Fathom site-specific EIS, into a habitat conservation area (HCA), thereby precluding the sale. Declaration of Forrest Cole ¶ 24, Fed. Def. Exh 2. The 1999 TLMP ROD placed non-

US RELIEF BRIEF                          24

development LUDs upon project areas previously authorized in the North and East Kuiu site-specific ROD, and the Ushk Bay site-specific ROD, thereby precluding those projects. *Id*. Nor has Congress shown reluctance to designate areas as wilderness simply because the Forest Service has issued a site-specific timber project decision for that area. The Forest Service approved the Chuck Creek timber sale and laid it out on the ground, but never sold it because the Tongass Timber Reform Act (TTRA) placed the area in wilderness. *Id*. Thus, plaintiffs' suggestion that the signing of site-specific RODs prejudices the forest planning process lacks factual support.

Even when courts have entered injunctions in NEPA cases based on the theory of "bureaucratic momentum" they have enjoined activities constituting much more serious commitments than the signing of RODs. *Sierra Club v. Marsh,* 872 F.2d 497, 507 (1st Cir. 1989) (reversing decision of the district court not to enjoin the actual construction of a causeway); *Massachusetts v. Watt,* 716 F.2d 946 (1st Cir. 1983) (enjoining actual oil and gas lease sale). In the Ninth Circuit, the "bureaucratic momentum" theory does not even require cancellation (as opposed to suspension) of existing sales contracts. *Northern Cheyenne Tribe v. Hodel,* 851 F.2d 1152, 1156-58 (9th Cir. 1988).

The courts' scepticism of claims of bureaucratic momentum arises from the presumption that the agency will comply with the law after preparing its NEPA documentation. *Id.* at 1157; *see also North Carolina v. City of Virginia Beach,* 951 F.2d 596, 602-603 (4th Cir. 1992) (refusing to enjoin construction in the absence of a showing that the construction would have a "direct and substantial probability of influencing" the agency's decision).

The bureaucratic momentum theory requires a much stronger commitment than the

signing of a site-specific ROD.  As the First Circuit explained when it first developed the theory, NEPA's purpose "is to require consideration of environmental factors before project momentum is irresistible, before options are closed, and before the agency commitments are set in concrete." *Massachusetts v. Watt,* 716 F.2d at 953.  The signing of a site-specific ROD falls far short of any of those situations.  Moreover, the First Circuit made clear that harm from such bureaucratic momentum arises "when governmental decisionmakers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment."  *Sierra Club v. Marsh,* 872 F.2d at 500.  Plaintiffs have not made (and until an actual site-specific FEIS and ROD are produced cannot make) a showing that future RODs will necessarily lack an analysis of the effects of the site-specific project.

The only support plaintiffs can point to in support of the proposition that it is proper to enjoin the mere signing of a site-specific EIS is this Court's Order Clarifying Injunction in *Sierra Club v. Rey,* J00-009 CV (D. Alaska).  As the hearing transcript makes clear, that Order resulted from expedited proceedings on short notice and contains no discussion of the case law, in particular *Ohio Forestry* and *Kerns v. United States Bureau of Land Management.*  Plnts' Exh. 11 at 3.  In any event, *Sierra Club v. Rey* is distinguishable in numerous respects.

First, in *Sierra Club v. Rey,* plaintiffs could argue that future site-specific FEISs would not contain the necessary analysis of whether a roadless area should be recommended for wilderness status, because such recommendations are made exclusively as part of the forest plan process.  Here, in contrast, it is possible that site-specific EISs will contain analysis curing the defect in the TLMP FEIS and ROD.

