1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

FOREST CONSERVATION COUNCIL, et al.,

Plaintiffs,

v.

UNITED STATES FOREST SERVICE,

Defendant.

CASE NO. C02-1293C

ORDER

In this action, plaintiff environmental groups and organizations challenge defendant United States Forest Service's ("USFS") authorization of timber harvest projects in several national forests located in the Northwest region of the United States.  Plaintiffs' complaint alleges that in approving those projects, USFS failed to consider the monetary value of leaving the forests in their natural unharvested state in violation of the Multiple-Use Sustained-Yield Act ("MUSYA"), 16 U.S.C. § 528 *et seq.*, the Forest and Rangeland Renewable Resources Planning Act ("FRRRPA"), 16 U.S.C. § 1600 *et seq.*, the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.*, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and Forest Service Planning Regulations, 36 C.F.R. 219.  Currently before the Court are the following dispositive motions: (1) Defendant's motion to dismiss or, alternatively, for summary judgment on jurisdictional grounds (Dkt. No. 27); (2) Defendant's motion to dismiss or, alternatively, to sever this action and transfer some of Plaintiffs' claims to the District of Alaska (Dkt. No. 41); (3) Plaintiffs' motion for summary judgment as to the "Phase I" timber sales

ORDER – 1

EXHIBIT 9
Page 1 of 25

1    projects (Dkt. No. 28); and (4) Defendant's cross-motion for summary judgment as to the "Phase I"

2    projects (Dkt. No. 62).  The Court has carefully considered the papers filed by the parties and amici

3    curiae[1] in support of and in opposition to the current motions and has determined that oral argument shall

4    not be necessary.  The Court finds that although Plaintiffs have demonstrated their standing to bring the

5    current action, their statutory and regulatory challenges to USFS's decisions in question fail as a matter

6    of law.  Accordingly, the Court GRANTS Defendant's cross-motion for summary judgment with respect

7    to its authorization of four timber harvest projects constituting Phase I of this litigation (Dkt. No. 62) and

8    DISMISSES all of Plaintiffs' claims pertaining to those projects.

9        I.    BACKGROUND

10       In this lawsuit, Plaintiffs request the Court to declare that USFS's site-specific planning analyses

11   and decisions pertaining to twenty-five timber harvest projects were made in violation of substantive and

12   procedural requirements contained in the MUSYA, NFMA, and NEPA.  The parties are in agreement as

13   to the majority of the facts pertaining to the challenged projects.  Pursuant to the parties' Court-approved

14   stipulation, this action has been divided into several phases, each phase encompassing USFS decisions

15   with respect to particular timber harvest projects.  (See Dkt. No. 12).  Phase I USFS decisions, which are

16   the subject of the current cross-motions for summary judgment, include the following projects:

17       A.    Sea Level Timber Sale

18       The Sea Level timber harvest project area is located in southeast Alaska, on Revillagigedo Island

19   of the Ketchikan Ranger District of the Tongass National Forest.  USFS issued a record of decision

20   pertaining to this project on May 3, 1999.  The record included the Environmental Impact Statement

21   ("EIS") which, according to USFS, was prepared to "implement direction of the Tongass LMRP to help

22   provide a sustained level of timber supply to meet annual and LRMP planning cycle market demand, and

23   _____

24       [1] Amici curiae Vaagen Bros. Lumber, Inc., Engle Investors, American Forest Resource Council,
     and American Forest & Paper Association have filed a motion for leave to submit a brief on the merits of
25   the parties' pending dispositive motions (Dkt. No. 64).  The Court hereby GRANTS that motion.

26   ORDER – 2

1  to provide local employment in the woods products industry consistent with the multiple use and

2  sustained yield of Forest resources." (Def.'s Cross-Mot. for Summ. J. at 19 ¶ 19.) USFS submits that

3  the Sea Level project's EIS considered the impact of the timber harvesting on fish habitat, water quality

4  and soils, recreation and scenery, wildlife, and marine environment. (*Id.*) In determining the net benefit

5  from timber harvest, USFS acknowledged the importance of such non-market factors as the value of

6  recreation, fishing, and hunting activities that contribute to most optimal use of the project area. USFS,

7  however, declined to assign monetary values to these non-market factors having concluded that

8  "quantitative dollar values of non-priced values cannot be determined." (*Id.*)

9  **B.    Moose Subwatershed Timber Sale**

10  The Moose Subwatershed timber harvest project area is located in the South Santiam Watershed

11  in Linn County, Oregon, in the Sweet Home Ranger District of the Willamette National Forest. USFS

12  issued a record of decision pertaining to this project on July 29, 1998. The EIS prepared for the Moose

13  Subwatershed project considered several alternative uses of the area, as well as the value of non-timber

14  resources found therein. However, the EIS did not assign monetary value to the area's non-timber use

15  alternative.

16  **C.    Johnson Timber Sale**

17  The Johnson timber harvest project area is located in the Upper Cowlitz Watershed in Lewis

18  County, Washington, in the Cowlitz Valley Ranger District of the Gifford Pinchot National Forest. On

19  September 29, 1998, USFS issued a record of decision authorizing the harvesting of timber in that area.

20  USFS examined several alternatives to the timber harvest, including a "no action" alternative, and

21  evaluated twenty-three issues pertaining to the project. While USFS has considered, among other issues,

22  the impact of timber harvesting on "elk calving areas, recreation access, mountain goat and northern

23  spotted owl habitat, water quality, snags and down woody material for wildlife," the agency did not

24  assign monetary value to the area's non-timber use alternative.

25  **D.    Blodgett Timber Sale**

26  ORDER – 3

EXHIBIT  9
Page  3  of  25

1    The Blodgett timber harvest project area is located in Lane County, Oregon, in the Cottage Grove

2    Ranger District of the Umpqua National Forest.  On September 30, 1998, USFS issued a record of

3    decision authorizing timber harvesting in that area.  Initially, it was proposed that USFS approve

4    harvesting of various types of timber on 410 acres of the forest land.  Upon consideration of several

5    alternative plans and their environmental impact on the area's vegetation, wildlife, aquatics, and

6    economics, the proposed size of the harvest area was reduced to 190 acres.  In approving the Blodgett

7    Timber Sale, USFS analyzed the environmental and economic impact of the project on the area, but again

8    did not assign monetary value to the area's non-timber use alternative.

