# EXHIBIT B

Thomas S. Waldo
Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, Alaska 99801
Ph: 907-586-2751
Fax: 907-463-5891
Email: twaldo@earthjustice.org

Nathaniel S.W. Lawrence
NATURAL RESOURCES DEFENSE COUNCIL
3723 Holiday Drive, SE
Olympia, WA 98501
Ph: 360-534-9900
Fax: 360-534-9909
Email: nlawrence@nrdc.org

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| ORGANIZED VILLAGE OF KAKE, SOUTHEAST ALASKA CONSERVATION COUNCIL, NATURAL RESOURCES DEFENSE COUNCIL, SIERRA CLUB, THE WILDERNESS SOCIETY, and CENTER FOR BIOLOGICAL DIVERSITY, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | |
| UNITED STATES FOREST SERVICE; UNITED STATES DEPARTMENT OF AGRICULTURE; MARK REY, in his official capacity as Under Secretary of Agriculture; DENNIS E. BSCHOR, in his official capacity as Alaska Regional Forester; and FORREST COLE, in his official capacity as Forest Supervisor for the Tongass National Forest, | ) ) ) ) ) ) ) ) | Case No. J04-0029 CV (JKS) |
| Defendants. | ) ) | |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR EQUITABLE RELIEF**

Organized Village of Kake, et al. v.
U.S. Forest Service, et al.,
J04-0029 CV (JKS)

# TABLE OF CONTENTS

I.     THIS COURT CAN GRANT RELIEF AS TO ANY TIMBER SALE THAT
       RELIES ON ILLEGAL DEFECTS OF THE UNDERLYING FOREST
       MANAGEMENT PLAN. ................................................................................1

       A.    Full and effective relief against an illegal forest management plan turns on
             traditional equitable balancing, not on whether Plaintiffs separately
             challenged all timber sales that rely upon the plan's illegal features. ........................1

       B.    Neither the Supreme Court's ruling in *Ohio Forestry*, nor the Ninth Circuit
             cases the Forest Service cites, require that timber sales be named in
             complaints for them to be enjoined pursuant to a successful forest
             management plan challenge..........................................................................................3

       C.    Statues of limitations are irrelevant in the context of equitable relief for a
             successful challenge, timely brought, against a forest management plan. ...................7

       D.    The exhaustion doctrine controls whether courts take jurisdiction of an
             administrative law challenge, not whether they can grant full and effective
             relief against an illegal forest management plan that was properly appealed
             through all available administrative avenues...............................................................8

       E.    Relief is appropriate against those future timber sales for which Plaintiffs
             seek an injunction, because they would necessarily be inconsistent with the
             Ninth Circuit's ruling here, and inevitably interfere with full and effective
             relief. ...........................................................................................................................9

II.    VACATUR OF CERTAIN TIMBER SALE RECORDS OF DECISION IS AN
       APPROPRIATE REMEDY..............................................................................14

III.   THE PROPOSED TIMBER SALES ON KUIU ISLAND WILL CAUSE
       IRREPARABLE HARM TO THE ORGANIZED VILLAGE OF KAKE. ....................15

IV.    THE BALANCE OF EQUITIES FAVORS ENTRY OF THE EQUITABLE
       RELIEF REQUESTED BY PLAINTIFFS.......................................................19

       A.    The Court should evaluate relief in light of the entire Tongass timber sale
             program. .....................................................................................................................20

       B.    The Alaska Forest Association offers no viable option for relief.............................22

             1.    AFA misunderstands market demand.............................................................23

             2.    Unfavorable but persistent economic conditions make it impossible
                   for the Forest Service to offer significantly more "economic" timber
                   sales...............................................................................................................24

                   a.    There is no viable option for raising the value of the timber. ..........25

                   b.    To lower the cost of Tongass timber any further would
                         require enormous subsidies Congress is unlikely to fund. ...............27

Organized Village of Kake, et al. v.
U.S. Forest Service, et al.,
J04-0029 CV (JKS)                                    i

3.    The volume of timber sought by AFA is beyond the capacity of the Tongass. ..........................................................30

4.    AFA has failed to demonstrate that the requested relief will cause any significant harm. ..........................................................31

V.    NO LEGITIMATE PUBLIC INTEREST WOULD BE SERVED BY ALLOWING THE FOREST SERVICE TO PROCEED NOW WITH RODS AND TIMBER SALES IN AREAS WHERE PLAINTIFFS SEEK AN INJUNCTION. ..........................................................33

CONCLUSION ..........................................................35

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)        ii

Plaintiffs Organized Village of Kake, et al., submit this reply in support of their Motion

for Equitable Relief Pending Revision of the Tongass Land Management Plan ("Plf. Mot.")

(Docket No. 57).  This brief responds to Federal Defendants' Opposition to Plaintiff's Motion for

Relief ("Fed. Opp.") (Docket No. 81) and to Alaska Forest Association's Opposition to

Plaintiffs' Motion for Equitable Relief ("AFA Opp.") (Docket No. 72).

I.    THIS COURT CAN GRANT RELIEF AS TO ANY TIMBER SALE THAT RELIES
      ON ILLEGAL DEFECTS OF THE UNDERLYING FOREST MANAGEMENT PLAN.

Relying heavily on *Ohio Forestry Association. v. Sierra Club*, 523 U.S. 726 (1998),

Federal Defendants argue that the Court should grant relief only as to timber sales for which

Plaintiffs have raised site-specific challenges, even though the claims on which Plaintiffs

prevailed are all programmatic.  Neither *Ohio Forestry* nor any other authorities bar the relief

sought by Plaintiffs.  *Ohio Forestry* concerns only whether a case is ripe, not the relief a court

may grant for an indisputably ripe, successful challenge to a programmatic forest plan.

A.    Full and effective relief against an illegal forest management plan turns on
      traditional equitable balancing, not on whether Plaintiffs separately challenged all
      timber sales that rely upon the plan's illegal features.

In granting relief, the question before this Court is how to give effect to the merits ruling,

protecting the interests of Plaintiffs and the public, while according equitable consideration to the

potential for hardship to the Defendants.  As Plaintiffs noted in their opening brief, Plf. Mot. at 5,

because environmental harm typically is by its nature irremediable, this balancing process

normally favors an injunction.  Here, Plaintiffs have proposed relief carefully tailored to allow

logging to continue at status quo levels while protecting the areas that the Forest Service most

obviously must consider placing off limits in order to comply with the Ninth Circuit's ruling.

Organized Village of Kake, et al. v.
U.S. Forest Service, et al.,
J04-0029 CV (JKS)                    1

The Forest Service proposes that relief be limited to just those timber sales for which Plaintiffs pled site-specific claims. Plaintiffs, however, challenged much more than those individual sales. They challenged the underlying forest management plan which allocates national forest lands to different uses (determining where sales are allowed), and with which all sales must be consistent. *See* 16 U.S.C. 1604(i). Specifically, they challenged the agency's decision to open up roadless and other sensitive areas to logging, as not having been made after consideration of correct information about the potential demand for timber, about the impacts on and forestwide scarcity of high value habitat, and about the feasibility of restricting logging across the Tongass to areas of reduced importance to wildlife and human users of the forest. The Ninth Circuit agreed with Plaintiffs, finding that the forest plan and its environmental impact statement (EIS) are illegal in those regards. *See Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 810-15 (9th Cir. 2005) ("*NRDC*"). The Court's ruling means that the agency must reconsider, based on much better economic and environmental information, whether these areas ought be opened to timber sales, or placed off limits to safeguard other interests.

Full relief now requires a halt to logging in sensitive areas, pending a new plan and EIS. In the Tongass Land Management Plan (TLMP), the Forest Service should initially have considered protecting roadless areas and Kuiu Island in light of information absent from the process. Relief in this case, therefore, and minimizing the likelihood of environmental harm to these areas, lie in preserving the areas so that as much as possible the agency can give full consideration to protecting them intact, as the law required that it do in 1997.

Full relief also requires a halt to new decisions to pre-commit sensitive areas to logging. NEPA is a procedural statute that protects the environment by mandating fully informed decisions rather than by dictating a particular outcome. *See, e.g., id.* at 811. Because of the

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    2

Forest Service's substantial discretion in determining land allocations and logging levels, the procedural requirements of the National Forest Management Act and the Administrative Procedure Act also achieve their ends in this fashion – by requiring reasoned and informed decisions pursuant to lawful processes.  An open mind is therefore essential, if the reconsideration process is to be meaningful.  *See, e.g., Save the Yaak Comm. v. Block*, 840 F.2d 714, 718 (9th Cir. 1988) (NEPA "will not be used to rationalize or justify decisions already made.'" (quoting 40 C.F.R. § 1502.5)).  Premature decisions to enter and log the sensitive old growth stands at issue here would literally pre-judge their fate and necessarily foreclose unprejudiced deliberation about whether to protect them fully in the forest management plan process.  That would reduce the likelihood that these areas will get the environmental protection that they deserve and that the court of appeals ruled the agency must lawfully consider.  *See Envt'l Def. Fund v. Andrus*, 596 F.2d 848, 853 (9th Cir. 1979) ("After major investment of both time and money, it is likely that more environmental harm will be tolerated").