Second, in *Sierra Club v. Rey,* the Court expressed concern that the Forest Service "did

not give any consideration to the appropriateness of additional wilderness designations within the Tongass. . . particularly within currently roadless areas."   Hearing Transcript, Plnts' Exh. 11 at 4. Here, there is no comparable failure to consider an issue.  Moreover, since the adoption of the 1997 ROD, the agency has prepared a SEIS evaluating the wilderness values of each roadless area on the Tongass and determined not to recommend any further wilderness.  *See, NRDC I,* 421 F.3d at 804-05.  The agency has also prepared an EIS that considered whether to adopt a regulation prohibiting timber sales and road construction on the Tongass, and ultimately determined to exempt the Tongass from the nation-wide prohibitions of the former Roadless Area Conservation Rule.  *See,* 68 Fed. Reg. 75136-01 (December 30, 2003).  As explained in part VIII below, the Forest Service  has included information from the TLMP SEIS and the Roadless EIS regarding roadless areas when preparing the site-specific DEISs.

Consistent with *Ohio Forestry* 523 U.S. at 736, each site-specific EIS analysis focuses on whether "allow[ing] clearcutting on a particular site was improper, say because the site was better suited to another use or logging there would cumulatively result in too many trees' being cut."  The Court recognized in its May 13, 2002 Findings of Fact and Conclusions of Law in *Sierra Club v. Rey,* that such site-specific analysis can be a ground for denying injunctive relief against site-specific timber sale projects.  .

> [T]imber harvest and or road building authorized by site specific timber projects shall not be enjoined as those projects already have environmental impact statements which considered "the no-action alternative that would preserve wilderness values." Even though the forest-wide TLMP was flawed for failing to consider wilderness values, since wilderness values were already considered for the specific timber sales, it is fair and equitable to allow those projects to continue....

Fed Def Exh. 8 at 7.

Far from being an activity that should be enjoined, the signing of the site-specific RODs

is the action that, after exhaustion of administrative remedies, will constitute final agency action

reviewable by this Court. It is at that point that the Court will be able to determine whether the

defects in the TLMP EIS and ROD still matter with regard to the site-specific ROD, and if so

whether to enjoin activities under the site-specific ROD.

C. <u>Nothing in the CEQ Regulations Prohibits the Issuance of Site-Specific RODs</u>

The Council of Environmental Quality (CEQ) has promulgated regulations on the

implementation of NEPA at 40 CFR Parts 1500 through 1508. These regulations are binding on

agencies. 40 CFR § 1500.3. Nothing in those regulations prohibits the issuance of site-specific

RODs while the agency cures the defects identified by the Ninth Circuit.

In pertinent part, 40 CFR § 1506.1 reads:

> (a) Until an agency issues a record of decision as provided in § 1502.2
> (except as provided in paragraph (c) of this section), no action concerning the
> proposal shall be taken which would:
>  (1) Have an adverse environmental impact; or
>  (2) Limit the choice of reasonable alternatives.
> ***
> (c) While work on a required program environmental impact statement is
> in progress and the action is not covered by an existing program statement,
> agencies shall not undertake in the interim any major Federal action covered by
> the program which may significantly affect the quality of the human environment
> unless such action:
>  (1) Is justified independently of the program;
>  (2) Is itself accompanied by an adequate environmental impact statement;
> and
>  (3) Will not prejudice the ultimate decision on the program. Interim action
> prejudices the ultimate decision on the program when it tends to determine
> subsequent development or limit alternatives.
> ***
> On its face, the section prohibits only actions "concerning the proposal" which would

have an adverse environmental impact or would limit the choice of reasonable alternatives. The

signing of a site-specific ROD does neither.  A site-specific ROD does not limit the choice of reasonable alternatives.  As shown in part V.B. above, the Forest Service can and has adopted forest plan revisions that prohibit timber harvest in areas despite the fact that a timber sale had already been authorized for that area pursuant to a site-specific ROD.

Moreover paragraph (c) allows certain additional activities pending the preparation of programmatic EISs which would not be permitted pending a site-specific EIS.  Paragraph (c) prohibits only the "undertaking" of an action, not the issuance of a decision or the preparation for that action.  Even activities that would have an adverse environmental impact or would limit the reasonable choice of alternatives may be "undertaken" pending completion of a programmatic EIS if they meet the three requirements of paragraph (c).  All three of those requirements are met here.  The site-specific projects have independent utility in contributing to a supply of Tongass timber.  They are supported by their own environmental impact statements, which plaintiffs have not shown to be inadequate.  Finally, they authorize the development in the site-specific ROD, but do not tend to "determine subsequent development."