9    Each of the above-listed timber harvest projects was developed and approved in accordance with

10    a corresponding Land and Resource Management Plan ("LRMP") adopted by the Secretary of

11    Agriculture, as required by the NFMA.  Thus, each of the four timber sale decisions were allegedly

12    consistent with the objectives of its respective national forest's LRMP.

13    II.    USFS'S MOTION TO DISMISS PLAINTIFFS' CLAIMS ON JURISDICTIONAL
       GROUNDS

14

15    In this motion, USFS argues that Plaintiffs' claims for violation of various federal statutes and

16    regulations should fail for two reasons.  First, USFS maintains that this Court has no jurisdiction to

17    adjudicate Plaintiffs' claim for violation of the FRRRPA, challenging the validity of several USFS

18    planning documents of national scope, such as the Renewable Resource Assessment and the Renewable

19    Resource Program.  According to USFS, the national level documents do not amount to a final agency

20    action and therefore the Administrative Procedure Act ("APA") does not authorize their judicial review.

21    Second, USFS submits that Plaintiffs do not have standing to prosecute their FRRRPA claims as well as

22    all other claims asserted in this action.  With respect to Plaintiffs' standing to assert claims for USFS's

23    alleged violation of the NFMA and NEPA in the process of issuing the twenty-five site-specific timber

24    sale decisions, USFS argues that Plaintiffs have failed to establish "a geographic nexus between the

25    individual asserting the claim and the location suffering an environmental impact."  (Def.'s Mot. to

26    ORDER – 4

EXHIBIT    9
Page   4   of   25

1    Dismiss at 13 (quoting *Pub. Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1015 (9th Cir. 2003)).)

2           In their response to USFS's motion to dismiss, Plaintiffs aver that they "will not pursue any

3    declaratory or injunctive relief against the national planning documents." (Pls.' Resp to Mot. to Dismiss

4    at 3.)  They explain that their claims for violations of the FRRRPA were based on a belief that "USFS

5    would attempt to justify its site-specific timber sale decisions on analysis that was conducted at the

6    national level." (*Id.* at 4.)  Based on USFS's clarification that "the national level planning documents

7    'provid[e] only tentative objectives not required to be . . . implemented through individual projects,"

8    Plaintiffs state that in this lawsuit, their legal challenges of USFS's actions will be limited to twenty-five

9    site-specific timber sale decisions.  Accordingly, Plaintiffs' claim for violation of the FRRRPA, asserted in

10   Plaintiffs' Complaint as the Second Cause of Action, is hereby DISMISSED without prejudice .

11          Plaintiffs, however, object to USFS's contention that they lack standing to bring statutory

12   challenges directed at the twenty-five site-specific timber sale decisions.  As standing "is perhaps the most

13   important of [the jurisdictional] doctrines," *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990)

14   (citation omitted) (brackets in original), the Court scrutinizes closely Plaintiffs' standing to prosecute

15   their NFMA and NEPA claims in this matter.

16          The legal standard articulated by the United States Supreme Court for Article III standing

17   is well-known:

18          [T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an
             "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not
19           conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the
             defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be
20           redressed by a favorable decision.

21   *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000) (citing

22   *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  With respect to an organization's

23   standing, the rule is likewise well-settled:

24          An association has standing to bring suit on behalf of its members when its members
             would otherwise have standing to sue in their own right, the interests at stake are germane
25

26   ORDER – 5

EXHIBIT 9
Page 5 of 25

1    to the organization's purpose, and neither the claim asserted nor the relief requested

2    requires the participation of individual members in the lawsuit.

3    *Id.* at 181 (citing *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

4    In environmental disputes, the standing analysis often centers around the issue of whether the

5    plaintiff environmental organization has a sufficient geographical connection to an area that is alleged to

6    suffer harm as a result of the defendant's actions.  In other words, the paramount question in cases like

7    the one at bar becomes whether the defendant's allegedly wrongful act or failure to act caused the

8    plaintiff to suffer a concrete "injury in fact."  To prove the latter, the plaintiff must "adequately show[]

9    that she has an aesthetic or recreational interest in a particular place, or animal, or plant species and that

10   that interest is impaired by a defendant's conduct.  *Ecological Rights Found. v. Pac. Lumber Co.*, 230

11   F.3d 1141, 1147 (9th Cir. 2000) (citations omitted).  The relevant precedents reveal that the Ninth

12   Circuit approaches the "adequate showing requirement" very liberally.  For example, in *Ecological Rights*

13   *Foundation*, the court explained:

14
15        [A]n individual can establish 'injury in fact' by showing a connection to the area of
            concern sufficient to make credible the contention that the person's future life will be less
16        enjoyable – that he or she really has or will suffer in his or her degree of aesthetic or
            recreational satisfaction – if the area in question remains or becomes environmentally
17        degraded. . . . [A] person who uses an area for recreational purposes does not have to
            show that he or she lives particularly nearby to establish an injury-in-fact due to possible
18        or feared environmental degradation.  Repeated recreational use itself, accompanied by a
            credible allegation of desired future use, can be sufficient, even if relatively infrequent, to
19        demonstrate that environmental degradation of the area is injurious to that person.

20   *Id.* at 1149.

21   As noted above, in the initial brief memorandum in support of its motion to dismiss, USFS argued

22   that the plaintiff environmental organizations in this case lack standing to pursue their NFMA and NEPA

23   claims because of their alleged failure to demonstrate their members' geographical nexus with the national

24   forest areas affected by the timber sale decisions.  Plaintiffs responded to this argument by submitting

25

26   ORDER – 6

EXHIBIT  9
Page 6 of 25

several declarations in which Plaintiffs' individual members describe their recreational activities in the

areas subject to the Phase I timber harvesting projects. For example, Jeremy Hall, a member of Plaintiffs

Oregon Natural Resources Council and the Forest Conservation Council, who lives in the southern

Willamette Valley area, states:

> My friends and I use the areas affected by the Moose and Blodgett timber sales frequently
> and plan to do so in the future. We visit these areas for a diverse number of activities
> including photography, mushroom gathering, camping, swimming, and hiking. We are
> drawn to these areas because of their old growth forests, roadless lands, productive
> fisheries, swimming holes, scenery, unique geology, and immense biological diversity.