It is therefore irrelevant, in deciding relief for proven forest plan violations, whether Plaintiffs pled site-specific claims against an individual project.  Nor is there anything premature about enjoining the approval of such projects now, given that the agency is actively planning timber sales in a way that inherently forecloses planning options.

B.    Neither the Supreme Court's ruling in *Ohio Forestry*, nor the Ninth Circuit cases the Forest Service cites, require that timber sales be named in complaints for them to be enjoined pursuant to a successful forest management plan challenge.

Federal Defendants' lead objection to the requested injunction is the novel and mistaken claim that relief is only available for a small subset of the many timber sales authorized by the illegal general management plan for the Tongass National Forest.  First, the government argues, fuller relief is barred by *Ohio Forestry*.  Second, it points to cases finding that injunctions would

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                3

be premature as to some timber sales. *Ohio Forestry*, however, addresses only the justiciability of a forest management plan, an issue conclusively settled in this case and not open to review under the rubric of relief. And the relief Plaintiffs here seek is not premature, since the sales involved would necessarily be inconsistent with the Ninth Circuit's prior ruling in this case.

Federal Defendants are mistaken that *Ohio Forestry* means "relief against a specific project requires an action against that specific project." Fed. Opp. at 14. That opinion concerns only the timing of a merits challenge to a national forest management plan. *See Ohio Forestry*, 523 U.S. at 728 ("We conclude that the controversy is not yet ripe for judicial review"). At no point does it address the factors making relief appropriate (or not), when a forest plan, undeniably ripe for review, has been found illegal.

Quotes taken out of context do not convert *Ohio Forestry* to a remedies case. The Supreme Court did not, for instance, as the Federal Defendants would have it, "note[] that … Sierra Club would have to sue on a project-by-project basis." Fed. Opp. at 11. Rather, in responding to the Sierra Club's assertion that filing a single suit would be less burdensome, the Court noted that the plaintiff "does not explain … why one initial site-specific victory (if based on the Plan's unlawfulness) could not, through preclusion principles, effectively carry the day." *Ohio Forestry*, 523 U.S. at 734-35. The Court thus did not decide that multiple suits were required for relief against multiple sales. Rather it simply rejected the Sierra Club's argument because the plaintiffs had not demonstrated a real burden associated with waiting for implementation of a plan before litigating it.[1]

---

[1] Moreover, *Ohio Forestry* deals only with whether a forest plan could be reviewed before being applied to timber sales. *See* 523 U.S. at 736 (noting that at that juncture "review would have to take place without benefit of the focus that a particular logging proposal could provide"). Thus,

(footnote continued…)

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                4

Similarly, the Supreme Court did not "contemplate[] repeated suits against the implementation of a plan," Fed. Opp. at 11, as a prerequisite to relief on multiple sales. Instead, it found the problems with reviewing an as-yet unimplemented forest management plan were greater than those attending litigation after its application, even should that require multiple suits. *Ohio Forestry*, 523 U.S. at 735 ("The ripeness doctrine reflects a judgment that the disadvantages of a premature review that may prove too abstract or unnecessary ordinarily outweigh the additional costs of – even repetitive – postimplementation litigation"). Its conclusion, that litigation burdens would not justify potentially speculative consideration of plan level claims before concrete application of the plan to at least one timber sale, is simply not at issue in the equitable balancing required for formulation of an injunction against reliance on an adjudicated and illegal plan.

Much of this section of the Forest Service's brief reads as though it were trying to raise a defense, foreclosed at this stage of the proceedings, against review of Plaintiffs' claims on the merits. It argues that *Ohio Forestry* found forest plan "review was improper" and was "available only in the context of a challenge to a specific sale." Fed. Opp. at 11. It points to lower court rulings finding a lack of "jurisdiction to consider general challenges to a Forest Plan" and dismissing "claims directed at the validity of the Tongass LRMP." Fed. Opp. at 13 (internal quotation marks omitted). Here, however, the Ninth Circuit has already held that jurisdiction was proper and ruled on the merits of Plaintiffs' challenge to TLMP, and the time for appealing that holding has long since lapsed. *See NRDC*, 421 F.3d at 804-06, 816. All that remains is for

_____

(…footnote continued)
if it did contain opinions about the circumstances under which individual sales could be enjoined, they would of necessity be pure dictum.

Organized Village of Kake, et al. v.
United States Forest Service, et al.

this Court to shape a permanent injunction "reflecting the requirements imposed by our opinion." *Id.* at 816.

Federal Defendants' position that all timber sales – past, present, and future – must be separately named in a complaint is not supported by the two Ninth Circuit cases they cite. *See* Fed. Opp. at 12-13. First, the cases did not look at whether the naming of sales in a complaint affects a court's power to enjoin them when they rely on an illegal management plan. One of the cases considered whether to enter a "sweeping" injunction against all logging in the forest. *See Idaho Sporting Cong. v. Rittenhouse*, 304 F.3d 957, 974 (9th Cir. 2002) (denying a request that was apparently sought pursuant to a challenge to two individual timber sales, *see id.* at 966). The other did not consider injunctions at all. *See Kern v. BLM*, 284 F.3d 1062, 1079 (9th Cir. 2002).

Second, even as to the future sales Plaintiffs seek to enjoin here, the cited passages are not germane. The central factor in each was the possibility that plan-related defects could be avoided at the sale-specific level. One case found that a forestwide injunction against all logging was "not warranted" since the Forest Service might cure infirmities in its forest plan before issuing other timber sales, by revising, amending, or supplementing the defective plan. *Idaho Sporting Cong.*, 304 F.3d at 974. The other allowed the agency involved to proceed with timber sales before curing plan level deficiencies, as long as the missing cumulative effects analysis was included in sale specific documents. *Kern v. BLM*, 284 F.3d at 1078.

Here, in contrast, Plaintiffs seek only limited relief until the plan errors are corrected, and it is impossible to cure those errors at the site-specific level. The errors that rendered the Tongass plan inadequate directly infected the land allocations that determine where timber sales may be offered. *See NRDC*, 421 F.3d at 812 ("Had the decision makers and public known of the accurate demand forecast for Tongass timber, … the Forest Service may have selected an

Organized Village of Kake, et al. v.
United States Forest Service, et al.

alternative with less adverse environmental impact, in less environmentally-sensitive areas.");
*see also id.* at 816 (cumulative impacts of plan must be addressed "in a single, programmatic
EIS"); *id.* ("The Forest Service's error in assessing market demand fatally infected its balance of
economic and environmental considerations…."). Thus, the defects in the plan are relevant to
every timber sale authorized on the Tongass. It is not possible, in a site-specific EIS, to fix
forestwide land allocation errors based on forestwide information.

Plaintiffs, however, seek an injunction only against those sales which most indisputably
and unavoidably involve "environmentally-sensitive areas," *id.* at 812, that the agency has to
consider reallocating in its forest plan review. A focused injunction halting actions that cannot
be corrected at the site-specific level distinguishes this case from both *Idaho Sporting Congress*
and *Kern.* Here, the agency has no legitimate interest in pursuing the specific timber sales
covered by the proposed injunction before the required amendment of its overall management
plan. *See Neighbors of Cuddy Mt. v. U.S. Forest Serv.*, 137 F.3d 1372, 1382 (9th Cir. 1998)
("Because we ask only that the Forest Service conduct the type of analysis that it is required to
conduct by law … it is difficult to ascertain how the Forest Service can suffer prejudice by
having to do so now"). *See also infra* pp. 9-14.

    C.    <u>Statues of limitations are irrelevant in the context of equitable relief for a
successful challenge, timely brought, against a forest management plan.</u>

The Forest Service's statute of limitations arguments derive from its theory that relief can
only be granted as to sales for which specific claims were pled, and they fail for the same reason.
Statutes of limitations do not bar relief; they bar claims. All of Plaintiffs' claims were timely
brought. They therefore are not barred by any statute of limitations. The only claims that are
arguably time barred are ones that Plaintiffs did not, and did not need to, bring.