In sum, the issuance of site-specific EISs is perfectly consistent with the CEQ regulations.

## V.  VACATING EXISTING SITE-SPECIFIC RODS IS NOT NECESSARY TO PREVENT IRREPARABLE HARM

Plaintiffs likewise seek to vacate existing site-specific RODs that involve harvest or road construction in roadless areas or on Kuiu Island.   Those RODs fall into two categories.

The first consists of those RODs for which the statute of limitations has expired or as to which plaintiffs failed to exhaust their administrative remedies.  Those projects constitute subgroup 1B described in part E of the Background section of this brief.   For the reasons

discussed in parts II and III, *supra,* the Court lacks jurisdiction to grant relief against those projects.

The second category consists of sales for which the statute of limitations or failure to exhaust do not presently bar an action. These sales constitute subgroup 1A as described in part E of the Background section of this brief. The agency has modified its timber sale schedule and submitted a stipulation that it will not sale timber from those projects[11] until well after the expected completion date of the new TLMP ROD. Thus vacation is not necessary to prevent any on-the-ground disturbance. Nor is vacation necessary to prevent "bureaucratic momentum" for the reasons already discussed with regard to plaintiffs' request for an injunction against the signing of new RODs.

Indeed, not even in *Sierra Club v. Rey* did the court vacate existing site-specific RODs. Rather, the Court enjoined timber harvest and road building in roadless areas under some of the existing RODs, but did not vacate any of them. *Sierra Club v. Lyons [subsequently Rey],* J00-009 CV (JKS) (D. Alaska, Order filed April 26, 2002), Fed. Def. Exh.10; and Plnts' Exh. 12. When the Forest Service completed the SEIS and issued the 2003 ROD, the injunction expired, and the agency could begin holding the sales without the need to issue a new site-specific ROD, to engage in a second round of administrative appeals, or to take any other procedural steps that might be necessary to reinstate a vacated ROD. Given the serious timber supply situation on the Tongass, the imposition of such unnecessary steps is unjustifiable here.

Vacatur is an especially inappropriate means for dealing with existing RODs, which in

---

[11]     Except the Buckdance/Madder and Fusion sales against which plaintiffs seek no relief.

many cases will involve harvest in both roaded and roadless areas.  *See* Plnts' Remedy Brief at

17 ("Forest Service has offered the following large timber sales located at least partly in roadless

areas") and table at 18 showing percent of each sale  in roadless areas or on Kuiu Island.  *See*

*also,* Declaration of Forrest Cole ¶ 7, Fed. Def. Exh. 2 (Upper Carroll project 68% roaded and

South Lindenberg project 29% roaded).  In some cases, the roads to previously roadless units

have already been built.  Declaration of Forrest Cole ¶ 7, Fed. Def. Exh. 2.  Vacatur is a blunt

instrument ill-tailored to address actual environmental harm.

VI.  PRUDENTIAL CONSIDERATIONS COUNSEL AGAINST ATTEMPTING TO
PERFORM A WEIGHING OF THE EQUITIES WITH REGARD TO PLAINTIFFS' BROAD
PRAYER FOR INJUNCTIVE RELIEF

Even when a court finds a violation of an environmental law, an injunction does not issue

as a matter of course.  *Amoco Production Company v. Village of Gambell,* 480 U.S. 531, 542

(1987).  Rather the court must engage in a weighing of the equities.  That weighing is intensely

factual in nature and must be done in the first instance by the district court.  *Alaska Wilderness*

*Recreation and Tourism Ass'n v. Morrison*, 67 F.3d at 731-32.  It is precisely for this reason that

the Ninth Circuit remanded to this Court for a determination of the appropriate remedy.   *NRDC I*

421 F.2d 816 n.29.

In performing a weighing of the equities, the Court must consider impacts of the

injunction on third parties and the public interest.  *See e.g., Sierra Club v. Hennesey*, 695 F.2d

643, 647-8 (2d Cir. 1982) (reversing issuance of injunction because the district court had failed

to balance the equities by considering budgetary harm to fiscally strapped city).  The court must

also make findings on the record of where the public interest lies.  *Northern Cheyenne Tribe v.*

*Hodel*, 851 F.2d 1152, 1157 (9th Cir. 1988).