(Pls.' Resp. to Mot. to Dismiss, Hall Decl. ¶ 3.) Similarly, Margaret Clabby, a member of Plaintiffs

Tongass Conservation Society and the Forest Conservation Council, who lives near Ketchikan, Alaska,

declares:

> My family and my neighbors use the area affected by the Sea Level timber sale for a
> diverse number of activities, including fishing, plant and berry harvesting, camping,
> boating, and hiking. We plan to continue to engage in these activities in this area as long
> as the area remains relatively intact.

(*Id.*, Clabby Decl. ¶ 3.) Brett Clubbe, a member of Plaintiff Forest Conservation Council, who lives in

southwestern part of the Washington state, likewise declares that he regularly visits the Gifford Pinchot

National Forest and uses the areas affected by the Johnson timber sale decision for a variety of

recreational activities. (*See id.*, Clubbe Decl. ¶¶ 2-3.) Under applicable Ninth Circuit precedent, the

affirmative written statements of Plaintiffs' members confirming that those individuals in fact use the

areas affected by USFS timber sales decisions clearly satisfy the "injury in fact" element of Article III

standing. *See Ecological Rights Found.*, 230 F.3d at 1150 (finding that the plaintiff organizations whose

members' affidavits averred that they had aesthetic and recreational interest in the lawsuit's areas of

focus, had standing to allege the logging company's violation of the Clean Water Act).

ORDER – 7

EXHIBIT 9
Page 7 of 25

1    USFS concedes that Plaintiffs have satisfied the remaining elements of the standing rule, namely

2    causation and redressability. (Def.'s Reply at 3.)  In fact, having examined Plaintiffs' response to its

3    motion to dismiss, USFS has expressly agreed "not to further challenge Plaintiffs' standing as to the

4    Phase [I] projects." (*Id.*)  The Court agrees that Plaintiffs' alleged injury of diminished recreational value

5    of certain areas of the Tongass, Willamette, Gifford Pinchot, and Umpqua National Forests can be fairly

6    traced to USFS's decisions authorizing commercial timber harvesting in those areas.  Therefore, the

7    Court concludes that Plaintiffs have standing to challenge the legitimacy of those decisions.  Accordingly,

8

9    USFS's motion to dismiss or, in the alternative, for summary judgment (Dkt. No. 27) is hereby DENIED

10   in the part seeking dismissal of Plaintiffs' NFMA and NEPA claims.

11   III.    DEFENDANTS' MOTION TO DISMISS OR, ALTERNATIVELY, TO SEVER AND
             TRANSFER VENUE WITH RESPECT TO REGION 10 PROJECTS AND THE
12           TONGASS LRMP

13

14   USFS requests that the Court dismiss Plaintiffs' claims seeking review of USFS's site-specific

15   administrative decisions related to the following timber sale projects located in Region 10 of USFS:[2]

16   Canal Hoya, Rowan Mountain, Northwest Baranof, and Sea Level.  USFS argues that § 338 of the

17   Department of the Interior and Related Agencies Appropriations Act of 2003, deprives this Court of the

18   subject matter jurisdiction to review USFS's timber sale decisions in Region 10 by providing that such

19   review shall lie exclusively in the District of Alaska.  Alternatively, USFS asks that the Court sever

20   Plaintiffs' claims seeking review of Region 10 decisions and transfer them to the United States District

21   Court for the District of Alaska pursuant to 28 U.S.C. § 1631.  USFS separately argues that the Court

22   should dismiss Plaintiffs' claim challenging Northwest Baranof timber sale decision as barred by the

---

24   [2] Region 10, also known as the Alaska Region, embraces Chugach and Tongass National Forests.
25   *See* 36 C.F.R. § 202.2(e).  Canal Hoya, Rowan Mountain, Northwest Baranof, and Sea Level timber sale
     areas are all located in the Tongass National Forest.

26   ORDER – 8

1  applicable statute of limitations. In addition, USFS contends that the Court should dismiss Plaintiffs'

2  claim alleging legal deficiency of the Tongass LRMP as not ripe for judicial review. For the reasons set

3  forth below, USFS's motion to dismiss or, alternatively, to sever claims and transfer venue is hereby

4  GRANTED in part and DENIED in part.

### A.    Subject Matter Jurisdiction Over USFS's Region 10 Timber Sale Decisions

The statute that constitutes the legal basis for USFS's current motion, provides, in pertinent part:

> Any application for judicial review of a Record of Decision for any timber sale in Region 10 of the Forest Service that had a Notice of Intent prepared on or before January 1, 2003 shall –

> (1) be filed in the Alaska District of the Federal District Court within 30 days after exhaustion of the Forest Service administrative appeals process (36 C.F.R. § 215) or within 30 days of enactment of this Act if the administrative appeals process has been exhausted prior to enactment of this Act, and the Forest Service shall strictly comply with the schedule for completion of administrative action; and
> (2) be completed and a decision rendered by the court not later than 180 days from the date such request for review is filed; if a decision is not rendered by the court within 180 days as required by this subsection, the Secretary of Agriculture shall petition the court to proceed with the action.

Department of the Interior and Related Agencies Appropriations Act of 2004, Pub. L. No. 108-108, §

338, 117 Stat. 1241, 1314 (2003) ("Appropriations Act"). The statute was enacted on November 10,

2003. Based on the statutory language, USFS argues that because the Notices of Intent concerning the

four Region 10 projects in question were all published prior to January 1, 2003,[3] Plaintiffs should have

filed their claims for judicial review of the records of decision pertaining to those projects in the United

States District Court for the District of Alaska no later than December 10, 2003. According to USFS,

the fact that at the time when the statute was enacted those claims had already been pending in this Court

---

[3] USFS's brief in support of the motion to dismiss or sever provides the relevant dates of publication. (*See* Def.'s Mot. to Sever at 3-4.) Plaintiffs do not contest the accuracy of those dates.