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                7

Under the same heading, the agency also wrongly argues that the adjudged defects in the 1997 TLMP are "irrelevant" for its would-be time-barred sales:  Upper Carroll, Lindenberg, Red Mountain, and Synchro.  *See* Fed. Opp. at 16.  These four sales were, as the Forest Service points out, *id.*, initially authorized prior to 1997.  However, by statute, any "contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent" with the governing forest plan.  16 U. S. C. § 1604(i); *See Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1070 (9th Cir. 1998).  In the TLMP Record of Decision (ROD), the Regional Forester explicitly considered whether and how much all previously approved timber sale projects needed to be modified to be made consistent with the new plan.  *See* Exhibit 87 at 5 (ROD at 40).  All four of these contracts were offered long after adoption of the 1997 TLMP (indeed, after it was found illegal).  *See* Plf. Mot. at 17.  These sales could not have been offered if not consistent with the 1997 plan.  Therefore, the defective 1997 plan explicitly addressed these sales and, contrary to the government's assertion, is highly relevant to them.  An injunction against them is warranted.

>    D.    <u>The exhaustion doctrine controls whether courts take jurisdiction of an administrative law challenge, not whether they can grant full and effective relief against an illegal forest management plan that was properly appealed through all available administrative avenues.</u>

Federal Defendants' exhaustion argument founders on the same shoal as its statute of limitations theory.  The government is entirely correct that "exhaustion of administrative remedies prevents a party from seeking judicial review of agency action without completi[on] of all administrative remedies which the agency by regulation requires."  Fed. Opp. at 16-17.  Plaintiffs, however, are not seeking judicial review of the Skipping Cow and North Corner sales.  They are seeking to ensure that when the Forest Service amends – as it must – its management

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    8

plan for the entire Tongass, it will not in the interim have foreclosed conservation options that it should previously have considered, but failed to.  Whether Plaintiffs exhausted administrative avenues for challenges they did not bring has no bearing on their request for relief in this case. And there is no dispute that Plaintiffs properly exhausted administrative remedies as to the forest plan they have successfully challenged here.

> E.    <u>Relief is appropriate against those future timber sales for which Plaintiffs seek an injunction, because they would necessarily be inconsistent with the Ninth Circuit's ruling here, and inevitably interfere with full and effective relief.</u>

As discussed above, an injunction barring the Forest Service from signing new RODs for timber sales in roadless areas and on Kuiu Island is essential to remedying as much as possible the defects in TLMP and its FEIS.  *See supra* pp. 1-3.  Only after the agency has reconsidered whether and how to open up these areas, after taking into account better economic and environmental data and other reasonable alternatives, should decisions about specific roadless and Kuiu sales be made, if at all.

Plaintiffs' proposed injunction readily meets Federal Defendants' standard, that it be "tailored to restrain no more than what is reasonably necessary to accomplish its ends."  Fed. Opp. at 23.  The injunction would stop decisionmaking about, and on-the-ground conduct of, timber sales in only those areas where, as Plaintiffs have shown, it would cause harm of a kind the Forest Service must considering ruling out in a new management plan decision.  *See* Plf. Mot. at 8-13.  It would thus bar RODs and logging only where they would unavoidably undercut full relief and increase the likelihood of irreparable environmental harm.

In arguing for the right to decide to enter and permanently alter sensitive areas prior to the mandatory plan reconsideration, Federal Defendants resurrect *Ohio Forestry* arguments from earlier in their brief.  *See* Fed. Opp. at 18-20.  As noted above, however, the Supreme Court in

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    9

*Ohio Forestry* did not address whether future timber sales can be enjoined when a forest plan is properly and successfully challenged. *See supra* pp. 3-7. Moreover, even if the Court had held that "a plan claim must be raised as part of a challenge to a specific timber sale project,"[2] Fed. Opp. at 18, it would not in any way follow that "no relief can be issued against such a project until that particular project is ready for judicial review." *Id.* at 18-19. It would only need to be the case that some project was ready for judicial review before relief could be sought against plan implementation.

Federal Defendants are mistaken that the "Supreme Court believed that the courts should not focus on whether 'the Plan as a whole is 'improperly skewed.'" *See* Fed. Opp. at 19. The Court did view such an investigation as "time-consuming" and requiring "judicial consideration of the details of an elaborate, technically based plan." *Ohio Forestry*, 523 U.S. at 736. But it did not prohibit review of the overall plan. Rather, it summed up its several concerns, including the "improperly skewed" observation, only as counseling against *premature* plan challenges: "All this is to say that further factual development would significantly advance our ability to deal with the legal issues presented and would aid us in their resolution." *Ohio Forestry*, 523 U.S. at 737

---

[2] *Ohio Forestry* did not so hold. The Supreme Court did make it plain that challenges to the logging provisions of forest plans required "the focus that a particular logging proposal could provide." *Ohio Forestry*, 523 U.S. at 736. It also indicated that a timber sale challenge *might* be paired with a forest plan claim. *Id* at 734 ("such later challenge might also include a challenge to the lawfulness of the present Plan if (but only if) the present Plan then matters"). The Court left unresolved whether a challenge to a forest plan after implementation through a timber sale decision *has to* include a separate claim against the timber sale. The addition of such a claim would not make the forest plan challenge any riper, so there is no apparent reason to require one. In the present matter, of course, Plaintiffs did include challenges to site-specific aspects of timber sales as well as to the underlying forest plan.

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    10

(internal quotation marks omitted).  Moreover, once again, the availability of plan review has been settled in this case, and the review itself is over and done with.

Federal Defendants are also thoroughly mistaken that the draft EIS (DEIS) for the Kuiu Timber Sale shows how site-specific documents can cure the defects in TLMP, before TLMP itself is revised.  The Kuiu DEIS does, as they assert, use the correct interpretation of the Brooks and Haynes timber demand projections, and discusses site-specific impacts of logging.  Fed. Opp. at 20.  It does not use those projections and impact assessments, however, to determine whether the timber sale program for the Tongass should be confined to previously roaded areas or should avoid Kuiu Island.  *See* Fed. Ex. 6 at A-7.  On the contrary, the Kuiu DEIS reports that the "location of timber sale projects is based first on the land allocation decisions in the Forest Plan."  *See* Exhibit 95 at 8 (Kuiu DEIS at A-13); *see also id.* at 5 ("The Kuiu Timber Sale EIS is a project-level analysis.  The scope of the analysis is confined to the Kuiu Timber Sale Area…. [I]t does not attempt to address decisions made at higher levels of planning"); *id.* at 3 ("The Kuiu Timber Sale is proposed at this time to respond to goals and objectives of the Tongass Land and Resource Management Plan").  It is precisely because land allocations are made in the forest plan, in light of forestwide analyses not replicated in site-specific documents, that they cannot be cured at the timber sale level.  The unavailability of a site-specific cure for adjudged plan level defects, including land allocation and maximum logging levels, makes this case like *Sierra Club v. Rey*, in which this Court enjoined the signing of RODs because, as the Federal Defendants note, "wilderness recommendations are made only as part of the forest plan process."  Fed. Opp. at 21.  The same is true of land allocations.

The Forest Service claims that deciding on timber sales in roadless areas and Kuiu Island will not prejudice the mandated forest plan revision, *id.* at 24, but the record shows otherwise.

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    11

When the agency adopted its plan in 1997, it allocated lands in a way that allowed every logging project with a signed decision to go forward, and required modifications to only two of them. As to sales under contract, the Regional Forester concluded that "decision documents for these projects do not need to be modified because of the revised plan." Exhibit 87 at 5 (TLMP ROD at 40). For unsold projects with signed decisions, the TLMP ROD states that for all but two "it is not necessary to modify them." *Id.* The Eight Fathom timber sale was modified to avoid an old growth habitat area, and the South Lindenberg project got better riparian standards, but the Forest Service did not allocate lands to protected status in a way that forced cancellation of either project. *Id.*

The examples cited by Federal Defendants of places where the forest plan supposedly did force cancellation of a project, Fed. Opp. at 24-25, are misleading and actually support the requested injunction. The Chuck Creek timber sale was abandoned only after Congress designated the area Wilderness. *See id.* at 25. This does not show that the Forest Service will be able to ignore the bureaucratic momentum behind a timber sale, but rather demonstrates how difficult it is to persuade the agency to abandon a project. For the North and East Kuiu project and the Ushk Bay project, it was not a forest plan that forced cancellation of the timber sales, but court injunctions that would have required the agency to undertake new site-specific EISs. *See Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723 (9th Cir. 1995) (requiring supplemental EIS for North and East Kuiu); *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059 (9th Cir. 1998) (affirming district court injunction against Ushk Bay project for failure to comply with forest plan). This helps illustrate the importance of an injunction (and vacatur) to help secure fair treatment in the forest planning process. The only valid timber sale that was actually canceled as the result of a forest plan was Chicken Creek,

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                12

which was a portion of the Eight Fathom project.  Fed. Opp. at 24.  That there is only one such

example in Tongass history, and that it was only one portion of a site-specific timber sale ROD,

shows just how difficult it is to persuade the Forest Service to reverse course on a final timber

sale project during a programmatic planning process.[3]

The Forest Service should not, as Federal Defendants suggest, be allowed to make new

logging decisions in roadless areas in keeping with a "presumption that the agency will comply

with the law."  *See id.* at 25.  In the first place, as discussed above, sales in these areas cannot be

lawful.  *See supra* pp. 6-7.  Second, the agency's own conduct rebuts any such presumption,

since it has continued to decide to log roadless areas after the Ninth Circuit's ruling, as it has

already done in Emerald Bay and intends to keep doing.  *See* Plf. Mot. at 13-15.  What it seeks in

resisting the balanced injunction proposed by Plaintiffs is simply license to do so again.