Decisions regarding injunctions are particularly complex when the alleged violation of environmental laws potentially infects a large number of projects. Such cases can have a serious impact on the public interest. This Court has developed a standard for tailoring injunctions in such cases. In *Hanlon v. Barton*, 740 F.Supp. 1446, 1459 (D. Alaska 1988), Judge von der Heydt stated that in such cases "it is likely that neither complete suspension of harvesting nor unrestricted continuation of such activity would be appropriate pending the Forest Service's compliance with its obligations under NEPA and ANILCA." He suggested that an appropriate injunction would be one that would keep the principle southeastern timber facilities in business, while minimizing harm pending completion of supplemental environmental studies, and keeping as many options open as possible, so that supplemental studies can consider a broad range of alternatives. *Id.*; *See also, City of Tenakee Springs v. Courtright*, No. J86-024 CV (D. Alaska, Memorandum and Order July 31, 1987 at 2-3) (excerpts attached hereto as Fed. Def. Exh. 12 ); *Alaska Wilderness Recreation and Tourism Ass'n v. Morrison*, J94-0033 CV (JWS) (D. Alaska, Order from Chambers, filed April 29, 1996, at page 5) (attached hereto as Fed. Def. Exh. 13).

In general, the weighing of the equities can best be accomplished by reviewing all potentially affected projects together. However, unusual circumstances make such an approach inappropriate here. As described in the background section, the Forest Service has already modified its sale schedule to delay sales in roadless areas at issue in these pending cases until after the expected issuance date of the new TLMP ROD. If one excludes all the sales for which the statute of limitations has run or the plaintiffs failed to exhaust their administrative remedies, the only sales scheduled for FY 2006 or FY 2007 to which plaintiffs object are the Kuiu Roaded

sale.[12/] and the Straight Creek sale under the Kuiu project, and the Scratchings sale under the Scratchings project, all now scheduled for 2007.  No ROD has issued for either project, nor is it known whether those sales will appraise positively.

The present record does not permit a reasonable basis for weighing the equities with regard to these sales.  First, the agency has not even issued its FEIS and ROD for the Kuiu and Scratchings projects.  Thus it cannot be known at this time whether the FEIS for those projects will contain analysis that will make the defects of the TLMP FEIS and ROD "no longer matter."

Second, it cannot now be determined what role the Kuiu and Scratchings projects would play in meeting the volume needs of the Southeast timber mills.  As explained in the background section, at cannot be determined at this time whether the entirety of the sales planned for FY 2006 and FY 2007 will actually be able to be offered.  This is so for several reasons.  First, many of the scheduled sales do not have a ROD yet.  If the ROD is delayed, or if an administrative appeal results in a remand for additional work, a scheduled sale will not be held at the time scheduled.  Although plaintiffs do not seek injunctive relief against sales in roaded areas not on Kuiu Island, such sales can be administratively appealed by other parties and could be the subject of litigation.  For example, until recently the Scott Peak sale was scheduled for FY 2006, but is now scheduled for possible sale in FY 2007 because the it was successfully administratively appealed.  The 4.1 mmbf Overlook Sale was likewise scheduled for sale in FY 2006, but has been withdrawn due to an administrative appeal and is now scheduled for 2007.  Declaration of Forrest Cole ¶ 14, Fed. Def. Exh. 2.