ORDER – 9

EXHIBIT  9
Page  9  of  25

1    is of no consequence to Plaintiffs' alleged duty to refile them in the District of Alaska within the

2    statutorily mandated time frame.  Plaintiffs, however, take serious issue with the statute's application to

3    their current claims.  They urge the Court not to apply § 338 retroactively, arguing that the statute does

4    not apply to claims for judicial review filed prior to its enactment.  In addition, Plaintiffs point out that

5    their claims challenging the four Region 10 timber sales decisions in question have been pending in this

6    Court for more than two years.  Based on that, Plaintiffs contend that dismissing these claims or

7    transferring them to the District of Alaska would undermine the alleged sole statutory purpose to

8    expedite judicial review of USFS's Region 10 timber sales decisions.

9        The parties correctly identify *Landgraf v. USI Film Products*, 511 U.S. 244 (1994) as a leading

10   authority on the issue of retroactive application of statutes.  In that case, the Supreme Court started the

11   explanation of the rule in question by acknowledging that a presumption against retroactive legislation is

12   "deeply rooted" in American jurisprudence.  *Id.* at 265.  The Supreme Court then set the following

13   framework for analyzing a statute's temporal reach:

> When a case implicates a federal statute enacted after the events in suit, the court's first
> task is to determine whether Congress has expressly prescribed the statute's proper reach.
> If Congress has done so, of course, there is no need to resort to judicial default rules.
> When, however, the statute contains no such express command, the court must determine
> whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights
> a party possessed when he acted, increase a party's liability for past conduct, or impose
> new duties with respect to transactions already completed.  If the statute would operate
> retroactively, our traditional presumption teaches that it does not govern absent clear
> congressional intent favoring such a result.

*Id.* at 280.

The Supreme Court recognized that "[it] ha[s] regularly applied intervening statutes conferring or

ousting jurisdiction," because "[a]pplication of a new jurisdictional rule *usually* 'takes away no

substantive right but simply changes the tribunal that is to hear the case.'"  *Id.* at 274 (emphasis added).

The Supreme Court, however, clarified that "[t]his jurisdictional rule does not affect the general principle

ORDER – 10

that a statute is not to be given retroactive effect unless such construction is required by explicit language or by necessary implication."[4] *Id.* at 274 n.27. The *Landgraf* opinion further elaborated that similar to jurisdictional statutes, "[c]hanges in procedural rules may often be applied in suits arising before their enactment without raising concerns about retroactivity" assuming that they do not affect the parties' substantive rights. *See id.* at 275. The Supreme Court again limited the reach of that general principle as follows:

> The mere fact that a new rule is procedural does not mean that it applies to every pending case. Our orders approving amendments to federal procedural rules reflect the commonsense notion that the applicability of such provisions ordinarily depends on the posture of the particular case.[5] Nor do we suggest that concerns about retroactivity have no application to procedural rules.

*Id.* at 275 n.29. In a similar vein, construing the *Landgraf*'s rule on retroactive application of statutes, the Ninth Circuit explained that "[r]egardless of whether a statute is 'substantive' or 'procedural,' it may not apply to cases pending at the time of enactment if the new statute would prejudice the rights of one of the parties." *Chenault v. United States Postal Serv.*, 37 F.3d 535, 539 (9th Cir. 1994).

The Court now considers whether under the *Landgraf* rule, § 338 of the Appropriations Act applies to claims for judicial review pending before courts of then proper jurisdiction at the time of the statute's enactment. As shown below, the Court answers this inquiry in the negative.

---

[4] Importantly, in a case decided subsequent to *Landgraf*, the Supreme Court clarified that to fall within the realm of purely jurisdictional statute, an act of Congress must only prescribe "*where* a suit may be brought, not *whether* it may be brought at all." *Hughes Air Craft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 951 (1997).

[5] The Supreme Court provided several examples of the orders amending rules of civil procedure that did not apply retroactively. *Landgraf*, 511 U.S. at 275 n.29 (citing, among other orders, Order Amending Bankruptcy Rules and Forms, 421 U.S. 1021 (1975), which "appli[ed] to pending cases 'except to the extent that in the opinion of the court their application in a particular proceeding then pending would not be feasible or would work injustice.'").

ORDER – 11

EXHIBIT 9
Page 11 of 25

Examination of the language of § 338 reveals that the statute is conspicuously silent with respect to its effect on claims challenging Region 10 decisions pending in courts as of November 10, 2003.[6] Consequently, the Court must determine whether application of § 338 to Plaintiffs' claims for review of USFS's Region 10 decisions would have a retroactive effect by way of impairing Plaintiffs' rights associated with the claims at issue. *See Landgraf*, 511 U.S. at 280. In that respect, § 338 not only confers jurisdiction to adjudicate Region 10 claims; it also limits the time period for filing such claims to thirty days after the statute's enactment. This facially procedural restriction, in effect, clearly limits a person's substantive right to challenge USFS's decisions and obtain proper relief. Indeed, if the Court now orders Plaintiffs' Region 10 claims dismissed, according to § 338's plain language, Plaintiffs will be forever barred from filing those claims because the claims should have been filed in the District of Alaska on or before December 10, 2003. Thus, unlike the majority of jurisdictional statutes, § 338 does not merely change the tribunal for Plaintiffs' Region 10 claims, but also potentially takes away Plaintiffs' substantive rights. As such, it is retroactive in nature and is not binding upon the claims already pending at the time of its enactment. *See id.*

In addition, applying § 338's jurisdictional provision and dismissing or transferring Plaintiffs' Region 10 claims after they have been pending in this Court for more than two years will cause yet another delay in adjudication of the claims. Doing so will work manifest injustice upon Plaintiffs and contradict § 338's unambiguous purpose to ensure speedy judicial review of Region 10 timber sale decisions. Accordingly, the Court declines USFS's invitation to construe § 338 as applicable to Plaintiffs' claims for judicial review of USFS's Canal Hoya, Rowan Mountain, Northwest Baranof, and Sea Level timber sale decisions and confirms its jurisdiction to adjudicate these claims.

---

[6] USFS expressly agrees with this interpretation of § 338. (*See* Def.'s Mot. to Dismiss or Sever at 8.)