Finally, Federal Defendants are mistaken that continued decisions to log roadless and

other sensitive areas are consistent with the governing NEPA regulations.  They argue that 40

C.F.R. § 1506.1 is irrelevant to timber sales during plan revision because it prohibits only actions

that limit the choice of reasonable alternatives in a programmatic EIS, like that for TLMP.  Fed.

Opp. at 28.  That is precisely what a timber sale ROD does, however, when it commits an area to

---

[3] Moreover, the Forest Service abandoned the Chicken Creek sale only under duress.  The U.S.
Fish and Wildlife Service wrote a strongly worded letter to the Regional Forester insisting that
Chicken Creek (VCU 195) should be protected from logging to ensure wildlife viability, because
it was part of a particularly large contiguous block of old growth.  *See* Exhibit 85 at 1-2
(Holmberg letter); Exhibit 84 (map showing Chicken Creek in VCU 195).  At that time, petitions
to list two Tongass species (Queen Charlotte goshawk and Alexander Archipelago wolf) as
threatened or endangered under the Endangered Species Act (ESA) were pending before the Fish
and Wildlife Service.  *See* Exhibit 87 at 4 (TLMP ROD at 34); Exhibit 85 at 8-9 (Holmberg letter
reminding Forest Service of importance of interagency cooperation under the ESA).

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    13

logging that ought to be considered for protection in the forest plan.  For the same reason, timber sales in these areas do not qualify for the exemption in 40 C.F.R. § 1506.1(c), which only applies to undertakings that do not "tend[] to determine subsequent development or limit alternatives." Federal Defendants suggest, as well, that a timber sale is not an "undertaking" proscribed by 40 C.F.R. § 1506.1(c).  *See* Fed. Opp. at 29.  But the regulation orders that "agencies … not undertake in the interim any major Federal action…," and the fact that EISs must be completed for timber sale RODs confirms that the RODs themselves are major federal actions.  *See also* 40 C.F.R. § 1508.18(b) ("Federal actions tend to fall within one of the following categories: … (4) Approval of specific projects").

## II.     VACATUR OF CERTAIN TIMBER SALE RECORDS OF DECISION IS AN APPROPRIATE REMEDY.

Vacatur of signed timber sale RODs is appropriate for the same reasons that an injunction against signing new ones is.  Vacatur is the normal remedy for agency action in violation of the Administrative Procedure Act, which authorizes the court to "set aside" arbitrary and unlawful agency action.  *See* Plf. Mot. at 4.  Here, Plaintiffs seek only limited vacatur of those specific sale RODs that threaten their interests the most, not of all sale RODs or the forest plan itself. Given the Forest Service's extraordinary push to prepare for roadless area logging even after the Ninth Circuit's decision here, *see* Plf. Mot. at 13-15, unbiased decisionmaking about whether to protect those areas in a new TLMP will be difficult enough with vacatur, let alone without it.

The Forest Service raises only ineffectual arguments against vacatur.  Exhaustion of administrative remedies is irrelevant in the relief context.  *See supra* pp. 8-9.  Bureaucratic momentum is demonstrably a threat.  *Id.* at 11-13.  Indeed, if anything, the agency's plea that

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    14

RODs not be vacated so it can expeditiously proceed with logging after a new plan decision, *see* Fed. Opp. at 30, underscores the risk of letting its recent timber sale decisions stand.

The absence of a vacatur order in *Sierra Club v. Rey* is no precedent here. Vacatur was not at issue in that case. With different equitable circumstances, the plaintiffs there did not seek vacatur, and the Court did not address it. *See* Fed. Ex. 8.

The Forest Service itself holds the keys to logging roaded units in partially roadless sales: it can segregate and separately offer them without offending the injunction Plaintiffs propose. This is what the agency did in the Woodpecker EIS, where, after this Court's injunction in *Sierra Club v. Rey*, the agency released a ROD for only the roaded portions of the Woodpecker project. *See* Exhibit 89 at 3 (2002 Woodpecker ROD at 1).

Vacatur of the Threemile, Emerald Bay and Woodpecker (2003 roadless) RODs would also obviate the need for resolution of the site-specific claims currently pending in the present case and two others. *See* Plf. Opening Br. (Nov. 23, 2005) (Docket No. 48) (Threemile); *NRDC v. USFS*, No. J04-0010 CV (JKS) (D. Alaska) (Woodpecker); *SEACC v. USFS*, No. J06-0005 CV (JWS) (D. Alaska) (Emerald Bay). They could be dismissed without prejudice as moot.

III.    THE PROPOSED TIMBER SALES ON KUIU ISLAND WILL CAUSE
        IRREPARABLE HARM TO THE ORGANIZED VILLAGE OF KAKE.

None of the defendants disputes that logging in roadless areas will cause significant irreparable harm to the environment, to Plaintiffs, and to other members of the public. However, Federal Defendants object to relief requested by Plaintiffs on Kuiu Island, suggesting the substantial evidence of logging's impact to the culture and way of life of Kake residents offered by Plaintiffs does not provide a "reasoned basis" for an injunction. Fed. Opp. at 35-39. The Forest Service does not, however, dispute any of Plaintiffs' evidence that Kuiu Island is

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    15

significant to the culture and subsistence way of life of the people of Kake[4] or that logging and road building on the island have substantially impaired the connection the people of Kake have with their history.  Instead, the Forest Service argues relief should be denied primarily because similar objections might be raised by people in other parts of the Tongass to other logging projects in roaded areas and because other parts of the Tongass are more heavily damaged by logging than Kuiu.  Neither is a persuasive basis for denying relief in this case.

Initially, arguing that all regions of the Tongass are within the traditional areas of some Tlingit or Haida clan, the Forest Service asserts no injunction should be granted for projects on Kuiu to protect the strong cultural and historical interests of the people of Kake because other areas in the Tongass might be important to other Native people.  *See* Fed. Opp. at 35-36.  Even assuming this prediction were true, and ignoring the fact that not all parts of the Tongass are equally important to associated clans, the idea that other plaintiffs in some speculative future case might make similar claims does not offer a basis for denying relief to Plaintiffs in this case. The time to resolve the impacts of speculative future litigation is when such a case is brought.

Though admitting Kuiu logging has been "significant," the Forest Service seeks to minimize the resulting substantial damage to the people of Kake and their subsistence and cultural uses of the island by comparing logging levels on Kuiu to two even more damaged

---

[4] In a footnote, Federal Defendants point to a map showing traditional Tlingit territories to suggest parts of Kuiu Island are not within the Kake people's traditional area.  Fed. Opp. at 35 n.13.  That map, depicting areas as of the late 19th century, shows Kuiu Island to have been within the territories of two "kwaans":  Kake and Kuiu.  The Forest Service fails to note, though, that, as a result of forced relocation, by the early 20th century people resident on Kuiu had moved to the current Kake village site.  *See* Plf. Mot. at 9-10.  Modern descriptions of the traditional use area of the residents of Kake include the territories of both kwaans and cover the entirety of Kuiu Island.  *See* Exhibit 83 at 4 (ADFG subsistence report Fig. 15).

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    16

islands.  *See* Fed. Opp. at 36-37.  This ignores the fact that logging on Kuiu has been heavily

concentrated in the northern part of the island closest to Kake.  *See* Exhibit 100 at 4 (Christensen

Decl. Attachment 1) (Kuiu Island logging map).  Approximately 19% of North Kuiu has been

cut, greater than the most heavily logged islands on the Tongass.  *Compare* Fed. Opp. at 36-37

*with* Exhibit 100 at 3 (Christensen Decl. ¶ 6) (27,588 acres logged out of 147,179 total acres on

North Kuiu).  Moreover, this substantial logging on Kuiu has disproportionately removed the

best quality habitat for deer.  *See* Exhibit 100 at 3, 5-6 (Christensen Decl. ¶ 7 & Attachments 2

& 3) (maps conveying North Kuiu deer habitat before and after logging).

      Federal Defendants agree with Plaintiffs that the deer population has been slow to

recover from a population crash in the 1970's and that hunters from Kake have been unable to

hunt or take many deer from their traditional use areas on Kuiu.  Fed. Opp. at 37-38.  The agency

does not dispute that logging has destroyed significant deer habitat on Kuiu.  Plf. Mot. at 11.