---

[12/] Although originally scheduled for sale in FY 2006, this sale is more likely to be offered in FY 2007.  Declaration of Forrest Cole ¶ 9, Fed. Def. Exh. 2.

Moreover, Congress has prohibited the Forest Service from offering any timber sale that is not appraised as having a positive value.  Section 416 of the 2006 Interior & Related Agencies Appropriations Act of 2006, Pub. L. 109-54, August 5, 2005, 119 Stat. 499, 551-52.  Until recently, the timber sale schedule planned the offer of the 40 mmbf Synchro sale in 2007.  That planned sale has been dropped from the schedule because it did not receive a positive appraisal.  Declaration of Forrest Cole ¶ 14, Fed. Def. Exh. 2

Because the timber sale schedule is subject to so many unusual uncertainties, it is almost impossible for the Court to assess the importance of any particular sale to the needs of industry and the ability of the agency to provide alternate timber elsewhere.  Under these circumstances prudence dictates that the Court defer ruling on sales outside the projects at issue in these cases until such time when the record permits a more reasoned weighing of the equities.  Deferring such consideration would be consistent with the statement of the Ninth Circuit in *Idaho Sporting Congress v. Rittenhouse,* 305 F.3d 957, 974 (9th Cir. 2002), rejecting broad-based relief because the Circuit prefers to consider relief "in the context of site-specific actions if and when they actually occur."

If the agency completes its site-specific analysis and ROD and chooses an action alternative, and that alternative is upheld on administrative appeal, there will be final agency action subject to review by this Court.  At that time there should be significantly greater clarity about the importance of those sales in responding to industry needs.  Ordinary prudence suggests that the weighing of the equities can best be accomplished at that point.

VII. PLAINTIFFS PROVIDE NO REASONED BASIS FOR ENJOINING ALL TIMBER
HARVEST ON KUIU ISLAND

Plaintiffs seek to enjoin all harvest on Kuiu Island regardless of whether that harvest

occurs in roadless or roaded areas.  This request affects two "group 1" projects with existing

RODs (Crane Rowan and Three-mile) and one "group 2" project (Kuiu) with no existing ROD.

No sales from the group 1 projects are planned prior to the expected completion date of the new

TLMP ROD.   For the reasons set forth above, a weighing of the equities for the Kuiu project is

premature at this time.  Even if the Court believed that review of the proposed Kuiu project were

appropriate now, plaintiffs provide no reasoned basis for enjoining the project merely because it

is on Kuiu Island.  Indeed the argument for enjoining harvest in roaded areas on Kuiu conflicts

with the reasons proffered for enjoining harvest in roadless areas.

Plaintiffs argue that Kuiu Island should have no harvest because it is within the traditional

use area of the Kake kwaan and has experienced significant harvest in the past.  Plnts' Remedy

Brief at 9-13   The inclusion of an area within a traditional use area of a kwaan is not a basis for

an injunction.  As the Court of Claims found in *Tlingit and Haida Indians of Alaska v. United

States,* 177 F.Supp. 452, 455 (Ct. Cl. 1959), all of the Tongass was within the traditional use area

of one or another Tlingit or Haida kwaan.[13]

Nor can the fact that the northern part of Kuiu Island has experienced commercial harvest

in the past provide a reasoned basis for enjoining all harvest on the island.  By seeking to enjoin

all sales in inventoried roadless areas, plaintiffs are, in effect, limiting timber harvest to portions

---

[13]     A more detailed map of traditional kwaan territories may be found at
http://www.ankn.uaf.edu/ANCR/Southeast/TlingitMap/TlingitMap.pdf.  Interestingly, that map,
shows much of Kuiu Island to be outside the Kake kwaan's traditional territory.

of the Tongass that have experienced commercial harvest in the past. Each such developed area is going to be located in the traditional use area of one or more Tlingit or Haida clan. Such developed areas would include portions of Chichagof Island in the traditional use area of the Hoonah kwaan, or Prince of Wales Island within the traditional territory of other Tlingit and Haida clans.[14]

Plaintiffs note that plaintiff Organized Village of Kake commented that it wishes Kuiu Island eliminated from the timber base. During the TLMP revision process, the Forest Service received numerous comments suggesting the removal of specific portions of the forest from the timber base. As the response to public comments section of the TLMP FEIS ( App L,.Part B, at L218-292, Fed Def. 4) demonstrates, there is hardly a part of the Tongass that was not suggested for removal from the timber base.