ORDER – 12

**B.    Plaintiffs' Claims Challenging the Northwest Baranof Timber Sale Decision and the Tongass LRMP**

USFS indicates that Plaintiffs' claims for judicial review of the Northwest Baranof timber sale decision was filed on June 17, 2002, whereas the final record of decision for this project was published on March 22, 1996.  Thus, USFS argues, the claim is time-barred under 28 U.S.C. § 2401(a), according to which "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."  Plaintiffs do not contest USFS's argument.  Accordingly, Plaintiffs' statutory claims challenging the validity of USFS's Northwest Baranof timber sale decision are hereby DISMISSED with prejudice.

In addition, USFS requests that the Court dismiss Plaintiffs' claims directed at the validity of the Tongass LRMP, taken separately from numerous challenges to site-specific projects, as not ripe for judicial review.  In so requesting, USFS relies on the opinion in *Ohio Forestry Association v. Sierra Club*, in which the Supreme Court held that the plaintiff environmental organizations' claims that a national forest's LRMP setting general logging goals and determining probable methods of timber harvest but not authorizing specific timber cutting was not ripe for review.  *See* 523 U.S. 726, 732-37 (1998).  Again, Plaintiffs have not opposed dismissal of their claims with respect to the Tongass LRMP.  The Court finds that USFS's "non-ripeness" argument has merit.  Accordingly, Plaintiffs' claims challenging the validity of the Tongass LRMP are hereby DISMISSED without prejudice.

IV.    THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT WITH RESPECT TO PHASE I TIMBER SALE DECISIONS

The parties' cross-motions for summary judgment both concentrate on the issue crucial to the viability of Plaintiffs' remaining claims against USFS, namely, whether in authorizing the four Phase I timber harvesting projects USFS violated the MUSYA, NFMA and NEPA by allegedly failing to properly consider the economic value of the pertinent forest lands in their unlogged state.  Plaintiffs argue that

ORDER – 13

EXHIBIT 9
Page 13 of 25

proper consideration of such value necessarily entails a quantitative economic analysis in the form of monetization of non-timber resources and comparison of their value to the economic value of timber harvesting and sale. USFS counters that neither NFMA and its implementing regulations nor NEPA obligate the agency to engage in quantitative economic analysis in considering economic effects of timber harvesting as one of the alternative uses of forest resources. Overall, USFS submits that before it authorized the timber sale projects in question it had fully complied with the mandates of the MUSYA, NFMA and NEPA. Having considered the parties' and amici curiae briefs on the implicated issues, the Court finds and rules as follows.

## A.    Legal Standard for Summary Judgment

Summary judgment is appropriate if the pleadings, affidavits, depositions, and admissions on file demonstrate that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Initially, it is the moving party's burden to establish that there is no genuine issue of material fact. *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 951 (9th Cir. 1978). In determining whether a genuine issue of material fact exists, the court must view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Once the movant has met its initial burden, the burden then shifts to the non-moving party to show the court that there is in fact a genuine issue for trial. *Id.* at 250. "The nonmoving party must identify for the court specific facts, supported by evidence, affidavits, depositions, sworn or certified copies of documents, or other material contemplated by Rule 56(e), which articulate and illustrate the presence of a genuine issue requiring trial." 11 James W. Moore et al., *Moore's Federal Practice and Procedure*, § 56.13(2) (3d ed. 1997).

## B.    Standard and Scope of Review

As noted above, Plaintiffs seek to remedy USFS's alleged violations of the MUSYA, NFMA. and

ORDER – 14

EXHIBIT 9
Page 14 of 25

1 NEPA. As USFS points out, and Plaintiffs concede, none of these statutes authorizes a private cause of

2 action. Accordingly, the Court shall review USFS's challenged decisions under the standard set by the

3 APA, 5 U.S.C. § 701 *et seq.*

4          In cases involving claims for violations of the NFMA and NEPA, courts must invalidate an

5 agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

6 law." *Native Ecosys. Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002) (quoting 5 U.S.C. §

7 706(2)(A)) (other citations omitted). In determining whether USFS decisions authorizing the timber

8 sales at issue were arbitrary and capricious, the Court shall consider "whether the decision was based on a

9 consideration of the relevant factors and whether there has been a clear error of judgment." *Idaho*

10 *Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998) (quoting *Marsh v. Oregon Natural Res.*

11 *Council*, 490 U.S. 360, 378 (1989)). As to the adequacy of an EIS that USFS has prepared for each of

12 the challenged projects, the Court must take a "hard look" to ascertain whether the EIS contains

13 "reasonably thorough discussion of the significant aspects of the probable environmental consequences."

14 *Idaho Sporting Cong.*, 137 F.3d at 1149 (citation omitted). The "arbitrary and capricious" and the "hard

15 look" standards, however, do not materially differ from each other. *Id.*

16          According to the APA, in determining whether an agency's action was arbitrary and capricious,

17 the Court "shall review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. The

18 Supreme Court has repeatedly emphasized that § 706 imposes a bright-line limitation on the reviewing

19 court's consideration of evidence in cases involving claims for review of administrative decisions:

20

21

22          [T]he focal point for judicial review should be the administrative record already in
           existence, not some new record made initially in the reviewing court. The task of the
23         reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to
           the agency decision based on the record the agency presents to the reviewing court. . . .
24         The reviewing court is not generally empowered to conduct a *de novo* inquiry into the
           matter being reviewed and to reach its own conclusions based on such an inquiry. The

25

26 ORDER – 15

1   factfinding capacity of the district court is thus typically unnecessary to judicial review of
2   agency decisionmaking.

3   *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) (internal quotation marks and

4   citations omitted).

5       Based on this statutorily mandated scope of review, USFS argues that in considering Plaintiffs'

6   MUSYA, NFMA and NEPA claims at issue, the Court should only consider the voluminous

7   administrative record USFS has filed in this matter.  Accordingly, USFS requests that the Court strike

8   several declarations submitted by Plaintiffs' experts in support of Plaintiffs' motion for summary

9   judgment and labeled as "Plaintiffs' Administrative Record Excerpts" (*see* Dkt. No. 30).  Plaintiffs

10  respond that the declarations in question constitute a part of the pertinent administrative appeal record

11  because Plaintiffs' arguments on appeal heavily relied on the scientific analysis contained in the

12  declarations.