The defendants suggest, though, that because logging in the Threemile and Kuiu projects will

occur on interior parts of the island, it will not affect hunting that occurs along the beaches and

the road system.  *See* Fed. Opp. at 38.  This argument is self-contradictory, because the

Threemile and Kuiu projects as well as the Rowan Mountain sale will be connected to and

extend the existing road system.  *See* Exhibit 100 at 4 (Kuiu map).  It also ignores the obvious

fact that any deer taken on the beach and road system depend on habitat in the interior portions

of the forest.  *See* Exhibit 83 at 3 (ADFG subsistence report at 68).[5]

---

[5] The Forest Service also seeks to minimize the impact of more roads by pointing out that Kuiu is
not on the Alaska ferry system route and postulating that it may be less used than other islands
by hunters who wish to hunt from a road.  *See* Fed. Opp. at 37.  Even if this were true, it would
not alleviate the habitat loss impairing recovery of the deer population on Kuiu or the adverse
affects on the people of Kake resulting from the logging and road building in their traditional
                                                          (footnote continued…)

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    17

Though not responsive to the Organized Village of Kake's justifications for an injunction on Kuiu, the Forest Service nevertheless argues that no relief should be granted there because its marten populations face low risk from logging. *See* Fed. Opp. at 37. To support this proposition, the Forest Service cites the draft EIS for the Kuiu project. That analysis, however, ignores recent scientific research that has disclosed the TLMP standards for marten, applied in the project, are likely insufficient because they are based on incorrect assumptions about the amount of habitat needed to support the minimum number of females. *See* Exhibit 91 (Flynn 2004). Similarly, it fails to respond to research disclosing that the Kuiu marten population is uniquely significant and sensitive because it represents a separate species from the marten most common on the Tongass and contains one-quarter of the entire genetic diversity of that separate species. *See* Exhibit 97 (Dawson letter). Drawing on this research, biologists describe a substantial threat to the Kuiu marten, particularly in light of current low population levels, and recommend against proceeding with logging of marten habitat, like that in the Kuiu, Threemile, and Rowan Mountain sale areas, pending revision of the Tongass plan and requirements for marten conservation on Kuiu. *See id.*

Even further afield from Plaintiffs' argument, the Forest Service argues that no injunction should cover Kuiu Island because the North Kuiu roadless area is not a good candidate for wilderness protection. *See* Fed. Opp. at 38-39. Whatever the merits of this conclusion, it is not the basis of the injunction request. The importance of northern Kuiu to the culture and

_____

(…footnote continued)
areas. In fact, however, Kake residents testified that even without ferry access, more hunters using ATVs are showing up on Kuiu as the road network has expanded. *See* Exhibit 78 at 2-3.

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                18

subsistence way of life of the people of Kake is described in the testimony of Kake residents, *see* Exhibits 46, 76-81, and is unrebutted by the Forest Service's wilderness values assessment.

IV.     THE BALANCE OF EQUITIES FAVORS ENTRY OF THE EQUITABLE RELIEF REQUESTED BY PLAINTIFFS.

In balancing the equities, neither the Forest Service nor the Alaska Forest Association (AFA) disputes Plaintiffs' central argument that there is sufficient timber in the roaded areas of the Tongass, outside of Kuiu Island, to allow logging to continue indefinitely at the level that has prevailed for the last five years. *See* Plf. Mot. at 21-22. Rather, contradicting years of past practice and admonitions from this Court, the Forest Service argues that the Court should ignore the full picture of Tongass timber sale planning and instead resolve relief through piecemeal litigation. Fed. Opp. at 31-34. For its part, AFA argues that the prevailing logging levels are insufficient to sustain the industry in the long term and that the industry requires a seven-fold expansion of timber supply from the Tongass. This argument ignores both the persistent economic climate that has produced the current conditions and the limits of sustainable logging on the Tongass. More importantly, it provides no basis for denying or limiting equitable relief in this case. The only ways to achieve any expansion of the current industry in the short term would be to highgrade the best timber from the forest while also granting huge federal subsidies that Congress is unlikely to fund. The balance of equities does not favor such a dramatic departure from the status quo, even if it were achievable. A more prudent approach is to enjoin and vacate decisions in the parts of the Forest that cause the most harm to the environment and to Plaintiffs' interests, while permitting timber sales to proceed in other places at a level maintaining the status quo for the relatively brief time it will take to revise the forest plan and correct its defects.

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    19

A.     <u>The Court should evaluate relief in light of the entire Tongass timber sale program</u>.

While recognizing that the Court must weigh the equities in evaluating a request for injunctive relief, Federal Defendants proceed to argue that it would be imprudent to do so here because the Forest Service intends to continue approving more timber sales in roadless areas and on Kuiu Island.  Fed. Opp. at 31-34.  This argument has no support in the law or the facts.  In fact, it demonstrates why the Court should enjoin the Forest Service from approving new timber sales in the most sensitive and controversial parts of the forest pending completion of an adequate forest plan.  The agency's proposed alternative – piecemeal litigation over timber sales that will by necessity be based on a faulty plan – is wasteful and unnecessary.

The Forest Service is seeking to do the precise thing the Court denounced in *City of Tenakee Springs v. Courtright*, No. J86-024 Civil, slip op. at 3-4 (D. Alaska July 31, 1987) (Fed. Ex. 12).  At issue there was logging under a 50-year pulp mill contract.  The Court criticized the plaintiffs for seeking "piecemeal" relief, one project at a time, without evaluating the whole contract area.  *Id.* at 3.  "The court will not allow itself to be led blindly from one VCU to the next."  *Id.* at 4.  Following this admonition, Plaintiffs here have sought to provide "the full picture."  *See id.*

The Forest Service provides no convincing argument why the Court should adopt the piecemeal approach.  First, the agency argues that the defects in TLMP may not "matter" for the scheduled Kuiu and Scratchings timber sales.  Fed. Opp. at 33.  This is implausible.  As discussed above, the violation of law in this case "fatally infected" the entire plan, including the land allocations for its timber sale program.  *NRDC*, 421 F.3d at 816.  Since it is not possible to correct this defect in site-specific projects, the defects will necessarily "matter" for every timber sale offered.  *See supra* pp. 6-7.

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    20

Second, Federal Defendants argue that they may need to offer timber sales in roadless areas or on Kuiu Island if other projects on the schedule are delayed, found inadequate by agency officers through administrative appeals, or fail to appraise positively. Fed. Opp. at 33-34. The potential failure by the agency to produce marketable timber on schedule is not a reason to ignore the full picture here. Nor can it equitably be counted against Plaintiffs. Federal Defendants are the ones responsible for whether they fall behind schedule or otherwise fail in the respects identified in their brief. For example, it was Forest Service officials who determined that they had not complied with the legal requirements for the Scott Peak and Overlook sales, and it was Forest Service officials who designed the Synchro sale that did not appraise positively in the weak markets that have prevailed for several years. *See id.* The agency can avoid these problems in future sales with careful planning, and that is what should be required when the agency is operating under a plan held arbitrary and unlawful. Should unforeseen circumstances genuinely prevent the Forest Service from providing a sufficient supply of timber to maintain the status quo, the agency may seek relief from the injunction. The inherent uncertainty of future events is no reason to ignore the full picture and adopt a piecemeal approach.

The Forest Service suggests piecemeal litigation as an alternative, *see id.* at 34, but, as Judge von der Heydt recognized, this is a poor solution. The people of Kake should not have to go to court yet again to protect their ancestral home from a timber sale that will, as a matter of law, be based on a plan already held fatally inadequate. By the same token, people whose livelihoods and recreational pursuits are based in the roadless areas of the Forest should not have to return to court repeatedly to stop timber sales already known to be based on a defective plan.

The Forest Service has already started down this piecemeal track and intends to continue if not restrained by this Court. After the court of appeals held the forest plan inadequate, but

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                   21

before relief proceedings could begin in this Court, the Forest Service signed a ROD and denied all administrative appeals for the Emerald Bay timber sale project, located entirely in a roadless area. *See* Plf. Mot. at 13-14. This defiant action left Plaintiffs no choice but to file yet another lawsuit to protect their interests, based on the exact same legal violations already identified by the Ninth Circuit. *See Southeast Alaska Conservation Council v. U.S. Forest Serv.*, No. J06-0005 CV (JWS) (D. Alaska) (filed March 23, 2006). The Forest Service, by its own account, plans to do this seven more times before the plan revision is completed. *See* Plf. Mot. at 14-15.

The Court should consider the full picture and obviate the need for piecemeal litigation by enjoining new timber sale RODs in roadless areas and on Kuiu Island. The continued piecemeal litigation favored by the Forest Service is prejudicial to Plaintiffs, wasteful of judicial resources, and unnecessary. To paraphrase Judge von der Heydt, it leads the Court blindly from one timber sale to the next. *See* Fed. Ex. 12 at 4.

> B.    The Alaska Forest Association offers no viable option for relief.