Despite the impression that plaintiffs would give, Kuiu Island is not a particularly developed portion of the Tongass. Although significant timber harvest and road building has occurred on Kuiu Island, the extent of harvest on that island is modest when compared with some other islands on the Tongass. Kuiu Island has a total area of 481,012 acres, of which 34,300 acres[15](7%) have been harvested. Declaration of Forrest Cole ¶ 38, Fed. Def. Exh. 2. In contrast, Prince of Wales Island has a total area of 1,618,308 acres. *Id.* Of that total, 157,179 acres of national forest service land and 117,881 acres in other ownership has been harvested,

---

[14]     See map referenced in the preceding footnote. *See also, Hanlon v. Barton,* 740 F.Supp. 1446 (D. Alaska 1988) (efforts of Hoonah kwaan to enjoin harvest on Chichagof Island).

[15]     The Forest keeps its record in terms of "existing young growth" which slightly overstates the number of acres harvested because it includes not only harvest but some acreage of windthrown timber.

resulting in a harvest percentage of 17% of the Island.  *Id.*  Zarembo Island has a total acreage of 117,152 acres, of which 15,862 acres (13%) have been harvested.  *Id.*

Most of the productive forest land on Kuiu Island is already protected from timber harvest.  There are 321,729 acres of national forest productive forest land on Kuiu Island, of which only 120,141 (37%) are located in land use designations that allow timber harvest.  *Id.* at ¶ 41.

Moreover, Kuiu Island exhibits numerous factors that suggest that it is one of the areas of the Tongass where the reasons for avoiding timber harvest are particularly weak.  Kuiu is not accessible by the Alaska State Ferry system.  Threemile FEIS at 1-3 and Map at 1-5, Fed. Def Exh. 7.  Consequently, increased access by hunters is a lesser concern on Kuiu than it might be in other portions of the Tongass accessible by ferry.  Kuiu Draft at 3-86, Fed. Def.Exh 6 ("only minimal impacts due to road use are expected").

Kuiu Island is not one of the biogeographic regions where high risks to martin have been determined to exist.  Kuiu Draft 3-44, Fed. Def. Exh. 6.  The Kuiu Island Draft EIS noted that the TLMP FEIS predicted that there is a relatively high likelihood of sustaining viable marten populations when an average of 57 percent of the productive old-growth (POG) is retained within the matrix of development LUDs.  Kuiu DEIS at 3-73.   Currently, 72 percent of the POG has been retained within the matrix of the Kuiu project area.  *Id.*

Plaintiffs emphasize that the population of deer on Kuiu Island crashed in 1972 and has recovered only slowly.  The deer population did crash dramatically in 1972, and the Island was closed to all deer hunting from 1973 to 1991. Threemile FEIS 3-127, Fed. Def. Exh.7.  The crash, however, occurred prior to large-scale logging, and it was due to several other factors.

Those factors included a deep persistent snow pack that did not retreat until late June 1973, and deer populations that were above their carrying capacity as a result of artificially low wolf populations. *Id.* The low wolf population was due to a wolf eradication program that included a bounty on wolves until 1968, and a hunting and trapping program thereafter. *Id.* at 3-177.

Since 1992, all of Kuiu Island has been open for deer hunting, but recovery of the deer population has been slow because of high black bear populations and an increasing wolf population due to the ending of the wolf eradication program. *Id.* at 3-127, Def. Exh. 7. Black bear concentrations on Kuiu Island are among the highest recorded in North America. Kuiu DEIS at 3-63, Fed. Def. Exh. 6.