13      The Court is not persuaded by Plaintiffs' argument for two reasons.  First, as the Supreme Court

14  indicated in *Lorion*, *supra*, the agency's designation of the administrative record subject to the court's

15  review deserves judicial deference.  Second, Plaintiffs do not contend that USFS's decisions to authorize

16  the timber harvesting and sales in question were based, in part, on the declarations Plaintiffs now seek to

17  offer as substantive evidence.  Instead, Plaintiffs merely claim that the declarations were incorporated by

18  reference in support of their arguments raised during the administrative appeal.  In fact, there is no

19  indication that in dismissing Plaintiffs' administrative appeal, USFS had considered the declarations.

20  Accordingly, the Court's review of USFS's timber sale decisions in question will be limited to

21  consideration of the administrative record lodged by USFS (*see* Dkt. no. 51) and the declarations of

22  Plaintiffs' experts (Dkt. No. 30) are hereby STRICKEN.

23  **C.    Statutory Framework for the Management of National Forests**

24
25
26  ORDER – 16

EXHIBIT 9
PAGE 16 of 25

In managing national forests, USFS is bound by procedural and substantive obligations imposed by the MUSYA, NFMA, and NEPA. For the sake of clarity, the Court describes each of the implicated statutes separately.

### 1.    MUSYA

According to the MUSYA, "[i]t is the policy of the Congress that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528. The statute, however, expressly declares that these purposes are supplemental to the primary purposes for which the national forests were established, namely, "to improve and protect the forest within the boundaries, . . . [to] secur[e] favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States. *See id*; 16 U.S.C. § 475. Consistent with its title, the MUSYA directs the Secretary of Agriculture "to develop and administer the renewable surface resources of the national forests for multiple use and sustained yield of the several products and services obtained therefrom." 16 U.S.C. § 529. The statute defines "multiple use" as, in part, "[t]he management of all the various renewable surface resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people." 16 U.S.C. § 531(a). "Sustained yield of the several products and services" is defined as "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the national forests without impairment of the productivity of the land." 16 U.S.C. § 531(b).

The statutory language is silent as to what significance the Secretary of Agriculture and USFS should attach to each individual category of renewable forest resources in the course of managing the national forests. Thus, "it must be assumed that the decision as to the proper mix of uses within any

ORDER – 17

EXHIBIT 9
Page 17 of 25

particular area is left to the sound discretion and expertise of [USFS]." *Sierra Club v. Hardin*, 325 F.

Supp. 99, 123 (D. Ala. 1971). Importantly, the MUSYA does not mandate that USFS utilize any specific

economic analysis in the exercise of its discretion and expertise. *Clinch Coalition v. Damon*, 316 F.

Supp. 2d 364, 377-78 (D. W.Va. 2004).

    2.    *NFMA and Its Implementing Regulations*

    The NFMA implements the MUSYA's general policy statement by requiring the Secretary of

Agriculture to "develop, maintain, and, as appropriate, revise [LRMP]s for units of the National Forest

System." 16 U.S.C. § 1604(a). The statute requires that in developing LRMPs, the Secretary use a

"systematic interdisciplinary approach to achieve integrated consideration of physical, biological,

economic, and other sciences." 16 U.S.C. § 1604(b). In addition, the Secretary must comply with the

NEPA, which entails preparation of an EIS when necessary. *See* 16 U.S.C. § 1604(g)(1); *Inland Empire*

*Pub. Lands Council v. Unites States Forest Service*, 88 F.3d 754, 757 (9th Cir. 1996).

    In accordance with the NFMA's express directive, *see* 16 U.S.C. § 1604(g), USFS has

promulgated regulations establishing substantive and procedural requirements for LRMPs ("Planning

Regulations"). *See generally* 36 C.F.R. § 219.1-219.29.[7] The Planning Regulations "set forth a process

for developing, adopting, and revising [LRMP]s for the National Forest System." 36 C.F.R. § 219.1(a).

This process encompasses a two-stage approach that the Ninth Circuit described as follows:

> At the first stage, a team . . . develops a proposed [LRMP] together with a draft and final
> EIS. Once the LRMP is approved, "[d]irect implementation of the LRMP occurs at a
> second stage, when individual site-specific projects are proposed and assessed.

*Inland Empire*, 88 F.3d at 757 (internal citations and quotation marks omitted). A proposed LRMP and

---

    [7] Although the Planning Regulations have been amended several times since the date of their
original promulgation, the parties are in agreement that USFS's timber sale decisions subject to the
current dispute are governed by the Planning Regulations in effect as of July 1, 1983. Accordingly, this
Order will analyze USFS's forest planning duties under the 1983 version of the Planning Regulations.

ORDER – 18

EXHIBIT 9
Page 18 of 25

1  final EIS shall be published in the Federal Register and shall invite public comment.  36 C.F.R. §

2  219.10(b).

3        According to the Planning Regulations, each approved LRMP "shall provide for multiple use and

4  sustained yield of goods and services from the National Forest System in a way that maximizes long term

5  net public benefits in an environmentally sound manner."  36 C.F.R. § 219.1(a).  The Regulations define

6  "net public benefits" as "the overall long-term value to the nation of all outputs and positive effect . . .

7  less all associated inputs and negative effects . . . whether they can be quantitatively valued or not.  36

8  C.F.R. § 219.3.  The definition includes the following important notation: "[n]et public benefits are

9  measured by both quantitative and qualitative criteria rather than a single measure or index."  *Id.*

10  

11        The Planning Regulations require that in developing a LRMP, USFS formulate several alternative

12  use proposals "to provide an adequate basis for identifying the alternative that comes nearest to

13  maximizing net public benefits."  36 C.F.R. § 219.12(f).  In doing so, USFS must consider the value of

14  goods and services generated by the area if no changes in the area's management occur.  *Id.*  Having

15  formulated the alternatives, USFS must engage in detailed consideration of "[t]he physical, biological,

16  economic, and social effects of implementing each alternative."  36 C.F.R. § 219.12(g).  Consideration of

17  the economic effects should include:

18  

19        The expected outputs for the planning periods, including appropriate marketable foods
   and services, as well as nonmarket items, such as recreation and wilderness use, wildlife

20  and fish, protection and enhancement of soil, water, and air, and preservation of aesthetic
   and cultural resource values; [and] the expected real-dollar value (discounted when

21  appropriate) of all outputs attributable to each alternative to the extent that monetary
   values can be assigned to nonmarket goods and services, using quantitative and qualitative

22  criteria when monetary values may not reasonably be assigned.