Without denying that continued logging and timber sale planning in roadless areas and on Kuiu Island will cause irreparable harm to Plaintiffs, AFA nevertheless opposes any relief whatsoever. Instead, AFA claims that it must have an "economic" timber supply "at least" seven times larger than what has prevailed on average over the last five years. AFA Br. at 6-7 (alleging 360 MMBF minimum demand); *cf.* Plf. Mot. at 21 (46 MMBF average cut for last five years). This suggestion is impracticable. It does not reflect a sound assessment of the timber markets and greatly exceeds even what the Forest Service proposes. To provide what the timber industry wants is beyond the sustainable capability of the Tongass National Forest, would cause unacceptable environmental harm, and would require hundreds of millions of dollars every year in federal subsidies that are not likely to be funded by Congress.

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    22

1.     *AFA misunderstands market demand.*

AFA gets off on the wrong track by equating mill capacity with market demand.  *See*, *e.g.*, AFA Opp. at 4-5, 11.  The fact that sawmills in Southeast Alaska are operating far below capacity is evidence not of demand for their products, but of a *lack* of demand.  When the marketplace no longer demands the products of a manufacturing facility, or when the facility cannot produce the products at a competitive price, those facilities will be closed or underutilized.  This is routine in a dynamic free market economy, and the Alaska timber industry is not immune.  *See*, *e.g.*, Exhibit 94 at 33 (Brackley, et al.) (describing decline of Alaska timber industry and stating, "Factors contributing to this decline included changes in the structure of the Alaska forest sector, changes in markets for Alaska products, and changes in conditions faced by Alaska's competitors."); Exhibit 101 at 2-7 (Crone Decl. ¶¶ 4-5); *see also* Plf. Mot. at 24.  Even AFA reluctantly acknowledges this, citing "changed market and processing conditions" and admitting, "Conditions have not improved."  AFA Opp. at 6.

Taking these conditions into account, the Forest Service's most recent best estimate of market demand for Tongass timber is even lower than what has prevailed in recent years.  In connection with the planning effort for the Tongass plan revision, the Forest Service's Pacific Northwest Research Station recently released a draft report projecting market demand for Tongass timber through 2025.  *See* Exhibit 94 (Brackley, et al.).[6]  The report assesses four possible scenarios, *see id.* at 24-26, and concludes that Scenario 1 – the "limited lumber" scenario – "assumes greater likelihood of occurrence since it only depends on the continuation of

---

[6] AFA attaches highly selective excerpts from this study, ignoring the conclusions and presenting a misleading picture.  *See* AFA Ex. 6.  Plaintiffs attach the entire report as Exhibit 94.

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    23

the *status quo*." *Id.* at 32.  Under this scenario, demand is forecast to be 32.8 MMBF annually

for 2003-2007 and 34.0 MMBF annually for 2008-2012.  *Id.* at 46 (Table 3).  The only scenarios

that would increase demand substantially during this time are Scenarios 3 and 4, both of which

require the construction of one or more Medium Density Fiberboard (MDF) or equivalent plants

in Southeast Alaska, *see id.* at 25-26, something that no one is proposing and would face

enormous obstacles.  *See* Exhibit 101 at 7-8 (Crone Decl. ¶ 6).  Thus, in the only likely scenarios,

demand for Tongass timber will not exceed the level that has prevailed in recent years.

> 2.     *Unfavorable but persistent economic conditions make it impossible for the
> Forest Service to offer significantly more "economic" timber sales.*

Recognizing the difficult economic conditions, AFA complains that the problem is a lack

of "economic" timber supplied by the Forest Service.[7]  *See* AFA Opp. at 6, 14-15.  Plaintiffs

agree with both AFA and the Forest Service that many timber sales in recent years have not been

"economic" or, in agency terms, have not appraised positively.  *See* AFA Opp. at 6 (agreeing

with Forest Service that half of all volume under contract in 2003 was not "economic"); *id.* at 15

("Of the timber sales offered in recent years, many have failed to be economic…."); Fed. Opp.

at 34 (describing legislation requiring positive appraisals and Synchro sale that received negative

appraisal); *see also* Plf. Mot. at 23-24.  However, given the markets and other constraints beyond

the control of the parties, there is little the Forest Service can do to provide more "economic"

timber, and this fact does not provide a basis to deny or limit Plaintiffs' relief.

---

[7] AFA never defines what it means by "economic" timber.  Plaintiffs assume it means timber
sales on which a purchaser could make a sufficient profit to justify the investment and the risk.

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    24

The difficulty in designing timber sales with a positive economic value is a direct result of the weak markets for the products produced by the mills.  If demand for those products were greater, they would command higher prices, which in turn would cause the timber sales to have a higher economic value.[8]  At bottom, all parties agree that it is a significant challenge for the Forest Service to design economically viable timber sales in today's markets.

To make the timber sales more economic would require the Forest Service either to increase the value of the timber or decrease the cost.  Conspicuously, AFA offers no suggestions for how either of these things could be accomplished in the prevailing economic conditions.  Neither option is viable during the interim period subject to this motion, while the Forest Service revises its land management plan.

a.    **There is no viable option for raising the value of the timber.**

Of course, the Forest Service has no power to raise the price consumers are willing to pay for timber products.  Those prices are determined by the markets.

Thus, the only thing the Forest Service could do to raise the value of the timber would be to pack its timber sale offerings with bigger, higher quality trees.  The practice of selectively targeting the highest quality timber is known as "highgrading."  It is, by definition, unsustainable:  if the best trees are cut today, only lower quality trees will be left tomorrow.  To

---

[8] AFA asserts that "[t]he depressed state of current timber operations are [sic] a direct result of a shortage in economic, federal Tongass timber supply."  AFA Opp. at 6.  However, the evidence cited in the next sentence to support this assertion shows that AFA has the cause and effect reversed:  "As of June 24, 2003, half of the volume that was currently under contract was recognized as being 'associated with projects having poor economics *due to* changed market and processing conditions.'"  *Id.* (quoting AFA Ex. 2) (emphasis added).  The shortage of "economic" timber sales is a direct result of the depressed markets, not the other way around.

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    25

a large extent, the depleted industry today is the victim of four decades of highgrading under the long-term pulp mill contracts. During that time, the Forest Service consistently targeted the highest value timber. "Across the Tongass, timber harvest has been concentrated in the higher volume classes…." Exhibit 86 at 3 (TLMP FEIS at 3-22).

The stands with the biggest trees also provide the best habitat values for numerous species. The Ninth Circuit explained:

> According to scientists assembled by the Forest Service to review independently the conservation measures related to wildlife habitat for the Tongass, high-volume stands
>
>> provide a combination of large living and dead trees, multiple canopy layers, high-nutrient forage on the forest floor, good protection from snowfall, and other important features leading to habitat of high quality for wildlife adapted to Old Growth. At the same time, these high volume classes have been, almost exclusively, the target for past logging in Southeast Alaska.

*NRDC*, 421 F.3d at 815. *See also* Exhibit 86 at 5 (TLMP FEIS at 3-27) ("High volume old-growth is a special concern since past timber harvest has been concentrated in these stands.").

It would be highly inappropriate to authorize an expanded timber sale program highgrading the best stands of old growth during the interim period subject to this motion. The failure to consider the direct and cumulative environmental effects of highgrading is one of the defects the Forest Service is required to correct in the new planning process. *NRDC*, 421 F.3d at 814-16. The Forest Service should be required to complete an adequate evaluation of the adverse environmental and economic impacts of this practice in an EIS before launching an expanded timber sale program targeting the best stands of old growth in the Tongass.

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                  26

      **b.**     **To lower the cost of Tongass timber any further would require enormous subsidies Congress is unlikely to fund.**

In the absence of a viable way to increase the value of the trees in a timber sale, the only alternative would be to reduce the costs, but this option is no more viable.  The price of the timber is as low as it can go.  Thus, the only way to reduce industry costs any further would be to grant huge subsidies that Congress is unlikely to fund.

It is not possible to lower the cost of the timber sale itself.  The Forest Service is required to offer the timber at no less than appraised value.  36 C.F.R. § 223.63.  As discussed above, the timber sales on the Tongass are already appraising at extremely low values, so much so that many cannot be offered because they are negative.  *See supra* pp. 24-25.  Moreover, there is no competition for any but the smallest timber sales.  In the last two fiscal years, no timber sale over 0.3 MMBF in size has attracted more than one bidder.  *See* Exhibit 93 (USFS bid data chart).  Many drew no bids at all.  *See id.* at 5.  With low appraisals and no competition to bid up the prices, the timber sales are already selling at rock-bottom prices.

Thus, the only thing the Forest Service could do to lower the cost of the timber would be to find ways to reduce other input costs for the purchasers.  Many of these costs, such as labor and fuel, are high in Alaska and completely beyond the control of the Forest Service.  *See* Exhibit 101 at 4 (Crone Decl. ¶ 5).  Many timber sale requirements that entail costs, such as the "best management practices" required to protect soil and water quality, are needed to protect other resource values.  *See*, *e.g.*, Exhibit 88 (TLMP App. C).