Very few deer are actually taken on Kuiu Island. Of the number of deer taken in Game Management Unit 3 (Deer, Etolin, Kadin, Kasheverof, Kuiu, Kupreanof, Mitkof, Woronkofski, Wrangell, and Zarembo Islands) in the 1998-1999 season, only 2.6 percent came from Kuiu. Threemile FEIS at 3-127, Fed. Def. Exh. 7. No hunters from Kake reported harvesting deer from Kuiu during the 2000-2001 or 1998-1999 seasons. *Id.*

Most of the deer harvest on Kuiu Island occurs along beaches (where timber harvest cannot occur under TLMP, Threemile FEIS 3-57, Fed. Def. Exh. 7) and along the existing road system, rather than in the interior part of the island where the harvest units of the Threemile project and planned Kuiu project are located. Threemile FEIS at 3-125, Fed. Def. Exh. 7; Kuiu DEIS Map Figure 2-4 showing preferred alternative, Fed. Def. Exh. 6.

The Kuiu project proposes activities in only one inventoried roadless area, North Kuiu Roadless Area #241. Kuiu DEIS at 3-8 and 3-9, Fed. Def. Exh. 6. The Kuiu DEIS carefully analyzes the roadless values of that roadless area using information from the TLMP Wilderness

SEIS.  Kuiu DEIS at 3-8, Fed. Def. Exh. 6.  The DEIS found with regard to wilderness potential

that "[t]here are no special attractions or features in this roadless area and no known significant

or unique features or values."  Kuiu DEIS at 3-9.   The roadless area lacks opportunities for

solitude and serenity, contains no distinctive scenery, contains primarily non-fish streams,

contains no recreation places and little potential for outfitter and guide permits.  Kuiu DEIS at 3-

9 to 3-11.  No endangered or threatened species are likely to occur in the roadless area, and its

vegetation is typical of Southeast Alaska.  Kuiu DEIS at 3-11.  Although the North Kuiu

Roadless Area lies within the traditional territory of the Kake Tlingit, there are no known cultural

resource sites in the roadless area.  Kuiu DEIS 3-12.[16]

The facts simply do not suggest a reasonable basis for enjoining all timber harvest on

Kuiu Island pending the correction of the TLMP defects identified by the Ninth Circuit, which

are unrelated to the Island.

## VIII.  THE PUBLIC INTEREST MILITATES AGAINST THE ISSUANCE OF THE BROAD INJUNCTION SOUGHT BY PLAINTIFFS

In view of the lengths the agency has already gone to modify the sale schedule in

response to the environmental concerns plaintiffs have expressed in the pending cases, it cannot

be said that the public interest favors the entry of yet broader injunctive relief.  To the contrary,

such relief would harm the public interest in three ways.

First, it would impair the ability of the Forest Service to seek to meet demand for timber

on the Tongass, a Congressional directive contained in Section 101 of the Tongass Timber

---

[16]     Nor were historic properties discovered in the areas that have the potential to be affected by activities associated with the Threemile or Crane Rowan projects. Declaration of Jane Smith Fed. Def Exh. 3.

Reform Act, Pub. L. 101-626, November 28, 1990, 104 Stat. 626.

Second,  the broad relief sought by plaintiffs would frustrate Congress's policy that there be a smooth transition between forest plans, and a minimum of disruption.  Congress enacted NFMA in large part out of concern that a number of court decisions had unduly restricted the ability of the Forest Service to sell timber from the National Forests.  S. Rept. No. 94-893 at 8-9, reprinted in 1976 U.S. Code Cong. & Admin. News, 6669.  While Congress was deeply concerned about the reduction of timber harvests, it also recognized the need to address "other objectives of planning management" S. Rept. No. 94-893, 10, reprinted in 1976 U.S. Code Cong. & Admin. News at 6671.