23  *Id.*  The interdisciplinary team of USFS then must compare "the significant physical, biological,

24  economic, and social effects of each management alternative."  36 C.F.R. § 219.12(h).  Specifically, the

25  team should engage in "a comparative analysis of the aggregate effects of the management alternatives

26  ORDER – 19

EXHIBIT 9
Page 19 of 25

and shall compare [their] present net value, social and economic impacts, [and] outputs of goods and services." *Id.*

The substantive and procedural requirements of the Planning Regulations apply to both forest-wide LRMPs and site-specific projects. *Inland Empire*, 88 F.3d at 757 (citing 16 U.S.C. § 1640(i)).

3.    *NEPA*

The NEPA requires that federal agencies prepare an EIS in connection with any proposed "major Federal action [] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The mandates of the NEPA serve two goals: (1) to ensure that the agency will have sufficient information on significant environmental impacts when it makes its decisions, and (2) to guarantee the availability of this information to a larger audience. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). The NEPA does not prescribe any substantive result; it is a purely procedural statute which is satisfied when the agency completes an EIS and engages in the appropriate public process. *See id.* at 350 (stating that "it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process."); *see also Sierra Club v. Espy*, 38 F.3d 792, 796 (5th Cir. 1994) (explaining that "NEPA is, of course, a procedural statute, mandating a process rather than a result.").

The Ninth Circuit has consistently held that a court's review of an agency's prepared EIS is "extremely limited." *Nat'l Parks & Conservation Ass'n v. U.S. Dept. of Transp.*, 222 F.3d 677, 680 (9th Cir. 2000). In the court's own words:

> We evaluate the EIS simply to determine whether it "contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences" of a challenged action. We need not agree with the agency's conclusions; we must approve the EIS if we are satisfied that the EIS process fostered informed decision-making and public participation. If we determine that the agency took a 'hard look' at a project's environmental consequences, our review is at an end.

*Id.* (internal citations omitted).

ORDER – 20

EXHIBIT   9
Page 20   25

**D.    The Validity of Plaintiffs' Claims for Violation of the MUSYA, NFMA, and NEPA**

By bringing the current lawsuit, Plaintiffs attempt to convince the Court to alter USFS's expert decisions pertaining to the management of the national forests' natural resources. As most of Plaintiffs' pleadings and papers filed in this action demonstrate, Plaintiffs' overall goal in prosecuting this lawsuit is preservation of the national forests in their unharvested and unindustrialized state. The Court acknowledges and admires this laudable goal. However, the Court is not in a position to assume USFS's managerial functions and strike a de novo balance between the economic values of timber production on the one hand and recreational activities on the other hand. To the contrary, the Court's review of the challenged timber sale decisions is limited to ascertaining whether USFS has complied with the applicable procedural and substantive rules in making its expert decisions with respect to sales of timber. Having reviewed the parties' arguments and the portions of the administrative record referred to by the parties, the Court answers that question in the affirmative.

Plaintiffs' claims for violation of the MUSYA, NFMA, and NEPA boil down to a contention that in authorizing the timber sales in question, USFS did not consider the quantitative, or monetary, value of non-timber harvest use alternatives in the project areas.[8] Plaintiffs submit that assigning monetary values to such resources is mandated by the following provision of the NFMA Planning Regulations:

> (g) *Estimated effects of alternatives.* The physical, biological, economic, and social effects of implementing each alternative considered in detail shall be estimated and compared according to NEPA procedures. These effects include those described in NEPA procedures . . . and at least the following:
> (1) The expected outputs for the planning periods, including appropriate marketable goods and services, as well as nonmarket items, such as recreation and wilderness use, wildlife and fish, protection and enhancement of soil, water, and air, and preservation of aesthetic and cultural resource values; . . .
> (ii) the expected real-dollar value (discounted when appropriate) of all outputs attributable

---

[8] Plaintiffs do not contend that in preparing each of the EIS at issue, USFS failed to consider the environmental or ecological impacts of timber harvesting.

ORDER – 21

EXHIBIT 9
Page 21 of 25

1    to each alternative to the extent that monetary values can be assigned to nonmarket goods

2    and services, *using quantitative and qualitative criteria when monetary values may not*
     *reasonably be assigned.*

3    36 C.F.R. 219.12(g)(1), (3)(ii) (second emphasis added).  At the same time, Plaintiffs admit that "the

4    Administrative Record for each of the pertinent timber sales decisions shows that USFS purported to

5    consider the economic impact of its decisions during the planning processes for the respective sales, as it

6    is required by NFMA." (Pls.' Mot. for Summ. J. at 33.)  Plaintiffs also concede that "for each of the four

7    timber sales, USFS found that the 'no action' alternative – the option of leaving the forest in its natural

8    and unlogged state – produces no economic benefit." (*Id.*)  Plaintiffs expressly disagree with that finding

9    and argue that USFS did not employ the correct method in analyzing the economic value of non-timber

10   resources.

11

12        Although the Ninth Circuit has not yet addressed the validity of Plaintiffs' "monetary value

13   analysis claims," in *Clinch Coalition v. Damon, supra*, the United States District Court for the District of

14   West Virginia dismissed claims for violations of the MUSYA, NFMA, and NEPA that were based on the

15   allegations similar to Plaintiffs' current economic analysis theory.  In *Damon*, the plaintiff environmental

16   groups sought to invalidate USFS's decision to authorize a timber sale having alleged that USFS failed to

17   "analyze adequately the economic impacts and net present benefits of th[e] timber sale." 316 F. Supp. 2d

18   at 368.  Specifically, Plaintiffs argued that in authorizing the timber sale, USFS "failed to account for the

19   significant economic value associated with clean water, wildlife, recreation, scenery, non-timber forest

20   products . . . generated by the . . . timber sale area in its existing condition." *Id.* at 377.  The court held

21   that this allegation was insufficient to declare USFS's timber sale decision to be in violation of the