Unable to find any other ways to lower costs, the Forest Service has turned in recent years to enormous direct subsidies in the form of road construction.  Normally, road construction is a cost the purchaser of a timber sale must absorb and is reflected in the appraised value of the sale.  However, as discussed above, the Forest Service in recent years has had difficulty

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                          27

designing timber sales in the Tongass that appraise positively.  Therefore, the agency has

resorted simply to building the roads for the purchasers using public funds at a cost greatly

exceeding the revenues from the timber sales.  In the case of the Midway sale, to take an extreme

example, the cost of the road was 48 times the revenue received for the timber sale, resulting in a

loss to taxpayers of nearly $2.5 million on the road alone.  *See* Exhibit 98 (public works road

chart).  According to information supplied by the Forest Service in this litigation, the following

timber sales currently under contract include roads built with public funds:

| Timber Sale Name | Timber Contractor | Volume (MMBF)[9] | Cost of Road Contract | Timber Sale Value | Loss to Public on Roads |
|---|---|---|---|---|---|
| Midway | Icy Straits | 8.2 | $ 2,500,000 | $ 52,467 | $ 2,447,533 |
| Summore Change II | Viking | 11.0 | 2,539,000 | 443,524 | 2,095,476 |
| Kogish-Shinaku II | Viking | 8.2 | 875,923 | 96,001 | 779,922 |
| Fusion | Viking | 31.9 | 1,405,853 | 277,772 | 1,128,081 |
| Finger Point | Viking | 10.3 | 680,991 | 67,561 | 613,430 |
| Skipping Cow | Alcan | 18.6 | 1,300,000 | 143,196 | 1,156,804 |
| Luc Lac II | Viking | 8.6 | 224,627 | 121,817 | 102,810 |
| Upper Carroll II | Pacific | 16.5 | 1,555,000 | 179,952 | 1,375,048 |
| Lindenberg | Viking | 23.2 | 391,000 | 231,295 | 159,705 |
| Buckdance-Madder | Pacific | 15.4 | 2,877,000 | 106,926 | 2,770,074 |
| TOTAL | | | $ 14,349,394 | $ 1,720,511 | $ 12,628,883 |

*Id.*

In short, the Forest Service spent $14.3 million of public money to build roads for timber

sales worth only $1.7 million, for a loss of $12.6 million.  The cost of the roads was more than

eight times the value of the timber.  These sales comprise nearly every large sale – and account

---

[9] The timber sale volumes are derived from Exhibit 99, Exhibit 42 (volume under contract
through 1/31/06), and Exhibits 32 and 39 (Skipping Cow and Buckdance-Madder
advertisements).  The remainder of the data in the table are from Exhibit 98.

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    28

for the huge majority of all volume – currently under contract on the Tongass.  *See* Exhibit 99

(volume under contract through 3/31/06).[10]  The large-scale Tongass timber sale program would

no longer exist without these subsidies.

Moreover, the road subsidies are just the tip of the iceberg.  The Forest Service spends

millions more every year on timber sale planning, layout, appraisal, administration, monitoring,

and the like.  In total, as discussed in the opening brief, the Forest Service has been losing nearly

$50 million per year on the Tongass timber sale program.  *See* Plf. Mot. at 27.[11]

Thus, to offer 360 MMBF per year in "economic" timber sales, as the timber industry

seeks, would require a huge expansion of the subsidies already paid by taxpayers.  This volume

is more than seven times the volume cut on the Tongass in recent years and would thus cost

hundreds of millions of dollars per year.  Because there is no indication Congress would be

willing to fund such a wasteful program, AFA's wish for one is not a substantial equitable factor

for the Court to weigh in the balance.

---

[10] Several sales on Exhibit 99 have been or soon will be canceled (Orion North, King George, Bohemia, and Shamrock).  *See* Fed. Ex. 2 at 7-8 (Cole Decl. ¶ 16).  Others that still appear on the" list have little or no volume remaining.  *See* Exhibit 99.

[11] In his declaration, Tongass Forest Supervisor Forrest Cole asserts, without citation to any facts or data, that litigation "is one of the primary reasons why the Tongass timber sale program operates at such high costs."  Fed. Ex. 2 at 11 ¶ 26.  The cost of litigation is less than 0.5% of the total cost of the Tongass timber sale program.  *See* Exhibit 16 at 11 (SEACC subsidy report).  In the context of the rest of the paragraph in which Cole makes this claim, it appears that what he is actually citing is the cost of compliance with NEPA and other laws, not the cost of the litigation itself.  *See* Fed. Ex. 2 at 11-12 ¶ 26.

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                29

3.    *The volume of timber sought by AFA is beyond the capacity of the Tongass.*

The 360 MMBF minimum annual timber supply sought by AFA, *see* AFA Opp. at 6-7, is also not a legitimate equitable consideration because it exceeds by a wide margin the maximum the Tongass can produce. According to the Forest Service, the maximum possible cut under the current plan is 212 MMBF per year on average.[12]  *See* Exhibit 90 at 4 (2003 SEIS at 2-15). Even this, however, is only theoretical. In practice, the Forest Service estimates that it may be able to produce 70% of this volume, if the demand exists. *See* Exhibit 14 at 16 (2003 SEIS at 3-287); Plf. Mot. at 22. Thus, if there were sufficient demand, the maximum likely volume that could be produced under the current plan is about 148 MMBF per year on average.

To achieve the volume AFA claims is necessary would therefore require the Forest Service to more than double the land area available for logging under the current plan. Such an expansion of logging would cause unacceptable and illegal risks to wildlife, subsistence, water quality, recreation, and other values the Forest Service is charged to protect. *See*, *e.g.*, Exhibit 87 at 2 (TLMP ROD at 15) (high logging alternatives would have "relatively high risk of not maintaining habitat sufficient for viability of all species"); *id.* at 3 (ROD at 16) (high logging alternatives "would not maintain an acceptable level of scenic quality or undeveloped recreation opportunities"). The timber supply sought by AFA is unrealistic in the long term and impossible in the relatively short time it will take to correct the defects of the existing plan.[13]

---

[12] This is the "NIC I," or economically viable, component of the Allowable Sale Quantity for the current plan. *See* Exhibit 90 at 3-4 (2003 SEIS at 2-12, 2-15); Exhibit 14 at 3 (2003 SEIS at 2-10); Plf. Mot. at 22.

[13] Contrary to AFA's assertion, *see* AFA Opp. at 9, the Forest Service would not be required or even allowed to supply the full market demand for timber if that demand were as high as AFA claims. The directive of the Tongass Timber Reform Act (TTRA) to "seek" to supply sufficient

(footnote continued…)

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    30

4.    *AFA has failed to demonstrate that the requested relief will cause any significant harm.*

While AFA argues at great length for an unattainable timber supply, it fails to demonstrate significant harm from the relief requested.  For example, Walt Schrader testifies that he needs "at least" 250 MMBF of affordable timber – five years at 50 MMBF per year – to achieve his goal of purchasing the Wrangell sawmill.  Schrader Decl. at 1-2, ¶¶ 1-3.  However, for the reasons discussed above, there is no scenario under which the Forest Service would be able to produce that volume of "affordable" timber in the foreseeable future, particularly if it is also to provide timber to the existing mills in Craig and Ketchikan.  Thus, the relief requested will not harm Schrader.

Kirk Dahlstrom and Steve Seley both claim that they would like to buy more economic timber sales and expand their sawmill operations to two shifts, but neither asserts that the relief requested would necessarily disrupt their operations.  Dahlstrom asserts that "several" of Viking's sales are in roadless areas, *see* Dahlstrom Decl. at 3 ¶ 6, but this is an exaggeration.  According to the Forest Service, the only sale affected by the requested relief is Lindenberg.[14]  *See* Fed. Ex. 2 at 8 ¶ 16 (Cole Decl.).  The Forest Service plans to offer significant additional volume in FY06 and FY07, *see id.* at 18-19, and the Court has been given no reason why Viking

---

(…footnote continued)

timber is subject to compliance with all applicable laws and with providing for multiple use and sustained yield of all resources.  16 U.S.C. § 539d(a); *see Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 731 (9th Cir. 1995) ("TTRA envisions not an inflexible harvest level, but a balancing of the market, the law, and other uses, including preservation.").

[14]  The Fusion sale includes roadless areas, but the relief requested by Plaintiffs specifically excludes this sale due to a prior settlement agreement.  *See* Plf. Mot. at 26.

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    31

could not replace Lindenberg with other sales scheduled for offer.  Dahlstrom himself does not claim otherwise.