Congress provided for the preparation of forest plans, but in doing so it established a system designed to result in a smooth transition between plans.  Congress directed the Forest Service to "attempt to complete" the initial set of forest plans by 1985, and provided that until the initial plan was completed, the forests could continue to be managed under existing pre-NFMA plans.  16 U.S.C. § 1604(c).   Thereafter, plans were to be revised at least every 15 years.  16 U.S.C. § 1604(f).  However, Congress has enacted legislation at least seven times providing that there shall be no challenge to an existing plan on the ground that the plan in its entirety is outdated.  *See, historical note following* 16 U.S.C § 1604.  During the revision process, the agency is not expected to cease timber sales regardless of whether they might be inconsistent with some of the plan alternatives.  *ONRC Action v. Bureau of Land Management*, 150 F.3d 1132 (9th Cir. 1998).  Indeed, the Forest Service offered timber sales throughout the Tongass during the decade it worked on the revision.  Moreover, the agency has wide discretion with regard to transition and grandfathering provisions when plans are changed.  *See, Forest*

*Guardians v. Dombeck,* 131 F.3d 1309 (9th Cir. 1997). The broad injunctive relief sought by plaintiffs would preclude a smooth transition and cause just the "trainwreck" Congress has always sought to avoid.

Third, plaintiffs' attempt to prohibit the signing of new RODs and to vacate existing RODs, if granted, would almost certainly lead to needlessly increasing the administrative costs of site-specific timber sale preparation. The Forest Service has expended millions of dollars preparing NEPA documents for site-specific projects. Declaration of Forrest Cole ¶ 26, Fed. Def. Exh. 2. Plaintiffs have not shown that anything in the site-specific NEPA documents is defective. Rather, based on the defects in the TLMP FEIS and ROD identified by the Ninth Circuit, the plaintiffs would have the Court enjoin the agency from signing a ROD for which all the site-specific analysis has been completed, and vacate previously signed site-specific RODs. Doing so results in waste of administrative costs.

Such waste is particularly unjustifiable given the amount of analysis that has already taken place. Each of the sales has its own site-specific analysis, which fully considers a no-action alternative. *See, Sierra Club v. Rey,* J00-009CV (JKS) (D. Alaska, Finding of Facts and Conclusions of Law filed May 13, 2002 at 7) (where site-specific EIS considered wilderness values as part of the no-action alternative, harvest would not be enjoined based upon plan FEIS and ROD defects). Moreover, the agency has already prepared a SEIS for the TLMP revision, which considered each roadless area for potential wilderness designation. *See, NRDC I,* 421 F.3d at 804-05. That SEIS used the proper interpretation of the Brooks and Haynes projections. SEIS at 3-255 to 3-256, Fed. Def. Exh. 11. The agency also prepared an EIS to consider a regulation that would have prohibited timber harvest and road construction in the Tongass, and ultimately

determined not to apply the former Roadless Area Conservation Rule to the Tongass because its application would have unacceptable impacts on timber dependent communities. *See,* 68 Fed Reg. 75136-01 (Dec. 30, 2003). The Ninth Circuit has repeatedly held that such additional analyses militate against the issuance of an injunction. *Friends of the Earth v. Coleman,* 518 F.2d 323, 330 (9th Cir. 1975); *Sierra Club v. Hathaway,* 579 F.2d 1162, 1168 (9th Cir. 1978); *Laguna Greenbelt, Inc. v. Department of Transportation,* 42 F.3d 517, 527 (9th Cir. 1994).

CONCLUSION

For the forgoing reasons, the Court should approve the attached stipulation and otherwise deny the relief sought by plaintiffs.

RESPECTFULLY SUBMITTED this 19th day of April, 2006 at Anchorage, Alaska.

> S/ Bruce M. Landon
> BRUCE M. LANDON
> Department of Justice
> Environment & Natural Resources Division
> 801 B Street, Suite 504
> Anchorage, Alaska  99501-3657
> Phone: (907) 271-5452
> Facsimile: (907) 271-5827
> Email: bruce.landon@usdoj.gov
>
> Attorney for Federal Defendants