22   MUSYA, NFMA, and NEPA.

23

24        In particular, the *Damon* court concluded that the MUSYA, NFMA, and NEPA do not require

25   USFS to use any particular methodology that quantifies or monetizes the impact of timber harvesting on

26   ORDER – 22

non-timber resources of the national forests. *See id.* at 377-82. The court explained that the MUSYA's requirement that USFS provide an accounting for "all costs and all benefits before any particular tract of national forest land is allocated to a . . . timber sale," 16 U.S.C. § 529, "is far from being a directive by Congress that the Forest Service must utilize a specific economic analysis." *Id.* at 377-78. To the contrary, the MUSYA "'contain[s] the most general clauses and phrases' such that [the statute] 'can hardly be considered concrete limits upon agency discretion.'" *Id.* at 378 (quoting *Perkins v. Bergland*, 608 F.2d 803, 806 (9th Cir. 1979). Similarly, based on the NFMA's legislative history, the court concluded that in enacting that statute, Congress "did not envision [it] as requiring that a monetary value be assigned to non-timber resources because of the imprecision in attempting such analysis." *Id.* at 379. Further, on the basis of federal precedent interpreting the NEPA, the court rejected the plaintiffs' argument that the NEPA requires USFS to engage in a mathematically expressed cost-benefit analysis in evaluating the environmental impacts of timber sales. *Id.* at 380-81 (citing, among other decisions, *Trout Unlimited v. Morton*, 509 F.2d 1276, 1286 (9th Cir. 1974)). Finally, with respect to the Planning Regulations that form the skeleton of Plaintiffs' current claims, the *Damon* court found that 36 C.F.R. § 219.12(g) "does not require the Forest Service to utilize a particular methodology is assessing the economic impacts of a proposed projects." *Id.* at 381.

Plaintiffs' claims asserted in this action are no different from those summarily dismissed by the *Damon* court based on the plain language, legislative history, and prior case law interpreting the implicated federal statutes. Plaintiffs acknowledge that for each of the Phase I timber sales "the USFS found that the "no action" alternative – the option of leaving the forest in its natural and unlogged state – produces no economic benefit." (Pls.' Mot. for Summ. J. at 33.) Yet, by stating that "it is beyond dispute that the timber sale areas in their natural state provide economic benefits that dwarf the economic value of the timber resource, (*id.*), Plaintiffs attempt to convince the Court that USFS's expert economic

ORDER – 23

EXHIBIT 9
PG 23 25

1  analysis in the EIS prepared for each timber sales project was incorrect.  In light of the highly deferential

2  standard of review applicable to USFS's timber sale decisions in question, the Court finds no merit in

3  Plaintiffs' statutory and regulatory challenges of those decisions.  As discussed above, under the

4  MUSYA, NFMA, and NEPA, USFS enjoys broad discretion as to the manner in which it conducts the

5  required economic analysis under the Planning Regulations.  *See Inland Empire*, 88 F.3d at 760

6  (explaining that an agency's interpretation of its own regulations should be given deference unless it is

7  arbitrary and capricious and noting that is "especially true when questions of scientific methodology and

8  involved"); *see also Inland Empire Pub. Lands Council v. Schultz*, 992 F.2d 977, 981 (9th Cir. 1993)

9

10 (stating that courts should "defer to agency expertise on questions of methodology.").

11       Plaintiffs' claims are flawed for yet another important reason.  As the amici curiae aptly point out

12 in their brief, in arguing that USFS must have assigned monetary value to the non-timber resources in the

13 project areas, Plaintiffs assume that the national forests must be managed for the sole purpose of gaining

14 the greatest possible economic return.  This assumption, however, is incorrect in light of the MUSYA's

15 express language mandating that in using the resources of the national forests, USFS must consider "the

16 relative values of the various resources, and not necessarily the combination of uses that will give the

17 greatest dollar return." 16 U.S.C. § 531(a); *see also Intermountain Forest Indus. Ass'n v. Lyng*, 683 F.

18 Supp. 1330, 1338 (D. Wyo. 1988) (discussing the "multiple use" definition and concluding that "[t]here

19 is no principled basis for plaintiffs' assertion that the national forests must be managed primarily to

20 produce economic benefits.").  Accordingly, even if USFS had assigned monetary value to the non-timber

21 resources and had found that value to exceed the projected value of the harvested timber, USFS might

22 not have changed its decision to authorize the particular volume of the timber sales due to competing

23 purposes of the sales such as improving the forests' quality, "securing favorable conditions of water

24 flows, and . . . furnish[ing] a continuous supply of timber for the use and necessities of citizens of the

25

26 ORDER – 24

EXHIBIT    9

Page 24 of 25

1    United States." 16 U.S.C. § 475. In fact, according to the MUSYA's express mandate, those purposes

2    are superior to administering the national forests for such uses as outdoor recreation advocated by

3    Plaintiffs. *See* 16 U.S.C. § 528.

4        In sum, the Court holds that under the principles enunciated in the MUSYA, NEPA, NFMA, and

5    the Planning Regulations, USFS did not act arbitrarily and capriciously in declining to assign monetary

6    value to non-timber resources of the national forests areas subject to the Phase I timber sales decisions.

7    Nor did USFS abuse its discretion in conducting a qualitative analysis of the economic impact of those

8    timber sales. Accordingly, Plaintiffs' MUSYA, NFMA, and NEPA claims challenging the validity of

9

10   those decisions fail as a matter of law.

11       V.    CONCLUSION

12       For the foregoing reasons, Defendant's motion to dismiss or, alternatively, for summary judgment

13   on jurisdictional grounds (Dkt. No. 27) and Defendant's motion to dismiss or, alternatively, to sever the

14   matter and transfer some of Plaintiff's claims to the District of Alaska (Dkt. No. 41) are hereby

15   GRANTED in part and DENIED in part. Plaintiffs' motion for summary judgment as to the Phase I

16   timber sales projects (Dkt. No. 28) is DENIED and Defendant's cross-motion for summary judgment as

17   to the Phase I projects (Dkt. No. 62) is GRANTED.

18       SO ORDERED this ___14th___ day of September, 2004.

19

20

21                                                  /s/ John C. Coughenour
                                                    UNITED STATES DISTRICT JUDGE

22

23

24

25

26   ORDER – 25

EXHIBIT 9
Page 25 of 25