Similarly, the only sale under contract to Pacific Log & Lumber (PLL) that would be affected by the requested relief is Upper Carroll II.  *See id.* at 8 ¶ 16.  Seley asserts in his declaration that "PLL must purchase economic timber sales by early summer of 2006…."  Seley Decl. at 5 ¶ 7.  That has already occurred.  Subsequent to his declaration, PLL was identified as the high bidder for the Madder-Buckdance sale, and the Forest Service considers that volume under contract.[15]  *See* Fed. Ex. 2 at 6 ¶ 13, 7-8 ¶ 16 (Cole Decl.).  Seley does not assert that PLL cannot replace the volume from the Upper Carroll II sale with other sales scheduled for offer.

Although Jackie DuRette asserts that, for her road construction business, "[t]here is no other work for us this field season," DuRette Decl. at 3 ¶ 7, there will be many more opportunities.  As discussed above, the Forest Service has been offering numerous large and small road construction contracts every year.  Less than three weeks ago, for example, the Forest Service published a solicitation for the "Logjam Roads" contract, with an estimated value between $250,000 and $500,000.  *See* Exhibit 96 (Logjam solicitation).  In addition, DuRette Construction would be entitled to damages from the Forest Service from an enjoined road contract.  *See* Exhibit 92 (road contract damages clause).

---

[15] The injunction requested by Plaintiffs would bar the Madder-Buckdance sale, but Plaintiffs will modify their request if the Forest Service and PLL cancel the Orion North contract as provided in an interim settlement agreement.  *See* Plf. Mot. at 26.  The Forest Service asserts that cancellation of Orion North is expected.  Fed. Ex. 2 at 7 (Cole Decl. ¶ 16).  Plaintiffs thus share the Forest Service's assumption that Madder-Buckdance will be available.

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    32

V.    NO LEGITIMATE PUBLIC INTEREST WOULD BE SERVED BY ALLOWING THE
      FOREST SERVICE TO PROCEED NOW WITH RODS AND TIMBER SALES IN
      AREAS WHERE PLAINTIFFS SEEK AN INJUNCTION.

Federal Defendants do not, and could not, substantiate their claim that the proposed

injunction would "impair the ability of the Forest Service to seek to meet demand for timber."

Fed. Opp. at 39.  Plaintiffs' proposal would allow the agency to continue to sell timber at greater

than current levels not merely for the duration of plan reconsideration but permanently.  *See* Plf.

Mot. at 21-22; *see also* Fed. Ex. 2 at 18-19 (Cole Decl.) (FY06 and FY07 timber sale schedules

with volumes over 50 MMBF/year from roaded areas).  It would also allow the Forest Service to

do the environmental documentation and other preparatory work for any timber sale at all, as

long as actual decisions to log in certain sensitive areas were held in abeyance.  The agency's

brief offers no factual basis whatever for a conclusion that demand for Tongass timber has

accelerated – or would do so – so dramatically that it could not be met for the foreseeable future

within these parameters.  Moreover, the congressional directive that Federal Defendants cite

about meeting market demand certainly does not indicate a public interest in roadless area

logging prior to lawful adoption of a forest plan, since it expressly makes the agency's market

demand duties "[s]ubject to … other applicable law" and specifically cites the planning statute

that governs here.  16 U.S.C. § 539d(a); *see NRDC*, 421 F.3d at 801.

Similarly unavailing to the agency is its argument about a "smooth transition between

forest plans."  Fed. Opp. at 40.  In the first place, it is difficult to see how a smooth transition is

disrupted by an injunction that does not interfere with the orderly provision of timber to meet

actual demand levels.  In the second, what is at issue here is not how to move through the normal

forest planning process.  Rather, it is how to put the Forest Service, other interested agencies, and

the public as nearly as possible in the position they should have been in 1997 when a forest plan

Organized Village of Kake, et al. v.
United States Forest Service, et al.

was illegally adopted.  Neither the legislative enactments defendants cite, nor the Ninth Circuit cases, deal with the question of whether the Forest Service ought be allowed to log in precisely those areas it must consider preserving in order to fix an illegal plan.

The Forest Service raises the specter of increased administrative costs from having to redo preparation of individual timber sales.  Fed. Opp. at 41.  Here, it would have its cake and eat it too, since it argues that the Court ignore potentially increased litigation costs to Plaintiffs if the timber sales are allowed to proceed.  *See id.* at 24.[16]  Moreover, Federal Defendants make no showing at all that the costs of timber sale preparation would be significantly increased by having some sales put on hold and some RODs vacated, let alone that any added administrative costs would be so extreme as to defeat relief needed to protect the interests of Plaintiffs and the public.

Finally, the documentation the agency has done of Tongass logging in other contexts does not in any way substitute for the analysis it will be required to complete pursuant to the Ninth Circuit's order here.  The wilderness review the Forest Service performed following this Court's ruling in *Sierra Club v. Rey* considered only the specialized issue of wilderness recommendations to Congress, not the land use allocations at issue here.  The Ninth Circuit rejected the argument that the Wilderness EIS sufficed to correct the error in this case.  *See NRDC v. USFS*, 421 F.3d at 804-05.  Nor did the temporary Tongass exemption from the Roadless Area Conservation Rule address the issues required for the forest plan revision.  To the

---

[16] In point of fact, Plaintiffs argued that requiring lawsuits over additional individual sales, in which they would be automatically entitled to judgment, would "spawn needless litigation" which the Court ought to reject.  Plf. Mot. at 16-17.  The public interest militates against such litigation not because of monetary costs to Plaintiffs but rather owing to the repeated waste of judicial resources.

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                    34

contrary, the exemption was based on the assumption of a valid forest plan for the Tongass, an assumption later held false. *See* 68 Fed. Reg. 75,136, 75,138 (Dec. 30, 2003).

<u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs request that the Court grant the relief requested in their motion for equitable relief.

Respectfully submitted this 12th day of May, 2006,

 /s/ Thomas S. Waldo

Thomas S. Waldo (ABA# 9007047)
Eric P. Jorgensen (ABA# 8904010)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
Ph: 907-586-2751
Fax: 907-463-5891
Email: twaldo@earthjustice.org

Nathaniel S.W. Lawrence
NATURAL RESOURCES DEFENSE COUNCIL
3723 Holiday Drive, SE
Olympia, WA 98501
Ph: 360-534-9900
Fax: 360-534-9909
Email: nlawrence@nrdc.org

*Attorneys for Plaintiffs*

Organized Village of Kake, et al. v.
United States Forest Service, et al.
J04-0029 CV (JKS)                35

**CERTIFICATE OF SERVICE**

I, Thomas S. Waldo, certify that on May 12, 2006, a true and correct copy of PLAINTIFFS'
REPLY IN SUPPORT OF MOTION FOR EQUITABLE RELIEF, with accompanying
documents, was served electronically to Bruce Landon, Steve Silver, and Amy Gurton Mead.


 /s/ Thomas S. Waldo
―――――――――――――――――
Thomas S. Waldo

Organized Village of Kake, et al. v.
U.S. Forest Service, et al.,
J04-0029 CV (JKS)                36

**TABLE OF EXHIBITS**

Ex. No.    Description

83    Alaska Department of Fish and Game, 1990, Harvest and Use of Fish and Wildlife by Residents of Kake, Alaska (ADF&G Kake Subsistent Report) (excerpt)

84    Chicken Creek Map, Eight Fathom Final Environmental Impact Statement, May 1996

85    Letter to U.S. Forest Service from Nevin D. Holmberg, dated 11/19/96 (Holmberg Letter)

86    1997 TLMP Revision Final Environmental Impact Statement (TLMP FEIS) (excerpt)

87    1997 TLMP Revision Record of Decision (TLMP ROD) (excerpt)

88    1997 TLMP Forest Plan, Appendix C (TLMP App. C)

89    2002 Woodpecker Project Area Record of Decision (2002 Woodpecker ROD) (excerpt)

90    2003 Wilderness Final Supplemental Environmental Impact Statement (2003 SEIS) (excerpt)

91    Flynn, et al., 2004, Abundance, Prey Availability and Diets of American Martens: Implications for the Design of Old-Growth Reserves in Southeast Alaska (Flynn 2004) (excerpt)

92    Road Contract Damage Clause, 2005 (excerpt)

93    FY 2004 - 2005 U.S. Forest Service Bid Data (USFS bid data spreadsheet)

94    Brackley, et al., 2006, Timber Products Output and Timber Harvests in Alaska: Projections for 2005-25 (Brackley, et al.)

95    2006 Kuiu Timber Sale Area Draft Environmental Impact Statement (Kuiu DEIS) (excerpt)

96    Logjam Roads Solicitation, 4/20/06 (excerpt)

97    Letter to U.S. Forest Service from Natalie Dawson, May 10, 2006 (Dawson Letter)

98    Public Works Road Chart, 4/27/06

99    Volume Under Contract Chart, 5/11/06

100      Declaration of Bob Christensen

101      Declaration of Lisa Crone